UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| VIRGINIA S. CAUDILL, | ) | |
| | ) | |
| Petitioner, | ) | Civil No. 5: 10-84-DCR |
| | ) | |
| v. | ) | |
| | ) | |
| JANET CONOVER, WARDEN, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Respondent. | ) | |

In 2000, Virginia Caudill and her co-Defendant Jonathan Wayne Goforth were convicted for the 1998 robbery and murder of Lonetta White. Both were sentenced to death. Caudill filed a petition for habeas corpus relief in this Court in 2010, claiming that: (i) she was denied the effective assistance of counsel; (ii) the prosecutor engaged in several acts of misconduct; and (iii) the trial court committed numerous errors, including the improper exclusion of mitigating evidence and giving improper jury instructions. [Record No. 1] As explained fully below, Caudill has not provided any reason to grant the relief sought.

**I.**

The following description of the relevant facts is derived largely from the Supreme Court of Kentucky's opinion in Caudill's direct appeal, *Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky. 2003). At the time of the murders in mid-March, 1998, Caudill had been living with Steve White. On March 13 or 14, the couple argued about Caudill's drug use, and Caudill moved out of his home. When Caudill went to a nearby crack house, she encountered Goforth, a prior acquaintance whom she had not seen in fifteen years. On the afternoon of March 14, Goforth drove Caudill to the home of Lonetta White, Steve White's 73-year-old mother. Once there,

Caudill convinced Lonetta White to give her $20 or $30 to rent a hotel room for a night. But after getting the money, Caudill returned to the crack house and bought cocaine.

Around 3:00 a.m. on March 15, Caudill and Goforth returned to Lonetta White's home. One or both bludgeoned Lonetta White to death. At trial, each blamed the other. Caudill contended that Goforth was the sole or primary active participant in the crimes. She testified that she went to the door and asked White for more money to rent a room while Goforth remained out of sight. Caudill contended that when White turned to get the money, Goforth attacked the elderly woman without warning. When White begged Caudill for help, Goforth allegedly took Caudill to a separate room and tied her hands together. After Goforth killed White, he ransacked the home, and took the jewelry, guns, and a mink coat he found and put them in his truck. Caudill testified that Goforth wrapped White's body in a carpet, and convinced her to carry the body and load it into the trunk of White's car. The pair then drove White's car and Goforth's truck to a vacant field where Goforth doused White's vehicle with gasoline and set it on fire.

Conversely, Goforth contended that the roles were reversed, with Caudill acting as the lead participant in the crimes. He testified that Caudill told White that they were having car trouble, but once inside her home, Caudill demanded more money. When White refused, Caudill hit White in the back of the head with a hammer that she had taken from Goforth's truck. When Caudill continued to beat White with the hammer, Goforth alleged that he walked into the living room, sat on the sofa, and considered what to do next. According to Goforth, it was Caudill who ransacked the home, loaded the goods into his truck, wrapped White's body in a carpet, and convinced him to load the body into the trunk of White's car. The two then drove both vehicles to a vacant field, where Caudill doused White's automobile with gasoline and set it on fire.

When questioned by police on the evening of March 15, Caudill denied any involvement, stating that she had been with Goforth. But before law enforcement could question Goforth, the pair left Fayette County, and later fled the state. The two first moved to Ocala, Florida, and then to Gulfport, Mississippi. Caudill then moved by to New Orleans, Louisiana, where she was arrested six months after the murder. At that time, Caudill admitted she was present when White was killed, but contended that Goforth was the murderer. Goforth was arrested shortly thereafter, and asserted that Caudill and an unidentified African-American male had committed the murder.

During the trial in February 2000, two jailhouse informants testified that Caudill had confessed to her participation in the murder, although each gave inconsistent details of the events. Cynthia Ellis testified that Caudill told her that, when White refused to give her money, Caudill pulled a clock off the wall and struck her twice on the head. Julia Davis testified that Caudill told her that she broke into the victim's home to steal money for drugs, but when White discovered her, Caudill killed her, stole her guns and jewelry, and set fire to her vehicle. Following trial, a jury convicted both Caudill and Goforth of murder, first degree robbery, first degree burglary, second degree arson, and tampering with physical evidence. Each was sentenced to death.

Caudill's conviction and sentence were affirmed on direct appeal, *Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky. 2003) (*Caudill I*), and following state collateral review proceedings, *Caudill v. Commonwealth*, No. 2006-SC-000457-MR, 2009 WL 1110398 (Ky. Oct. 29, 2009) (*Caudill II*). Caudill then sought habeas relief in this Court pursuant to 28 U.S.C. § 2254, asserting eighteen grounds for relief, not including subparts. [Record No. 1]

## II.

Before a federal court may grant relief based upon a claim presented in a federal habeas petition, the petitioner must have presented the claim to the state courts and exhausted all remedies available in the state system. 28 U.S.C. § 2254(b)(1)(A). To "fairly present" a claim to the state courts, the petitioner must have presented the state courts with both the legal and the factual bases supporting the claim. *Hanna v. Ishee*, 694 F.3d 596, 609 (6th Cir. 2012) (*citing Williams v. Taylor*, 529 U.S. 420, 437 (2000)). Fair presentation of a federal constitutional claim requires the petitioner to make the federal basis of the claim explicit to the state court, either by citing federal law or decisions of federal courts. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."); *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999). If a petitioner cites exclusively to state statutes and state court decisions, she may fail to adequately indicate that she was asserting a violation of her federal civil rights. *Baldwin v. Reese*, 541 U.S. 27, 33 (2004) (holding that a petitioner's failure to identify a federal claim or to cite case law which might alert the state court to the federal nature of a claim is not fair presentation); *Gray v. Netherland*, 518 U.S. 152, 163 (1996) ("[I]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court.") If the petitioner has not exhausted a claim, the federal court may nonetheless deny relief if the claim is without merit. 28 U.S.C. § 2254(b)(2).

Exhaustion is an affirmative defense and may be waived if the respondent fails to assert it. *Smith v. Moore*, 415 F. App'x 624, 628 (6th Cir. 2011) ("A respondent failing to raise his procedural default challenge waives it. 'The state may waive a defense,' including procedural

default, 'by not asserting it.'") (*citing Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004)). Additionally, if a petitioner's claim has been exhausted in the state courts, he or she bears the burden of demonstrating any right to federal habeas relief. *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (*quoting Caver v. Straub*, 349 F.3d 340, 351 (6th Cir. 2003)).

When a petitioner presents a claim to state courts but those courts do not address the merits of the claim in any manner, the federal habeas court evaluates the merits of the claim *de novo*. *Van v. Jones*, 475 F.3d 292, 293 (6th Cir. 2007); *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) (*citing Wiggins v. Smith*, 539 U.S. 510, 531 (2003)). *De novo* review is only appropriate if the petitioner affirmatively shows that the state court's decision "did *not* involve a determination of the merits of his claim," such as where the state court denied the claim on procedural grounds. *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 784-85 (2011).

Where the state courts adjudicated the claim presented for federal collateral review, habeas relief is only available if the state court's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). These two provisions collectively require a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal quotation marks omitted). This deference is required even where the state court provides no explanation for its decision. *Harrington*, 131 S. Ct. at 784.

To apply the deference required by § 2254(d)(1) to the state court's legal conclusions, "clearly established law" refers to both bright-line rules and legal principles set forth in the

decisions of the United States Supreme Court, as of the time the state court rendered the pertinent decision. *Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002); *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., opinion of the Court for Part II). Conversely, "clearly established law" does not include *dicta* in Supreme Court decisions. *Id*. Nor does it include holdings from the federal courts of appeal. *Id*. at 381-82.

A state court's decision is "contrary to" Supreme Court precedent if the state court reaches the opposite legal conclusion than the Supreme Court has reached in a prior case, or arrives at a different outcome when the case presents a "set of materially indistinguishable facts." *Williams*, 529 U.S. at 412. A state court's decision constitutes an "unreasonable application" of Supreme Court precedent only if the issue presented is so one-sided that "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents. *Harrington*, 131 S. Ct. 786 ("the state court's ruling on the claim being presented in federal court [must be] so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008). Deference is required "whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Harrington*, 131 S. Ct. at 784.

A state court determination premised on a factual determination is "based on an unreasonable determination of the facts" under § 2254(d)(2) only when it is "objectively unreasonable in light of the evidence presented in the state court-proceeding[.]"). *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003). The state court factual findings underpinning such

determinations are presumed correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1)); *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010).

If there were errors in the state court proceeding, the habeas court must determine if they were "structural defects" or "trial errors." Structural defects, such as the denial of the right to counsel, defy analysis by "harmless error" standards and require reversal of the state-court conviction. *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993). On the other hand, constitutional trial errors must be assessed to determine if the error had a "substantial and injurious effect" in determining the jury's verdict or other case result. *Jensen v. Romanowski*, 590 F.3d 373, 378 (6th Cir. 2009). If the error had little or no effect, then habeas relief should be denied. However, if the habeas court finds itself in "virtual equipoise" regarding whether the error had a substantial influence on the jury's verdict, it should grant the writ. *Id*. (*citing O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)). Finally, the Court notes that federal habeas relief does not lie for errors in the application of state law unless such errors deny the defendant the due process right to a fundamentally fair trial. *Estelle v. McGuire*, 502 U.S. 62, 68-70 (1991); *Brooks v. Anderson*, 292 F. App'x 431, 437 (6th Cir. 2008).

## III.

Caudill's petition contains eighteen distinct claims, not including subparts. To facilitate a clear and orderly discussion of the claims, each sub-claim will be addressed separately and in a slightly different order than the order in which they are presented in the petition.

### A. Claim 15 – Counsel Did Not Provide Ineffective Assistance of Counsel In Moving For Separate Trials.

Two weeks before trial (on February 4, 2000), Caudill's counsel filed a motion for a separate trial from Goforth, noting that because each defendant had accused the other of committing the murder, their defenses were antagonistic. [TR 110-111] However, the pair

proceeded to trial together. The motion was formally denied on March 10, 2000, after the trial had concluded. [TR 245] The Kentucky Supreme Court affirmed that denial on direct appeal, concluding that, notwithstanding the antagonistic defenses, the joint trial was particularly appropriate because Goforth and Caudill were both involved in the same series of events. *Caudill I*, at 651.

At a pretrial hearing held on February 9, 2000, Goforth moved *in limine* to exclude any possible testimony from a number of individuals, including Caudill, which would indicate that he had threatened them. Caudill was present during the hearing, but neither she nor her counsel indicated that Caudill had felt threatened by Goforth's statements regarding his criminal past. [DVD A-3, February 9, 2000, at 8:25-8:27]

During her direct testimony at trial, Caudill stated that, in the days following the murder, Goforth became angry at her for talking to the police and telling them that she had been with him the previous night. Caudill also testified that she first became afraid of Goforth only after the pair had left the state and driven to Ocala, Florida.

> At one point Mr. Goforth had made a statement to me, and he had even, he told me he was going to take me and put me on the railroad tracks. He put me in the car and drove me somewhere there was some railroad tracks. When we got to the railroad tracks, he got out of the car and told me to get out of the car. I got out of the car. I guess you could say I was like stuck, froze you know, I really didn't know what to do. But Mr. Goforth had taken a hit of crack. And then he told me to get back in the car. That's what, I guess that's what Mr. West is really asking, when I got afraid of him, was at that point, that I felt that he was, might highly likely harm me.

[DVD A-7, February 14, 2000, at 16:02:03 - 16:02:50] Caudill later re-affirmed on cross-examination that the point at which she became afraid of Goforth was when he had taken her to the railroad tracks. [DVD A-7, February 14, 2000, at 16:35:20 - 16:35:35 ("Q: And you say that

you were afraid of Mr. Goforth, that you were scared of him?"; "A: At the point when he took me to the railroad tracks, yes I was.")]

But during her RCr 11.42 proceedings, Caudill alleged for the first time that she became afraid of Goforth *before* they left Kentucky, when he told her that he had previously been in prison for armed robbery. In a verified statement accompanying her RCr 11.42 post-conviction motion, Caudill alleged that:

> Before Goforth and I left Kentucky, Goforth told me that he had been in prison previously for armed robbery. I thus believed that Goforth had a long history of violence. This petrified me and made disobeying Goforth's wishes to flee the state with him a difficult task. I feared going against Goforth's wishes.

[TR 488] In her collateral review proceedings, Caudill argued that, had her trial counsel learned of and disclosed this additional basis for fearing Goforth, her motion for a separate trial would have been granted because admitting her testimony regarding it would have been unduly prejudicial to Goforth. Thus, Caudill contended, her counsel's failure to discover it quite possibly changed the outcome of the entire case. [TR 459-60]

The Fayette Circuit Court rejected this claim, finding it incredible that Caudill would not have volunteered this information to her counsel. [TR 779] The trial court further noted Caudill's trial testimony that her fear of Goforth was based upon his conduct *after* they had left Kentucky at the railroad tracks. On appeal, the Kentucky Supreme Court also rejected the claim, concluding that: (1) Caudill's new allegation was contrary to the testimony she gave at trial; (2) it was incredible to conclude that the cause of Caudill's fear of Goforth was that she became aware that he had committed an armed robbery years before when he had just committed a brutal murder only days before the pair fled the state; and (3) the information would not likely have resulted in severance because Caudill's allegation that she feared Goforth was properly

admissible against him. *Caudill II*, at \*4. Caudill reiterates this claim in her habeas petition. [Record No. 1, pp. 105-108]

The Kentucky Supreme Court properly rejected Caudill's claim that her counsel was ineffective regarding this issue. To prevail on a claim that counsel was constitutionally ineffective, a defendant must establish: (1) deficient performance by counsel and (2) resulting prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To establish that her attorney's performance was deficient, the defendant must show that her counsel's actions were objectively unreasonable under prevailing professional norms, and overcome the strong presumption that her attorney's actions fell within the wide range of reasonably sound trial strategies. *Id*. at 668-89; *Railey v. Webb*, 540 F.3d 393, 415 (6th Cir. 2008). To establish that she suffered prejudice as a result, the defendant must show a reasonable probability that the outcome of the trial would have been different absent counsel's unprofessional errors. *Strickland*, 466 U.S. at 694; *Hodges v. Colson*, 727 F.3d 517, 528 (6th Cir. 2013). These standards apply on state review of a conviction, but on federal habeas review the standard is "doubly deferential". "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 788 (2011); *Hodges*, 727 F.3d at 534.

This Court agrees with the Supreme Court of Kentucky that Caudill failed to show either deficient performance or prejudice. Thus, her claim would fail under even a *de novo* standard. And affording that court the deference to which it is due under § 2254(d)(1), her request for federal habeas relief is plainly unavailing.

First, Caudill failed to show that her counsel's performance was deficient. During the trial, Caudill's counsel questioned her about, and she testified regarding, her fear of Goforth. In preparing for trial, either Caudill volunteered information on this topic to her counsel, or he elicited it from her. Whichever transpired, it was incumbent upon Caudill to provide him with all information that could reasonably be considered pertinent to this topic to permit her own attorney to adequately prepare for trial. If, as Caudill contended in her February 11, 2005, affidavit, she was afraid of Goforth before they fled the state because of his revelation regarding his criminal record, it was her obligation to disclose that information to her attorney. No standard of reasonable professional conduct requires defense counsel to make wild guesses regarding each and every conceivable fact or source of further information from his client after it has been made clear to the defendant that the topic is of interest to her attorney as a possibly useful line of defense. It is true, of course, that a defendant is not obligated to provide her counsel with all of the facts necessary for her own defense. *Cf. Vasquez v. Bradshaw*, 345 F. App'x 104, 116 n.2 (6th Cir. 2009) ("While we are sympathetic to the defense attorney who has a client that will not help, we do not believe our cases to support the proposition that a defendant gets only the defense that he is capable of providing personally.") But it is equally true that counsel may reasonably rely upon his client to tell him anything she knows of facts that even a layperson would know supports a line of defense that counsel has already made quite clear he intends to pursue at trial. This is particularly true where, as here, the defendant is the only person who is or could know the fact at issue. The Supreme Court of Kentucky's determination that her counsel's performance was not deficient was not an unreasonable determination of federal law under *Strickland*.

Second, even had Caudill's counsel elicited this information from her, reasonably competent counsel would likely not have presented this testimony in support of the motion for a separate trial because it lacked credibility and was contrary to her other testimony. As the Supreme Court of Kentucky pointed out, it was simply incredible for Caudill to assert that the source of her fear of Goforth was not the brutal murder she allegedly had witnessed him commit, but her newfound awareness that he had been jailed for an armed robbery committed years earlier. *Caudill II*, at *4. While knowledge of the prior felony may have convinced Caudill that Goforth's recent murder was not an isolated act of lawlessness, both the recentness and the severity of Goforth's actions in murdering White rendered the crimes of his distant past matters of trivial significance as indicators of his current dangerousness. Further, offering this testimony in support of the motion to sever would also have contradicted Caudill's own trial testimony that she became afraid of Goforth when he threatened to tie her to railroad tracks well after they had left the state. Accordingly, Caudill failed to demonstrate prejudice resulting from counsel's failure to elicit this information from her because, even had he done so, it is unlikely that reasonably competent counsel would have utilized information destructive to the case.

Finally, Caudill failed to show prejudice from her counsel's allegedly deficient performance. Caudill contends that she was prejudiced because the trial court would have granted her motion to sever had she supported it with evidence that she felt threatened by Goforth, testimony she contends was admissible but which would necessarily have been excluded as unduly prejudicial absent separate trials. [TR 105] However, the trial court permitted Caudill to testify that Goforth had threatened her directly, something it would not have permitted had it felt such testimony unduly prejudicial to Goforth. [DVD A-7, February 14, 2000, at 16:02] Likewise, the Supreme Court of Kentucky found their joint trial was proper

under Kentucky law. *Caudill II*, at \*4. Finally, Caudill offers nothing but her own conclusory assertion that there was a reasonable likelihood that the outcome of the trial would have been different had the circuit court granted her a separate trial. She offers no explanation whatsoever why this is so, nor is an explanation self-evident. The Supreme Court of Kentucky's determination that Caudill failed to show a reasonable likelihood that the outcome would have been different had the information been elicited and presented in support of her motion for a separate trial was not an incorrect or unreasonable application of federal law.

**B. Claim 10 – The Prosecutor Did Not Violate *Brady* By Failing To Disclose The Terms Of Deals With Ellis, Davis, And Holden.**

Caudill contends that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose the terms of its agreements - to either pursue lesser charges, recommend shorter sentences, or provide other inducements to testify - with witnesses Jeanette Holden, Cynthia Ellis, and Julia Davis, for use as impeachment evidence against them. [Record No. 1, pp. 79-80]

On the second day of trial, the prosecution called Jeanette Holden to testify. Holden lived in the house where Caudill had stayed on occasion in the days before the murder, and testified that, shortly before the murder, Caudill had asked her if she was willing to hurt somebody in order to get some money. Holden testified that she declined the offer. [DVD A-6, February 10, 2000, at 16:34-16:39] Holden further testified that a few days later, she saw Caudill carrying a bag of clothing into the house. Shortly thereafter, police came to the house looking for Caudill and drove her away. Holden testified that she then found a pack of cigarettes near a crack pipe Caudill had left on a coffee table, and that the pack had some blood on it and contained jewelry. [DVD A-6, February 10, 2000, at 16:44-16:47]

On cross-examination, Holden admitted that she had been convicted of a felony, and that she wished to be able to tell the parole board in the future that she was a cooperating witness in the case. [DVD A-6, February 10, 2000, at 16:54-16:56] She further testified that she did not get probation or a reduced sentence as a result of her testimony. [DVD A-6, February 10, 2000, at 17:02] Prior to Caudill's trial, Holden was charged with and pled guilty to drug trafficking charges. During Holden's sentencing, defense counsel and the prosecution agreed that "there are some additional charges that are being held by the police department that are not going to brought against [Holden] if she pleads." [DVD Video Exhibit Parts 1-4, January 28, 2000, at 02:54:45-:52]

On the third day of trial, the prosecution called Cynthia Ellis to testify. Ellis was incarcerated in the same unit of the Fayette County Detention Center as Caudill. At trial, Ellis testified that while both were incarcerated, Caudill had confided in Ellis that she had struck White with an object she had pulled from the wall, robbed her, and disposed of the body. [DVD A-6, February 14, 2000, at 11:53-11:58] On cross-examination, Ellis stated that she spoke with Detective Lyons in April 1999 and that charges for theft by deception were still pending at that time. However, Ellis further indicated that she "had already agreed to do a plea bargain." [DVD A-6, February 14, 2000, at 12:01-12:02] Further, Ellis testified that "the detective made it very clear before I ever really gave him any testimony that there were no deals to be made at all", and that Lyons told her that he did not have anything to do with deciding whether she could or would receive any favorable treatment on her charges in exchange for her statements or testimony. [DVD A-6, February 14, 2000, at 12:02-12:03] When Ellis was sentenced on August 16, 1999, the prosecutor told the judge:

> The position we always take in cases is that we do not take a position on probation … However, in this case, I did tell the defense attorney ... as part of the plea bargain, that I would approach and inform the Court that she has been

cooperative with detectives on two different occasions ... no recommendation on our part, we're just informing the Court that she has been cooperating with the Commonwealth ... we would not agree to reduce her charges ...

[DVD Video Exhibit Parts 1-4, August 16, 1999, at 11:09-11:10]

Finally, the prosecution called Julia Davis to testify on third day of trial. Like Ellis, Davis was incarcerated in the Fayette County Detention Center with Caudill. Davis testified that Caudill told her that she had broken into White's home with the intent to steal money, but when White saw her in the hallway, Caudill hit her and then took jewelry and clothes from the house. [DVD A-6, February 14, 2000, at 13:30-13:32] When asked what benefit she had received in exchange for her testimony, Davis indicated that she had received a two-year sentence for her crimes but that she could have received a sentence from five to seven years. [DVD A-6, February 14, 2000, at 13:32-13:33]

Caudill asserted no *Brady* violation on direct appeal, but made a brief argument under *Brady* on appeal from the denial of collateral relief under RCr 11.42. Brief for Appellant Virginia Caudill, *Caudill v. Commonwealth*, No. 2006-SC-000457-MR, 2009 WL 1110398 (Ky. Oct. 29, 2009), at pp. 30-31. The Supreme Court of Kentucky, adhering to its precedent in *Bowling v. Commonwealth*, 80 S.W.3d 405 (Ky. 2002), held that *Brady* imposed no duty to disclose the plea agreements because they are matters of public record (and hence freely available to defense counsel) under Kentucky law. But even more fundamentally, defense counsel was actually aware of the plea agreements and cross-examined the witnesses at length regarding their contents. *Caudill v. Commonwealth*, No. 2006-SC-000457-MR, 2009 WL 1110398, at *9 (Ky. Oct. 29, 2009).

The Supreme Court of Kentucky reasonably and correctly applied federal law regarding this issue. As the Supreme Court explained long ago, *Brady* "arguably applies in three quite

different situations. Each involves the discovery, after trial of information which had been known to the prosecution *but unknown to the defense*." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added). Regardless of the circumstances of a particular case, the fundamental inquiry is whether the omission deprived the defendant of a fair trial. *Id*. at 108. The Supreme Court of Kentucky concluded that no such deprivation occurred here because information regarding any favorable treatment given to the testifying informants was public information available for review by counsel for the defense, and because counsel obtained information regarding the witnesses' interactions with the government and used it as the basis for an extensive attack on their credibility. This ruling was consistent with precedent from the Supreme Court and the Sixth Circuit. *Matthews v. Ishee*, 486 F.3d 883, 890-91 (6th Cir. 2007) (holding that "[w]here, like here, the factual basis for a claim is reasonably available to the petitioner or his counsel from another source, the government is under no duty to supply that information to the defense. In other words, when the information is readily available to the defense from another source, there simply is nothing for the government to 'disclose.'") (internal quotation marks omitted) (*citing Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998)). While Caudill suggests that such a rule constitutes the sort of "defense due diligence" requirement rejected in *Banks v. Dretke*, 540 U.S. 668, 696 (2004), the Sixth Circuit has held otherwise. *SeeBell v. Bell*, 512 F.3d 223, 234 (6th Cir. 2008) (holding that publically available sentencing records are not *Brady* material), and continues to find *Brady* inapplicable to evidence available through public records. *United States v. Tavera*, 719 F.3d 705, 711-12 (6th Cir. 2013). Other circuits follow a similar approach. *Cf. Layton v. Phillips*, 340 F. App'x 687, 689 (2d Cir. 2009); *Parker v. Allen*, 565 F.3d 1258, 1277 (11th Cir. 2009).

In addition, the Supreme Court of Kentucky also concluded that Caudill's factual contentions that the witnesses received certain benefits for their testimony are either refuted by the record or are too *de minimus* to render to their testimony on the subject inaccurate. With respect to Holden, the statement made during her sentencing that certain charges against her would be dropped "if she pleads", clearly referred to her plea agreement in that case, and her agreement to testify against her co-defendant in that proceeding, not her testimony against Caudill. The Supreme Court of Kentucky so held when addressing Caudill's related claim of prosecutorial misconduct. *Caudill II*, at *9. This determination is correct and is not an unreasonable determination of the facts under § 2254(d)(1). In short, because Holden received no consideration for her testimony, there was nothing to disclose under *Brady*.

Next, it is clear that Ellis did not receive any concrete consideration for her testimony in the form of an agreement to reduce charges or to a reduced sentence. *Caudill II*, 2009 WL 1110398, at *8. As part of the plea agreement with Ellis, the prosecution did agree to advise her sentencing judge that she had been cooperating with authorities in two criminal cases. The prosecution did so, while expressly stating that it had not agreed to reduce charges against her, nor would he make a favorable sentencing recommendation. [DVD Video Exhibit Parts 1-4, August 16, 1999, at 11:09-11:10]

It is questionable whether the prosecution's modest agreement to merely recite an undisputed fact (i.e., that Ellis was cooperating with other investigations) is of sufficient impeachment value to Caudill to require disclosure under *Brady*. But assuming it did, Caudill suffered no prejudice as a result. "The prejudice analysis under *Brady* evaluates the materiality of the evidence." *Jefferson v. United States*, 730 F. 3d 537 (6th Cir. 2013). In determining materiality, "[t]he question is not whether the defendant would more likely than not have

received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Here, the fact that this aspect of Ellis's plea agreement was not disclosed does nothing to undermine confidence in the verdict. The jury was already aware that Ellis had been charged with theft by deception, and the modest incentive offered by the prosecution for her testimony (i.e., to simply advise her trial judge that she was cooperating, while emphasizing that he had not agreed to a favorable sentencing recommendation) would have done little if anything to undermine her credibility. Where, as here, "the potentially impeaching evidence was of marginal significance," *Jalowiec v. Bradshaw*, 657 F.3d 293, 313 (6th Cir. 2011), failure to disclose it does not undermine confidence in the verdict, and no *Brady* violation occurred. *See Byrd v. Collins*, 209 F.3d 486, 518 (6th Cir. 2000) ("where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.") (*quoting United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998)); *Akrawi v. Booker*, 572 F.3d 252, 264 (6th Cir. 2009) (holding that when "the jury heard substantial evidence of the potential for a charge-reduction deal," the failure of the prosecution to disclose an informal agreement with a witness did not meet the prejudice prong of the *Brady* analysis); *Jefferson v. United States*, 730 F. 3d 537, 551 (6th Cir. 2013).

Next, Julia Davis readily acknowledged that she had received a two-year sentence instead of a sentence of five to seven years. [DVD A-6, February 14, 2000, at 13:32-13:33] Assuming that the prosecution had an obligation under *Brady* to disclose this fact notwithstanding its ready and public availability, Caudill cannot show prejudice resulting from the failure to disclose the

information.  Davis acknowledged that she had received consideration in the form of a lesser sentence for her cooperation with the prosecution, permitting the jury to consider this evidence for its potential impeachment value.  *Kyles*, 514 U.S. 419 at 434 ("A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'").  Because the jury was ultimately presented with and could consider the impeachment evidence *Brady* requires, the Supreme Court of Kentucky reasonably concluded that the resulting verdict remained one worthy of confidence. *Caudill II*, at *9 ("The point was clearly relayed to the jury that Davis did, in fact, receive a benefit in sentencing due to her cooperation with investigators.").

### C. Claim 6A – The Prosecutor's Statements During Voir Dire Regarding The Juror's Duty To Start With A "Neutral" View Of The Case Until The Evidence Is Presented Was Not Contrary To The Presumption Of Innocence.

At the commencement of trial proceedings on February 7, 2000, a venire of potential jurors was seated.  Before *voir dire* commenced, the trial court briefly explained the presumption of innocence and that the burden of proof rested with the government.  The Court asked if any member of the venire objected to these concepts.  [DVD A-1, February 7, 2000 at 8:55 a.m.]  A number of the potential jurors in the venire indicated that they had heard about the case.  [DVD A-1, February 7, 2000 at 9:08]  The prosecution also explained that it bore the burden of proof, which it had to meet by presenting evidence.  [DVD A-1, February 7, 2000 at 9:11]

On direct appeal and in her petition, Caudill contends that the prosecution engaged in misconduct by making statements during *voir dire* and in closing arguments at the conclusion of the guilt phase that were intended to lessen, in the eyes of the jury, the standard of proof beyond a reasonable doubt.  During the *voir dire*, the prosecutor stated:

> How many of us can drive a car?  Most of us, that's right.  So if you got an automatic transmission in order to go forward you put it in drive or one of those other ones.  If you want to go in reverse you put it in "R."  If you don't want to go

anywhere you leave it in park or put it in neutral. What we're looking for here is ... for people that are sitting in neutral, who will make their decision about whether they put it in drive or reverse based on what they hear from the witness stand.

[DVD A-1, February 7, 2000 at 9:15] Caudill contends that these statements told the jury that they should start the case with no presumption of innocence. [Record No. 1, p. 51]

Caudill argues that this attempt to lessen the burden of proof continued during the prosecution's closing argument. The prosecutor stated:

I'm not going to offer you any definition of reasonable doubt. The law doesn't do that; I'm not permitted to do that. Reasonable doubt means what you may think it means. It means a reasonable doubt. What I can say though is that it doesn't mean that just because there is a question about a case or some unanswered part of a case, that there is automatically reasonable doubt. Mr. Larson and I have been trying cases probably between us for maybe 50 years. And I doubt that either he and I know I have probably never prosecuted a case where we knew the answer to every single question that could be asked about what happened. And there's lots of reasons. Primarily because lots of times, as in this case, the only person that knows the answer to the question is one of the defendants. And we don't have a way to open up their mind necessarily and draw out all the answers. So is there a question about a case? Sure there can be. And I'll say right up front in this case, we don't know and I'm not going to stand up here and try and tell you that we know exactly what happened in Lonetta White's house. We don't know that and we're never going to know it because the only two people, the only two surviving people, that hold the answer to that question are those people right over there.

[DVD A-8, February 16, 2000 at 11:03-11:04] Later during his closing, the prosecutor commented:

What thing did either of them do or show us or demonstrate to us that says they're not guilty of this offense? One of the defense counsels said 'You can't find them guilty for what they did afterwards.' Well that's right. And if I were him, I would've pointed that out too. That's not the point though. Because we can't look into their minds and open them up and take them out and put some instrument in there and tell us what was in their minds, and the only reason, the only way we can ever do that is to look at what they did and how they acted. Because when we look at what they did and what they acted that tells us what their states of mind were. It's not that they're guilty for running to Florida, it's that it's guilty people who run to Florida.

20

[DVD A-8, February 16, 2000 at 11:21-11:22] Caudill contends that, through these statements, the prosecutor intentionally and incorrectly defined reasonable doubt in such a way as to excuse any deficiencies in his proof regarding the elements of the offenses. And she separately argues that giving any definition of "reasonable doubt" violates Kentucky law. [Record No. 1, pp. 51-52, 53]

On direct appeal, the Supreme Court of Kentucky rejected Caudill's contention that these comments were improper or impermissibly shifted the burden of proving her guilt beyond a reasonable doubt. Regarding the prosecution's statements during the *voir dire*, that court held that "[i]nforming prospective jurors during *voir dire* that the court was looking for 'neutral' jurors equated to a desire for 'impartial' jurors and did not dilute the presumption of innocence or shift the burden of proof." *Caudill I*, at 675. As for the prosecution's statements during closing argument, the court concluded:

> The prosecutor's statement that 'just because there is a question or some unanswered part of the case, that there is automatically reasonable doubt' did not impermissibly define "reasonable doubt." *Commonwealth v. Callahan*, Ky., 675 S.W.2d 391, 393 (1984). *Callahan* also contains the disclaimer that "[w]e do not intend by this holding that counsel cannot point out to the jury which evidence, or lack thereof, creates reasonable doubt." *Id*. at 393. In *Sanders v. Commonwealth*, *supra*, we declined to reverse where the prosecutor told the jury that "beyond a reasonable doubt" does not mean "beyond all doubt or a shadow of a doubt." 801 S.W.2d at 671. As in *Sanders*, "we are wholly unconvinced, considering the circumstances, that absent this putative error the [appellants] may not have been found guilty of a capital crime, or the death penalty may not have been imposed." *Id*.
> ...
>
> The prosecutor's guilt phase argument that neither defendant did, showed, or demonstrated anything "that says they're not guilty of this offense" was fair comment on the quality of the evidence for the defense. *Tamme*, 973 S.W.2d at 38; *Bowling*, 873 S.W.2d at 178; *Haynes v. Commonwealth*, Ky., 657 S.W.2d 948, 952-53 (1983).

*Caudill I*, at 675-76.

In her current petition, Caudill reiterates her argument that the prosecution's statements denied her due process of law and require reversal. [Record No. 1, p. 49-50] To warrant federal habeas relief, the prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (holding that to warrant federal habeas review, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned"). A defendant's due process rights are only violated where the prosecutor's statements were both improper and flagrant. Therefore, the Court must determine whether the prosecutor's statements were improper. *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002).

It is improper for a prosecutor to assert the existence of certain facts during closing arguments that were not placed in evidence during trial, *United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1995), or to offer as evidence their own personal opinion on the credibility of a witness, *Byrd v. Collins*, 209 F.3d 486, 537 (6th Cir. 2000). But if the statements were improper, the Court must determine whether they were flagrant, considering "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Macias*, 291 F.3d at 452 (*quoting United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)). Even if a prosecutor's statement is clearly incorrect, either as to a matter of fact or as to a matter of law, to warrant habeas relief it must also be flagrant, such as where it is plainly an intentional misstatement meant to deliberately mislead the jury or the court. *Amos v. Renico*, 683 F.3d 720, 730 (6th Cir. 2012).

The burden to demonstrate a due process violation through a prosecutor's misstatement of the law is especially high. "Obviously, a 'prosecutor should not misstate the law in closing argument.'" *United States v. Moreland*, 622 F.3d 1147, 1162 (9th Cir. 2010). However, even where a prosecutor misstates the law, the jury is presumed to follow the law as embodied in the instructions given by the court, not as stated by counsel. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *United States v. Medina Casteneda*, 511 F.3d 1246, 1250 (9th Cir. 2008). In this case, Caudill has failed to demonstrate that the prosecution's statements, whether considered individually or collectively, were either improper or flagrant.

The statement that jurors should start the case with a "neutral" view of the evidence was not improper. While Caudill contends that telling the jury that it should "start in neutral" invited the jury to disregard the presumption of innocence, when viewed in context, it is plain that the comment was not intended to, and could not have in the eyes of the venire, related to the burden of proof. Before the prosecutor began his comments, in response to a statement from the trial judge, some members of the venire indicated that they had heard about the crime or the upcoming trial. [DVD A-1, February 7, 2000 at 9:08 a.m.] Several had also expressed a reluctance or unwillingness to stand in judgment of the actions of another. Caudill's excerpt of the prosecutor's statements omits his comments immediately following which place them in context. The prosecutor continued by asking: "Anybody not sitting in neutral right now?" When six or seven jurors indicated that they were not "in neutral" about the case, the prosecutor took note of their juror numbers and indicated that at a later time each would be individually questioned about that response. The prosecutor continued:

> One of the real beauties of being able to go through individual questioning is that we can address those issues as we talk to you individually. Now as we go through these questions that we ask they're general questions, later we're gonna ask a little bit more specifically about the publicity as I say. And the possible punishments that this case, that we'll ask you to consider in this case. We'll do that

individually. We're not intending to embarrass any of you or to pry into your personal lives, but we will ask these questions to try to help you determine whether or not you're in neutral, waiting to listen to the evidence.

[DVD A-1, February 7, 2000 at 9:17-9:20] The prosecution's comments about starting in "neutral" were thus squarely directed towards explaining that he was seeking jurors that had not already formed conclusions about the case through pretrial publicity and whose personal beliefs would not preclude them from judging others. Because this was simply an explanation regarding the need for impartiality, the comments were not improper.

Likewise, the prosecution's statements during closing argument were neither objectionable nor improper. During closing, the prosecution stated that a finding of reasonable doubt is not required merely because the prosecution does not provide definitive proof of exactly what transpired during the course of the commission of a crime, and later indicated that subjective elements, such as the defendant's state of mind, may be proved through objective evidence, such as how they acted or what they did. As the Supreme Court of Kentucky correctly concluded, the prosecution did not attempt to "define" reasonable doubt merely by asserting that the absence of conclusive proof regarding every aspect of the defendant's conduct was insufficient, by itself, to establish it. *Commonwealth v. Callahan*, 675 S.W.2d 391, 393 (Ky. 1984).

Even if the prosecution's comments could be considered improper, a petitioner fails to establish a due process violation unless he can also show that the violation was flagrant, rendering the trial fundamentally unfair. *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (noting that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.") (*quoting Smith v. Phillips*, 455 U.S. 209, 219 (1982)); *Sanders v. Commonwealth*, 801 S.W.2d 665, 671 (Ky. 1990) (holding

that, even assuming that prosecutor's statement during voir dire that "beyond a reasonable doubt" does not mean "beyond all doubt or a shadow of a doubt" was an impermissible attempt to define that term, the petitioner failed to show any resulting prejudice).

To determine if the statements were flagrant, the Court considers the four factors identified in *Macias*, *supra*. Here, the only factor favoring a conclusion that the statements were "flagrant" is that they were made deliberately. However, the only statement that could conceivably be considered an improper attempt to define the standard of beyond a reasonable doubt was the prosecution's single-sentence statement during his closing argument that reasonable doubt "doesn't mean that just because there is a question about a case or some unanswered part of a case, that there is automatically reasonable doubt." Because this statement was brief and isolated, the second factor does not support a finding that it was flagrant.

But perhaps the most important factor is whether the prosecutor's comments actually tended to mislead the jury or otherwise prejudice the defendant. Here, the prosecutor made a comment regarding reasonable doubt in his closing argument which Caudill contends is a misstatement of the law. Even if this were accurate, the "misstatement" is highly unlikely to have swayed the jury. The jury would have viewed the statement for what it was: argument. And the statement was followed by lengthy instructions of the trial judge which the jury would have viewed as conclusive on the subject. As the Supreme Court has explained:

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court. This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court.

*Boyde v. California*, 494 U.S. 370, 384-85 (1990). Where, as here, the trial court correctly instructed the jury regarding the government's heavy burden of proof, there is simply no reasonable likelihood that the jury was actually misled by the prosecution's single statement. Thus, there is no basis to conclude that the alleged "misstatement" was flagrant. Accordingly, no due process violation occurred, and the Supreme Court of Kentucky's conclusion regarding this issue was not contrary to or an unreasonable application of federal law. *Cf. Hansen v. Woodford*, 229 F. App'x 608, 609 (9th Cir. 2007) (prosecutor's misstatement of the law during closing argument did not deprive petitioner of due process when trial court correctly instructed jury on the law).

**D. Claim 1 – The Trial Court Did Not Violate *Batson* By Accepting The Prosecution's Facially Neutral Explanation For Using 8 Out Of 9 Peremptory Challenges To Strike Caucasian Males Without Further Investigation And Without Making A Clear Finding That The Proffered Grounds Were Not A Pretext For Impermissible Discrimination.**

Caudill contends that during pretrial proceedings the trial court violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by failing to conduct a more thorough examination into the prosecution's stated reasons for exercising eight of its nine peremptory strikes on male Caucasian jurors and by failing to make an express finding regarding discrimination. [Record No. 1, pp. 17-26] The facts, however, do not support this contention.

Prior to trial, the trial court first sustained two joint peremptory strikes by Caudill and Goforth of jurors #931 and #780. The defendants asserted that these jurors had indicated some predisposition in favor of the imposition of the death penalty during *voir dire*. [DVD A-4, February 9, 2000, at 9:11-9:12] Caudill's counsel next objected to the prosecution's striking of eight of the nine men from the jury panel because "it shows a clear bias against men in this case, possibly because there is a woman on trial here ..." When the prosecution queried, "[a]re you

saying men are a protected class? Is that what you're saying?", Caudill's counsel responded "yes." When the trial judge asked "white men?" Caudill's counsel responded "well, I don't know if they're whi... " but his voice trailed off. Counsel did not clarify whether the race of the men constituted part of the objection, and indeed appeared entirely unaware of the race of the jurors in question at the time the objection was made. [DVD A-4, February 9, 2000, at 9:12-9:13]

While the trial court clearly had some doubt about the viability of Caudill's *Batson* challenge regarding striking male jurors, it permitted the prosecution to explain its reasons for the challenges. The prosecution indicated that it had struck:

- Robert Feezor [Juror #949] because he indicated that only in extreme circumstances could he impose the death penalty and that he does not believe in it.

- Nicholas Edwards [Juror #776] because the prosecution did not think Edwards "understood what was going on" and because he only had a grade school education.

- Shannon Patterson [Juror #891] because he provided a different last name, Pennington, on one of his juror documents, had relatives in prison, and expressed hesitation about imposing the death penalty.

- James Franke [Juror #831] because appeared "uncomfortable" imposing the death penalty, and because "we thought he appeared a little ... strange."

- Robert Biene [Juror #879] because he appeared to have an unfavorable attitude towards the police and the judicial system based upon his prior experiences.

- Robert Keston [Juror #723] because he had a close familiarity with Caudill's attorney and expressed a hostility towards the death penalty.

- Gary Lloyd [Juror #735] because he indicated that only in extreme circumstances could he impose the death penalty and spoke about Illinois's moratorium on executions.

- William Case [Juror #825] because he suggested that the evidence could not be certain enough to warrant the imposition of the death penalty.

27

[DVD A-4, February 9, 2000, at 9:13-9:17]  Without waiting for or soliciting a response from the defense, the trial court determined that, assuming the male jurors were members of a protected class, the prosecution had articulated a nondiscriminatory reason for striking them.  Counsel for the defendants did not object to the substance of that ruling and did not request an opportunity to probe the validity of the prosecution's stated reasons for striking the jurors.  [DVD A-4, February 9, 2000, at 9:17]

On direct appeal, Caudill's brief did not appear to challenge the merits of the trial court's *Batson* ruling.  Rather, she contended that the trial court short-circuited the three-step analysis required by *Batson* because of its purportedly misplaced focus on whether white males constituted a "protected class," resulting in its failure to provide a thorough and adequate explanation for its holding that the prosecution's strikes were not the product of impermissible discrimination.  As a result, Caudill contended, "the court in this case made no findings at all." Brief for Appellant, *Caudill v. Commonwealth*, 120 S.W.3d 635, 657 (Ky. 2003), 2001 WL 34546226, at *104-106.  Arguably, Caudill's *Batson* objection on direct appeal was procedural rather than substantive.  *Id*. at 107 ("the court required no elaboration from the prosecutor, did not compare the reasons stated with the voir dire of the stricken jurors, did not compare the answers of the stricken jurors with those who were not, and allowed nothing further from the defense on this matter.").

In rejecting Caudill's *Batson* argument, the Supreme Court of Kentucky noted that the prosecution did not stand on its apparent objection at trial to Caudill's challenge on the ground that it was not predicated upon discrimination against a protected class, and the trial court assumed that *Batson* was implicated and directed the prosecution to provide justifications for its

peremptory strikes. The court then concluded that the trial court's factual determination that the prosecution's facially-neutral explanations for its peremptory strikes were non-discriminatory was not clearly erroneous. *Caudill v. Commonwealth*, 120 S.W.3d 635, 657 (Ky. 2003). The court did not expressly address Caudill's objection that the trial court did not conduct a more extensive inquiry before reaching its decision. If Caudill believed that the Supreme Court of Kentucky had misapprehended the nature of her argument, she did not raise that concern in her petition for rehearing. Petition for Rehearing for Appellant Virginia Caudill, *Caudill v. Commonwealth*, 120 S.W.3d 635, 657 (Ky. 2003), No. 2000-SC-296 (July 21, 2003).

In her current petition, Caudill again makes clear that her claim is that the trial court committed *Batson* error, not because its substantive finding of nondiscriminatory intent was clearly erroneous, but that it committed a procedural error by not conducting a proper third stage analysis of her *Batson* objection. [*Cf.* Record No. 1, p. 21 ("Although a court's finding of the lack of discriminatory intent is entitled to be reviewed under a "clearly erroneous" standard, *Hernandez*, *supra*; the trial court in this case made no findings at all.")] Caudill did not challenge the trial court's substantive factual determination that no *Batson* violation occurred on her direct appeal to the Supreme Court of Kentucky. Likewise, she does not challenge that determination in her present petition. Instead, Caudill continues to contend that the trial court erred by failing to conduct a proper third step *Batson* analysis.

As a threshold matter, the Court must determine whether the Supreme Court of Kentucky's denial of Caudill's *Batson* claim is entitled to the deference afforded by § 2254(d)(1). Here, there is no question that the court denied Caudill's *Batson* claim on the merits. However, its opinion does not expressly address her argument that the trial court's *Batson* analysis was procedurally flawed. Nonetheless, the Supreme Court has indicated that

29

§ 2254(d)(1) deference is appropriate in such situations. "There is no merit either in [the petitioner's] argument that § 2254(d) is inapplicable because the [state's highest court] did not say it was adjudicating his claim "on the merits." The state court did not say it was denying the claim for any other reason. When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 784-85 (2011) (*citing Harris v. Reed*, 489 U.S. 255, 265 (1989)). Here, the Kentucky Supreme Court unequivocally denied Caudill's *Batson* claim on the merits, finding that the trial court's factual determination that no *Batson* violation occurred was not clearly erroneous. While Caudill's brief was directed at the process used to reach that determination, the fact that the Kentucky Supreme Court implicitly rejected that argument *sub silentio* rather than expressly does not eliminate the deference required by § 2254(d). *Ballinger v. Prelesnik*, 709 F. 3d 558, 561-62 (6th Cir. 2013).

Nonetheless, Caudill's *Batson* claim would fail even under *de novo* review. The question of whether the prosecutions' striking white males from the jury panel violated *Batson* is wholly a red herring, because neither the trial court nor the Supreme Court of Kentucky denied Caudill's petition on that ground.[1] The trial court *assumed* the applicability of *Batson* to Caudill's

---

[1]  Even if the Supreme Court of Kentucky had held that white males were not a protected class that implicated *Batson* scrutiny, Caudill could not establish that such a determination was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court under § 2254(d)(1). While Caudill's trial objection was clearly directed only at the gender of the jurors struck, the trial court construed her challenge as one involving both gender and race. The Sixth Circuit has concluded that "*Batson* applies to peremptory challenges based on race or gender. And it applies to peremptory challenges by the government and by criminal defendants." *United States v. Kimbrel*, 532 F.3d 461, 466 (6th Cir. 2008) (citations omitted). However, the Supreme Court has held only that gender is an impermissible basis for exercising peremptory strikes in a civil trial. *J.E.B. v. Alabama*, 511 U.S. 127, 129 (1994). It

challenge and directed the prosecution to provide nondiscriminatory reasons for its peremptory strikes as required by *Batson*. [DVD A-4, February 9, 2000, at 9:13 a.m.] The Supreme Court of Kentucky noted that, while the United States Supreme Court had not decided the question, several federal appellate courts have concluded that *Batson* precludes the exercise of race-based peremptory strikes against Caucasians. *Caudill v. Commonwealth*, 120 S.W.3d 635, 657 (Ky. 2003).

The thrust of Caudill's argument is that *Batson* requires a trial court to make express findings on the record regarding whether the prosecution's facially-neutral reasons given for the peremptory strikes are genuine or are merely a pretext for intentional discrimination. [Record No. 1, pp. 19-20] When a party asserts a *Batson* challenge, the trial court undertakes a three-step burden-shifting analysis. First, the defendant must establish a *prima facie* case of discrimination by showing that the prosecution struck jurors of an identifiable group under circumstances which support an inference of discriminatory motive. *Batson*, 476 U.S. at 96-97; *United States v. Watford*, 468 F.3d 891, 911-12 (6th Cir. 2006). Second, if that showing is made, the burden shifts to the prosecution to provide a nondiscriminatory reason for the strikes, which is acceptable even if the explanation is not persuasive or even plausible. *Rice v. Collins*, 546 U.S. 333, 338 (2006). Third, once the prosecution provides a nondiscriminatory reason for the strikes, the trial court decides whether the objecting party has carried its burden of demonstrating that the totality of the circumstances prove by a preponderance of the evidence that the prosecution purposefully discriminated in striking the juror. *Hernandez v. New York*, 500 U.S. 352, 363-64 (1991).

---

has not expressly held that *Batson* applies to gender-based peremptory strikes in criminal trials. *United States v. Martinez*, 621 F.3d 101, 106-107 (2d Cir. 2010).

Caudill contends that, at the third step of the inquiry, the trial court must "conduct an inquiry" into discriminatory intent and must "explicitly adjudicate the credibility of the neutral explanations given." [Record No. 1, pp. 19, 20] However, the authority Caudill cites for these propositions do not support her position. In *Purkett v. Elem*, 514 U.S. 765 (1995), the Supreme Court held only that at the third stage of the analysis "the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Id*. at 768. In *Barnes v. Anderson*, 202 F.3d 150 (2d Cir. 1999), the Second Circuit held only that the trial court must decide whether the prosecution's explanations for its strikes are credible as part of its decision on the ultimate question regarding whether the defendant has carried his burden of persuasion to prove intentional discrimination. Nothing in that decision suggests that the trial court is constitutionally required to reach its decision in any particular way, or to state any conclusion other than whether the prosecution's strikes were or were not race-neutral. *Id*. at 156 (*citing United States v. Alvarado*, 923 F. 3d 253, 256 (2d Cir. 1991)).

Caudill places heavy reliance upon *United States v. Hill*, 146 F.3d 337 (6th Cir. 1998). There, the Sixth Circuit concluded that the trial court's failure to articulate its reasons for denying a *Batson* challenge on the record prevented it from reviewing the district court's factual determination that no discrimination occurred under a clearly erroneous standard. *Id*. at 342 ("Without a fuller indication of the circumstances that apparently led the district court to this conclusion, however, we cannot properly review the decision"). *See also United States v. Torres-Ramos*, 536 F.3d 542, 559 (6th Cir. 2008) ("the trial judge cannot simply accept the prosecution's explanation on its face," and "has a duty to conduct a hearing to determine if the defendant has established purposeful discrimination.") (internal quotation marks omitted). But *Hill* and *Torres-Ramos* involved direct appeal from federal convictions rather than a petition for

habeas relief.  Likewise, these decisions were predicated upon authority from the Sixth Circuit rather than the Supreme Court.  Caudill does refer to habeas decisions from other federal circuits which indicate that a trial court may violate *Batson* by reaching its decision too quickly or by failing to articulate its reasoning.  *Jordan v. Lefevre*, 206 F.3d 196 (2d Cir. 2000).  But the Second Circuit later retreated from *Jordan*, noting that while "the [trial] court made clear its reasoning for [its *Batson*] decision ... we are aware of no controlling Supreme Court precedent that required it to do so."  *McKinney v. Artuz*, 326 F.3d 87, 99 (2d Cir. 2003).  Noting that the federal district court, in granting habeas relief, had relied upon decisions like *Jordan* by federal appeals courts, the Second Circuit noted that "a state court's failure to abide by the decisions of a federal court of appeals does not alone provide a sufficient basis for granting habeas relief from a state conviction under section 2254."  *Id*. at 102 n.17; *see also id.* at 103 ("the district court cites only Second Circuit precedent for the idea that rushing the *Batson* inquiry may be impermissible under the *Batson* line of cases, and we are aware of no Supreme Court decision to that effect."); *Isaac v. Brown*, 205 F. App'x 873, 877 (2d Cir. 2006).

The Supreme Court has only held that *Batson* requires the trial court to make a factual finding regarding whether the prosecution exercised a peremptory strike with discriminatory intent.  *Hernandez*, 500 U.S. at 359.  Nothing in its precedent requires the trial court to either conduct a hearing or to make specific findings on the record, and it has upheld a trial court's denial of a *Batson* challenge where its precise grounds for doing so was not entirely clear from the record.  For example, in *Hernandez*, the Court noted that the trial court's determination of the prosecutor's intent relies heavily upon the trial judge's personal observation of the prosecutor's demeanor, *id*. at 365 ("the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge"), an assessment that is impossible to review upon a

documentary record on appeal. *Id.* at 369. When defense counsel continued to object, the Supreme Court could only state that "[t]he trial judge *appears* to have accepted the prosecutor's reasoning as to his motivation" based upon the trial judge's two short statements reiterating and accepting the proffered explanation as reasonable. *Id.* at 357 n.2 (emphasis added). This precedent indicates that the third step of the *Batson* analysis only requires the trial court to decide the determinative question of discriminatory intent, *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008), it does not require a further or more involved process to reach it or explain it.

While a number of appellate courts have urged trial courts to make express findings in the record at the third step of the analysis to facilitate appellate review, noting the "salutary effects" of such an approach, none has suggested that the Supreme Court's *Batson* jurisprudence requires such detailed findings. *Cf. U.S. Xpress Enterprises, Inc. v. J.B. Hunt Transport, Inc.*, 320 F. 3d 809, 814 (8th Cir. 2003). A trial court's finding that no intentional discrimination occurred in exercising a peremptory strike may just as easily be implicit in the trial court's ruling. *Stevens v. Epps*, 618 F.3d 489, 499-500 (5th Cir. 2010)). For example, in *United States v. Perez*, 35 F.3d 632 (1st Cir. 1994), when the defense did not challenge the explanation offered by the prosecution in response to a *Batson* challenge, the trial court stated simply "I understand," and moved on. While noting that it would preferable for "a district court [to] state whether it finds the proffered reason for a challenged strike to be facially race neutral or inherently discriminatory and why it chooses to credit or discredit the given explanation ...," the First Circuit found that the trial judge's actions evidenced his implicit rejection of the *Batson* challenge and found it sufficient under the circumstances. *Id.* at 636. This is particularly true where, as happened in Caudill's case, after the prosecution has offered a neutral explanation for its strikes, defense counsel remained silent and made no effort to challenge the authenticity of

those explanations.  As the First Circuit explained, "if defense counsel felt that the trial court had failed to actually assess the prosecutor's credibility or had made a precipitous or erroneous judgment, it should have pointed this out.... The prosecutor then could have elaborated his reasons and the court presumably would have expressly made the above two findings. Since defendant failed to pursue the matter further at *voir dire*, upsetting the judgment for lack of a more detailed explanation by the trial court in this case would make little sense." *Perez*, 35 F. 3d at 637; *see also United States v. Pulgarin*, 955 F.2d 1, 1 (1st Cir. 1992) ("[t]here was no further comment from defense counsel by way of elaboration of his thought, objection, dissatisfaction with the prosecutor's explanation, or request for examination.")

The Court therefore concludes that neither: (i) the fact that the trial court did not expressly state what facts it relied upon to determine that the prosecution's peremptory strikes were not exercised in a discriminatory fashion, nor (ii) its failure to *sua sponte* elicit further response from defense counsel in the face of his silence after the prosecution offered its explanation, was contrary to the three-stage analysis required to analyze *Batson* claims under Supreme Court precedent clearly established at the time of Caudill's appeal to the Kentucky Supreme Court. *Miller-El v. Cockrell*, 537 U.S. 322, 347 (2003) ("a state court need not make detailed findings addressing all the evidence before it" to render a proper *Batson* ruling); *Messiah v. Duncan*, 435 F.3d 186, 198 (2d Cir. 2006) ("unambiguous rejection of a *Batson* challenge will demonstrate with sufficient clarity that a trial court deems the movant to have failed to carry his burden to show that the prosecutor's proffered race-neutral explanation is pretextual.... The trial court is not compelled to make intricate factual findings in connection with its ruling in order to comply with *Batson*."); *Smulls v. Roper*, 535 F.3d 853, 860-61 (8th Cir.

2008); *Figueroa v. Ercole*, No. 09Civ7225(PGG), 2013 WL 3655903, at *15 (S.D.N.Y. July 15, 2013).

> ### E. Claim 8 – The Prosecutor Did Not Engaged In Misconduct By Failing To Correct False Statements By Informants Cynthia Ellis, Julia Davis And Jeanette Holden, To The Effect That They Did Not Receive Any Benefit From Their Testimony.

During the trial, the prosecution called Jeannette Holden, Cynthia Ellis, and Julia Davis to testify. As previously noted, at some point before Caudill's trial, each of these witnesses faced their own criminal charges. In her petition, Caudill contends that: (i) each witness received some benefit in the cases in exchange for testimony against Caudill; (ii) each falsely testified that she did not receive a benefit or misrepresented the benefit received; and (iii) the prosecution engaged in misconduct by knowingly presenting, or failing to correct, such testimony. [Record No. 1, pp. 66-77][2]

In *Napue v. Illinois*, 360 U.S. 264 (1959), the Supreme Court held that if "the State, although not soliciting false evidence, allows it to go uncorrected[,]" the State's inaction implicates the due process clause of the Fourteenth Amendment. *Id.* at 269. However, the defendant is denied due process and a new trial is warranted only if the omission is material,

---

[2]     The Respondent contends in a single paragraph that this claim is procedurally defaulted because Caudill should have asserted it on direct appeal but did not do so until her RCr 11.42 proceedings. [Record No. 9, p. 59] Respondent offers no argument in support. This appears to be an attempt to incorporate an argument made in its brief on appeal during the collateral review proceedings, where the Commonwealth argued that "RCr 11.42 cannot be used ... to raise issues that could have been presented on direct appeal." Brief for Appellee, *Caudill v. Commonwealth*, No. 2006-SC-000457-MR, 2009 WL 1110398 (Ky. Oct. 22, 2007), at pp. 17, 24 (*citing Baze v. Commonwealth*, 23 S.W.3d 619, 624 (Ky. 2000)). But the nature of claims cognizable under RCr 11.42 for purposes of defining the scope of state collateral review in Kentucky and the requirements of exhaustion and the related doctrine of procedural default for purposes of federal habeas review are entirely distinct. More fundamentally, the Kentucky Supreme Court decided this claim on the merits, *Caudill II*, at *7-9, rendering it exhausted. Thus, the Respondent's argument is without merit.

such that "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury ..." *Id.* at 271; *Giglio v. United States*, 405 U.S. 150, 154 (1972). *Compare United States v. Bagley*, 473 U.S. 667, 682 (1985) (holding that regardless of whether the defendant makes a *Brady* request for evidence favorable to him or her, if the prosecution fails to disclose it, the evidence is "material" if the failure to disclose it to the defense would undermine confidence in the outcome).

With respect to Jeannette Holden, the Court has already concluded in its discussion of Caudill's *Brady* claims that Holden's testimony that she did not get probation or a reduced sentence as a result of her testimony was neither false nor misleading. The Supreme Court of Kentucky held - and this Court agrees - that Caudill's evidence indicates that the prosecution in Holden's case agreed to drop certain charges against her in exchange for her guilty plea and her agreement to cooperate against her co-defendant *in that case*, not in Caudill's case. *Caudill II*, 2009 WL 1110398, at *9 ("Holden received a reduction in sentence in exchange for her testimony against her co-defendant, not Caudill."); Section B, *supra*. Because Holden's testimony that she received no deal or benefit for her testimony was neither false nor misleading, the prosecution did not engage in any misconduct by failing to "correct" it. *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995).

Likewise, Caudill failed to demonstrate that Ellis's testimony was perjured or incorrect. Ellis testified that she "had already agreed to do a plea bargain" before she spoke with Detective Lyons, and that she did not receive a "deal" in exchange for her testimony because Lyons "made it very clear ... that there were no deals to be made at all." First, Caudill contends that Ellis could not have executed a plea agreement before she spoke with Detective Lyons on April 6, 1999, because she was not indicted until April 27, 1999. [Record No. 1, p. 67] However, Ellis did not

testify that she had already signed and executed a written plea agreement by April 6, 1999, only that by that point in time she had agreed to do so. Ellis's actual testimony does not support the inference Caudill attempts to impose upon it. Further, Ellis is not a trained attorney, and likely may not have drawn a meaningful distinction in her mind between discussing a possible plea with her attorney and agreeing to the proposed terms and the finalizing step of executing a written and binding agreement. As the Supreme Court of Kentucky correctly noted, Ellis "did not testify that the details of the plea agreement had already been reached, contrary to Caudill's assertions." *Caudill II*, at *8.

Second, Ellis's testimony to the effect that she did not receive a "deal" or leniency on her sentence was accurate. During the sentencing hearing in Ellis's case, the prosecutor stated that, as part of Ellis's plea agreement, the prosecution agreed to "inform[] the Court that she has been cooperating with the Commonwealth" but that the prosecution "would not agree to reduce her charges ..." The Supreme Court of Kentucky found that the benefit that Ellis did receive, a mention from the prosecution that Ellis had cooperated in two cases, was simply too *de minimus* to render her testimony either inaccurate or misleading, *Caudill II*, at *8, let alone actually false.[3]

---

[3] *Napue* holds that the due process clause is implicated by the prosecution's knowing presenting false evidence. 360 U.S. at 269. Here, Ellis was not questioned about, nor did she give any testimony about, the terms of the plea agreement reached in her case generally, or specifically about the proviso that the prosecution advise the court regarding her cooperation. Therefore, Caudill cannot claim that Ellis's testimony was actually false, but only that her failure to volunteer additional information about the specifics of her plea rendered her testimony incomplete or misleading. It is questionable whether *Napue* imposes an obligation upon the prosecution to act in the face of testimony that is accurate, but only arguably incomplete, or whether it applies to testimony that is not false. *Abdus-Samad v. Bell*, 420 F.3d 614, 625-26 (6th Cir. 2005) (holding that prosecution did not procure false testimony in violation of *Giglio* where witness merely failed to offer additional testimony); *see also Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (holding that the testimony must be "actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.") (citations omitted); *Akrawi v. Booker*, 572 F.3d 252, 265 (6th Cir. 2009) ("The subject statement must be 'indisputably false' rather than 'merely misleading.'") (citations omitted). In light of the Court's

The Court agrees with both of these conclusions. Caudill presents a view of the evidence that is both selective and skewed. But when viewed in a reasonable light, she has failed to demonstrate that Ellis's testimony was false or misleading or that the prosecution refused to correct testimony from her that it knew to be false. *Cf. Hovey v. Ayers*, 458 F.3d 892, 916-17 (9th Cir. 2006) (holding that *Brady* and *Napue* require disclosure of agreements for favorable treatment in exchange for testimony, whether those agreements are express or implied, but "in the absence of a promise or deal of lenient treatment in exchange for a witness's testimony, a witness's subjective belief that he might receive lenient treatment in exchange for testifying does not render perjurious his testimony that he received no promises that he would benefit from testifying.")

Even assuming that Ellis's failure to volunteer that the prosecution in her case had agreed to mention her cooperation as part of her plea agreement had the effect of rendering her testimony actually false to implicate *Napue*, it is plain that the omission was not material. In determining materiality, the touchstone is whether the testimony "in any reasonable likelihood [would] have affected the judgment of the jury." *Woods v. Booker*, 450 F. App'x 480, 485 (6th Cir. 2011) (*citing Giglio*, 405 U.S. at 154). Here, there is no reason to conclude that the jury would have made a fundamentally different assessment of Ellis's testimony had it known of this fact, let alone reached a different judgment of Caudill's guilt, innocence, or culpability. While the prosecution's agreement to advise Ellis's sentencing judge that she was cooperating in other cases surely means that Ellis received something for her testimony rather than nothing at all, that minimal consideration would have made little or no difference in the minds of the jury. The

disposition of this claim, the Court will assume that *Napue* may apply in the circumstances as Caudill suggests.

reason that a prosecutor's agreement to give a favorable witness leniency in their own case must be disclosed to the defense is for its impeachment value, to raise before the jury the potential that the witness might either exaggerate or fabricate testimony in exchange for receiving a lesser punishment themselves. Here, Ellis's own counsel could have advised her sentencing judge that Ellis was cooperating in Caudill's case, and there is no reasonable likelihood that a jury would have believed that Ellis fabricated her testimony so that the same words could be spoken by the prosecutor instead. Further, even if the jury had given less credence to Ellis's testimony, the prosecution presented ample other evidence of Caudill's participation in and culpability for the crimes. Because there is no reasonable likelihood that evidence of this benefit in Ellis's plea agreement would have affected the judgment of the jury, Caudill's due process rights were not violated. *United States v. Agurs*, 427 U.S. 97, 103-04 (1976).

Finally, Caudill fails to demonstrate any claim under *Napue* or *Giglio* regarding the testimony of Julia Davis. Caudill contends that Davis lied regarding the maximum sentence she could have received absent her cooperation and about the sentence that her co-defendant could have received. [Record No. 1, pp. 70-71] Davis testified that, in exchange for her testimony against Caudill, she received a two-year sentence, when she was facing a sentence of five to seven years. On appeal to the Supreme Court of Kentucky from the denial of relief under RCr 11.42, Caudill contended that this was false, and that Davis was in fact facing a maximum of twenty-five years in prison. As a threshold matter, while Caudill submitted a copy of the indictment against Davis showing the charges she faced and the judgment entered against her [TR 544-554], she placed nothing into evidence to support her claim that Davis faced a twenty-five year prison term for her crimes. The unsupported assertion by Caudill's attorney that Davis

faced a longer jail term is not evidence at all, let alone evidence sufficient to demonstrate that Davis's testimony was false.

In addition, Caudill has acknowledged, as she did before the Supreme Court of Kentucky, that "[i]t may be that Davis was initially offered a five to seven year sentence." [Record No. 1, p. 70] As the Court noted with respect to Ellis, non-attorneys like Davis cannot be expected to understand technical legal matters or to testify with the same correctness and precision as might be expected from lawyers. Her testimony was likely not an attempt to explain the theoretical maximum she could receive under Kentucky statutes, or even the sentence she was, as a practical matter, likely facing in light of her criminal history and the circumstances unique to her case. Rather, it is likely that Davis was simply relaying what she was told by her own attorney regarding the sentence she would probably receive in her own case. The Supreme Court of Kentucky accordingly found that Davis's testimony was not perjured, as "[i]t cannot be deemed perjury that Davis, a non-lawyer, was unaware of the maximum possible sentence under law." *Caudill II*, at *8.

The Supreme Court of Kentucky further found that any incorrectness in Davis's testimony was not material because "[t]he point was clearly relayed to the jury that Davis did, in fact, receive a benefit in sentencing due to her cooperation with investigators." The Court concludes that these determinations by the Supreme Court of Kentucky are neither contrary to nor unreasonable determinations of federal law. Notably, the prosecution itself elicited testimony from Davis which made clear that she was receiving considerable leniency on her own sentence as part of her agreement to testify against Caudill. Caudill, therefore, has failed to demonstrate that Davis's testimony was perjured or that any inaccuracy was material to the outcome of her case. *Cf. Akrawi*, 572 F.3d at 264 (noting that where jury heard evidence of

charge-reduction deal, prosecution's failure to disclose additional information contrary to *Brady* would have added only incremental impeachment value, and hence was not prejudicial).

Davis also testified that she and her co-defendant were "charged with the same thing." Caudill contends this statement is false because Davis was facing more individual counts than her co-defendant. [Record No. 1, p. 71] However, Davis and her co-defendant were both charged for their participation in a joint enterprise to obtain medicine from pharmacies through forged prescriptions, and both were charged with offenses relating to the possession of and trafficking in controlled substances. [TR 544-547] As noted above, Davis is not an attorney, and her testimony - while technically incorrect - was likely the product of her own imprecise understanding of the nature of the charges against her rather than an intentional desire to lie. Nor has Caudill suggested any reason Davis would have for making a false statement about the charges her co-defendant faced, as such a false statement would in no way make Davis's own testimony any more or less credible. The Kentucky Supreme Court's determination that Caudill had failed to show that Davis's testimony was actually perjured, *Caudill II*, at *8, is not an unreasonable determination of federal law. *Cf. Rosencrantz v. Lafler*, 568 F.3d 577, 585 (6th Cir. 2009). In addition, although Davis's statement that she and her co-defendant were "charged with the same thing" might be technically incorrect, it is not a material misstatement under *Napue* because, in light of its singularly tangential nature to the credibility of Davis's testimony against Caudill and its minimal impact in relation to the body of evidence presented against Caudill, there is no reasonable likelihood that it affected the jury's decision regarding the outcome. *Giglio*, 405 U.S. at 154.

Finally, Caudill contends that all of Julia Davis's testimony was entirely fabricated, and that the prosecution presented it knowing it was fabricated. [Record No 1, p. 71] The source of

this claim is an affidavit signed by a Holly Turner in November 2004.  In her affidavit, Turner

claimed that, while incarcerated at the Fayette County Detention Center with Davis, she

overheard a conversation between Davis and an unknown inmate in which Davis allegedly stated

that she had told detective Lyons that Caudill had never made a statement to her, but that Lyons

instructed her to testify that Caudill had in fact done so.  Turner stated that Davis had agreed to

provide this perjured testimony because Lyons had given her a Coke.  Turner also stated that

Davis had "a reputation for telling on people to get herself out of trouble."  [TR 556-557][4]

Caudill presented this argument on appeal from the denial of relief under RCr 11.42.  However,

the Supreme Court of Kentucky found no prosecutorial misconduct regarding Davis's testimony

without addressing Turner's affidavit directly.

The Court must determine whether the Kentucky Supreme Court's rejection of Caudill's

*Napue* claim in light of this evidence constitutes an unreasonable application of federal law.

*Harrington*, 131 S. Ct. at 784-85.  The Court concludes that the Kentucky Supreme Court did not

make an unreasonable determination when it implicitly concluded that Turner's affidavit was

insufficient to prove that Davis's testimony was perjured.  As a threshold matter, Turner's

affidavit likely would have been excluded as hearsay, or with respect to Davis's alleged

statements regarding Detective Lyon's statements to her, double hearsay.  *Terrell v. Pfister*, 443

F. App'x 188, 194 (7th Cir. 2011).  But most fundamentally, Turner's affidavit demonstrably

lacked credibility.  Turner testified that the inmate to whom Davis allegedly admitted that she

had simply made-up her testimony against Caudill was "unknown," thus eliminating any chance

---

[4]    During the RCr 11.42 proceedings, Caudill presented affidavits from two other women, (Heather Harris and Nicole Lewis) who also claimed that Davis had admitted completely fabricating her testimony.  [TR 451-52; TR 558-562]  Caudill has apparently abandoned any attempt to rely on their testimony.

of finding and questioning the one person who could either confirm or contradict Turner's allegations. Second, Turner statement that the sole reason Davis had agreed to commit perjury on the stand was that "Detective Lyons bought her a Coke, so she would tell him anything" [TR 556] is not credible. Third, while Turner claimed shock at hearing about Caudill's conviction during a television news broadcast, she did not sign an affidavit stating that Davis had lied on the stand (undoubtedly information the defense would have liked to have known at the time) until four and one-half years after Caudill's conviction. Finally, Turner stated in her affidavit that Detective Lyons told Davis to falsely testify that Caudill had told her about the events of that night. However, at trial, Davis's account of what Caudill told her differed in significant regard from what Cynthia Ellis testified that Caudill had told her. If, as Turner alleged, Detective Lyons intended to present false testimony through Davis, one might reasonably assume that he would undertake considerable effort to make sure that it was consistent with the testimony offered by Ellis. The fact that it was not, and in fact was demonstrably different, seriously undermines the plausibility of Turner's assertion that Lyons was actively soliciting Davis's perjured testimony. Caudill's present explanation for this paradox - that Detective Lyons was simultaneously capable enough to seek out Davis as a second witness to bolster Ellis's testimony but too incompetent to make sure that the accounts were consistent - is utterly unconvincing. The Supreme Court of Kentucky did not unreasonably apply federal law in determining that Caudill had failed to prove that Davis's testimony was perjured.

**F. Claim 9 – The Prosecutor Did Not Engage In Misconduct By Objecting To Caudill's Question To Holden Regarding Whether She Had Cooperated With Law Enforcement Officers In Other Investigations.**

During cross-examination, Jeannette Holden denied that she had assisted Detective Lyons in other cases. When counsel then asked whether she had helped police detectives in a case

involving Christine Halvorsen, the prosecution objected to the question as irrelevant. During a sidebar conference, the trial judge indicated he would permit the question if defense counsel had a detective who would testify that Holden had received a benefit for cooperating in that case if Holden testified that she had not. When defense counsel indicated that his question was only based upon information received from another attorney in his office that Holden was helping police in the case against Halvorsen, the court sustained the objection and the question was not allowed. [DVD A-6, February 10, 2000, at 16:56-16:58]

On direct appeal, Caudill contended that the trial court's ruling violated her rights under the confrontation clause. Brief for Appellant, *Caudill v. Commonwealth*, No. 2000-SC-000296, 120 S.W.3d 635 (Ky. 2003), at pp. 12-17. The Supreme Court of Kentucky rejected that claim, finding that the trial court permitted Caudill to show Holden's possible bias through other testimony; that defense counsel failed to establish a basis for the question by showing that Holden had received some benefit for her cooperation; and that the testimony regarding any cooperation in Halvorsen's case would not be relevant for impeachment purposes in Caudill's case. *Caudill v. Commonwealth*, 120 S.W.3d 635, 661-62 (Ky. 2003) ("The mere fact that a witness helped the police in an unrelated case is not evidence of bias in this case and is not an adverse reflection on the witness's credibility in general.")

On appeal from the denial of relief under RCr 11.42, Caudill made a different claim from the same facts, arguing that the prosecution violated its duty to correct false testimony under *Napue* by objecting to defense counsel's question in the first place. Brief for Appellant, *Caudill v. Commonwealth*, No. 2006-SC-000457-MR, 2009 WL 1110398 (Ky. Feb. 26, 2007), at pp. 28-29. The Supreme Court of Kentucky summarily rejected this claim, holding that "[t]he

Commonwealth's objection to questions that were ultimately deemed improper and irrelevant cannot amount to prosecutorial misconduct." *Caudill II*, 2009 WL 1110398, at *9.

In her petition, Caudill reiterates her claim. She implicitly argues that: (1) Holden's answer to defense counsel's question would have necessarily undermined her credibility; (2) the question, therefore, was "proper and relevant"; and (3) it was misconduct for the prosecution to object to the question. [Record No. 1, p. 78] The Commonwealth responds that there was no presentation of false testimony under *Napue* because Holden never answered Caudill's question, and that Caudill points to no Supreme Court authority preventing the prosecution from objecting to a question relating to a collateral matter.[5] [Record No. 9, p. 70]

To state a viable ground for federal habeas relief, a petitioner must demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Not only must there be applicable and controlling precedent from the Supreme Court itself dictating the outcome of the case before the state court, but the state court's decision must be so clearly wrong that "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents" in place at the time the state court decision was rendered. *Harrington*, 131 S. Ct. at 786.

Because Caudill points to no such Supreme Court precedent - and because none exists - the Supreme Court of Kentucky's decision does not warrant federal habeas relief. While *Napue* and *Giglio* require the prosecution to correct testimony from their witnesses which it knows to be

---

[5] The Commonwealth's contention that this claim is procedurally defaulted [Record No. 9, p. 69] fails for the same reasons stated above.

false, here Holden did not testify at all, let alone falsely, in response to the question, as the trial court sustained the prosecution's objection. *Napue,* 360 U.S. at 269. Therefore, the prosecution's obligations under *Napue* (assuming without any basis to do so that Holden would have testified falsely) never arose. What Caudill seeks here is a significant extension of *Napue* that has never been endorsed by the Supreme Court. In essence, Caudill seeks to prevent the prosecution from objecting to questions which the defense believes might impeach a prosecution witness. Because the Supreme Court has never reached such a conclusion and because that conclusion does not necessarily flow from its precedents, the Supreme Court of Kentucky's decision was neither contrary to nor an unreasonable application of federal law.[6]

The Court has previously concluded that the prosecution did not violate *Brady*, *Napue*, or *Giglio*, but that even if it had committed such violation(s), Caudill's due process rights were not violated because the individual alleged acts or omissions were not "material" to the outcome of her case. The Court further concludes that, when considered cumulatively, the alleged violations do not undermine confidence in the verdict in violation of Caudill's due process rights. As noted above, Jeanette Holden's statement that she did not receive a benefit for her testimony was truthful. Likewise, Cynthia Ellis's testimony that she did not receive leniency or a reduction in her charges was correct. However, Ellis did not affirmatively disclose that the prosecution in her case agreed to (and did) mention to the judge that she was a cooperating witness in other cases.

---

[6] Further, it is open to question whether an informant's cooperation with the police in an entirely separate investigation impeaches the witnesses' testimony in the case at hand. *Cf. Soderstrom v. Lea*, 2011 WL 7770057, at *16-17 (C. D. Cal. Jan. 25, 2011). Even if such testimony did have impeachment value, it is the trial court that prevented its presentation by sustaining the objection. Finally, assuming that *Napue* required the prosecution to refrain from objecting to the question, Caudill has not argued or demonstrated that the omitted testimony regarding Holden's cooperation in an entirely unrelated case was "material," by establishing a reasonable likelihood that it would have affected the jury's decision in her case. It is clear that it would not. *Giglio*, 405 U.S. at 154.

As previously discussed, Julia Davis testified that she received a two-year sentence as a result of her testimony when she could have received a five to seven year sentence. While Caudill contends that Davis faced a sentence of twenty years or more, she has not offered any support for this claim. Considering the information regarding Ellis and Davis together, it is clear that it could not have had a material impact in the minds of the jury. The minimal benefit Ellis received for her cooperation would have made little or no difference in the minds of a reasonable jury regarding her credibility. And even if Caudill had demonstrated that Davis's testimony regarding her maximum prison sentence was false, it was likely the result of her lack of understanding of the law rather than intentional perjury. In light of evidence already in the record that Davis had received leniency in her own case in exchange for her testimony, the information would have added only incremental impeachment value. And because there is no reasonable likelihood that the sum of the errors alleged by Caudill would have affected the decision of a reasonable jury, she fails to provide a basis for federal habeas relief.

### G. Claim 13 - Counsel Was Not Ineffective For Failing To Investigate And Impeach The Prosecution's Informant Witnesses Based Upon Their Incorrect Statements Regarding Favorable Treatment In Their Criminal Cases In Exchange For Their Testimony.

Caudill contends that her counsel rendered ineffective assistance by failing to adequately undermine the credibility of witnesses Cynthia Ellis, Julia Davis, and Jeannette Holden. [Record No. 1, pp. 97-102] With respect to Cynthia Ellis, Caudill argues that her attorney should have undermined Ellis's credibility by demonstrating that she lied about the benefit she received for her testimony. [Record No. 1, p. 97] However, the Court has already rejected the necessary predicate for this argument (i.e., that Ellis's testimony was false). See Claim E, *supra*. The Supreme Court of Kentucky reasonably and correctly concluded that Ellis's testimony that she

did not receive a "deal" was an accurate layman's description of her agreement with the prosecution. Because this testimony was not false, Caudill's counsel was not ineffective for not cross-examining Ellis regarding it, as such questioning would not have undermined Ellis's credibility. Thus, the Supreme Court of Kentucky correctly and reasonably concluded that this ineffective assistance claim was without merit. *Caudill II*, at *10. Additionally, such cross-examination would have permitted the prosecution to bolster Ellis's testimony by emphasizing that she received no reduction in her sentence whatsoever for her testimony, a far more compelling fact than the "benefit" she received by having the prosecution merely mention her cooperation in other cases. Counsel acted well within the bounds of professional judgment with respect to his cross-examination of Ellis. *Dell v. Straub*, 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002) ("[C]ourts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel."

Caudill also faults her attorney for not "discover[ing] that Ellis had not been believed by the prosecution in the drug case, as discussed at her sentencing ..." [Record No. 1, p. 97] However, Caudill's assertion that the prosecutor in Ellis's criminal case did not believe her has no factual support in the record. At her sentencing, the prosecutor stated Ellis "has also cooperated in a drug case, nothing ever came out of that. We would not agree to anything." [DVD #3 Video Exhibits, pt. 2, August 16, 1999, at 11:08] Nothing in this brief statement suggests that the prosecution did not believe the information provided by Ellis, only that "nothing came of" that cooperation. This might be correct for any number of reasons: the case might have been dismissed against that defendant; Ellis's testimony might have been unnecessary or cumulative; or the defendant might have pled guilty. The actual reason, whatever

it might have been, is not part of the record. Counsel is not ineffective for failing to engage in speculation unsupported by any factual basis.

Caudill also contends that her counsel was ineffective for failing to cross-examine Julia Davis to demonstrate that she had testified falsely regarding the terms of her agreement with the prosecution. [Record No. 1, p. 97] However, the Court has previously concluded that Davis's testimony regarding that agreement was fundamentally correct and Caudill has produced no evidence to support her assertion that Davis realistically faced an appreciably longer sentence. Because the factual premise for this claim has been rejected, Caudill has failed to demonstrate that her counsel's performance was deficient, and the Supreme Court of Kentucky's conclusion to this effect was not an unreasonable determination of federal law. Further, the Supreme Court of Kentucky found that Caudill had failed to show prejudice from the failure to elicit testimony on the subject because the jury had already been "made well aware of the fact that Davis received a benefit in sentencing as a result of her co-operation." *Caudill II*, at *10.[7] This Court agrees. Caudill failed to demonstrate prejudice, as Davis had already testified that she had received a considerable reduction in her sentence in exchange for her testimony, and any error in

_____

[7] The Supreme Court of Kentucky's statement that "[e]ven if this information had been elicited on cross-examination, we do not believe the outcome of the trial would have been different," *id.*, does not track verbatim the standard for prejudice under *Strickland*, which is that the defendant must show "*a reasonable probability* that the outcome of the trial would have been different ..." *Hodges*, 727 F.3d at 528 (emphasis added). However, earlier in its opinion, the court articulated the proper standard for demonstrating prejudice under *Strickland*. *Caudill II*, at *3 ("Caudill's arguments ... fail to meet the burden of showing that there is a reasonable probability that testimony from an additional expert would have changed the outcome of the proceeding.") Under such circumstances, the isolated "shorthand reference" to *Strickland*'s prejudice prong does not indicate that the state court did not apply to proper federal standard. *Urban v. Ohio Adult Parole Authority*, 116 F. App'x 617, 627 (6th Cir. 2004) (*citing Woodford v. Visciotti*, 537 U.S. 19, 23-24 (2002)).

her understanding of the maximum punishment she faced could readily have been explained on the ground that she was not an attorney, eliminating any meaningful damage to her credibility.

Caudill also contends that her counsel was ineffective because he failed to call Heather Harris, Davis's ex-girlfriend, to testify that Davis had admitted to her before trial that her inculpatory testimony against Caudill was fabricated. [Record No. 1, p. 97] Caudill relies upon an affidavit Harris (signed March 1, 2001) in which Harris states that Davis, while both were incarcerated at the Fayette County Detention Center before Caudill's trial, told her that she had lied to Detective Lyons, and had even passed a polygraph test regarding Caudill's alleged statements to her regarding the murder. [TR 559-560] Caudill contends that her attorney knew that Harris was available to testify, and that there was no strategic reason not to call Harris to undermine Davis's credibility. The Kentucky Supreme Court did not explicitly address the merits of this claim because the trial court did not rule on it during Caudill's RCr 11.42 proceedings. *Caudill II*, at *10.

Even reviewing this claim *de novo*, it is without merit. While Caudill's counsel baldy asserts that her attorney was aware of the substance of Harris's statement prior to trial [Record No. 1, p. 97; TR 451], Caudill points to no actual evidence in the record to support this claim. Without knowledge of the substance of Harris's testimony or some reason to believe that Harris could provide useful evidence, Caudill's counsel was not ineffective because he did not call her as a witness during trial. Even if he had been aware of Harris's allegations, counsel acted well within the bounds of professional judgment in choosing not to rely upon her testimony in an effort to undermine Davis. Harris was Davis's ex-girlfriend, and the fact that the pair had been involved in a failed personal relationship could have been used to undermine Harris's credibility. Additionally, the prosecution could not have admitted evidence regarding the fact that Davis had

passed a polygraph test in an effort to bolster her testimony. However, if Harris had testified, the jury would have heard from the defense's own witness that Davis's testimony regarding Caudill's statements to her had been tested by, and passed, a polygraph examination. Under the facts presented, defense counsel quite reasonably could have wished to avoid bolstering the adverse testimony of Davis in this manner. Assuming Caudill's counsel was aware of Harris's testimony before trial, it was well within the confines of sound professional judgment to not to call her under those circumstances. *Burgess v. Booker*, 526 F. App'x 416, 431 (6th Cir. 2013) ("exculpatory affidavits made years after the events are 'treated with a fair degree of skepticism,' especially when there is 'no reasonable explanation for the ... delay.'") (*quoting Herrera v. Collins*, 506 U.S. 390, 423 (1993)); *see also Martinez v. Scutt*, No. 2:08-cv-10229, 2011 WL 1193210, at *24-25 (E.D. Mich. Mar. 29, 2011) (concluding that counsel did not act unreasonably in choosing not to call former cellmate of prosecution witness to testify that prosecution witness admitted to him that his testimony that defendant had confessed to murder was fabricated because counsel attacked prosecution witnesses' credibility on cross-examination and former cellmate lacked credibility), *appeal denied*, No. 11-1650/1651 (6th Cir. Jan. 24, 2012).

Next, Caudill contends that her attorney failed to adequately attack Jeannette Holden's credibility in many regards. [Record No. 1, pp. 98-99] She argues that counsel should have shown that Holden had cooperated with the police on other cases to get charges against her dropped (specifically, on a criminal case against Christine Halvorsen). However, counsel cross-examined Holden on both subjects. As to the former, Holden testified that she had not helped the police in other cases. As to the latter, the trial court sustained the prosecution's objection to counsel's question when he admitted that he lacked any evidence that Holden had received any

favorable treatment for her alleged cooperation.  [DVD A-6, February 14, 2000, at 16:55-16:58] Caudill offers no explanation regarding what additional or different cross-examination her counsel could have conducted, let alone what benefit such efforts would have produced. Particularly where "cross-examination techniques, like other matters of trial strategy, are entrusted to the professional discretion of counsel," *Dixon v. Houk*, 737 F.3d 1003, 1009 (6th Cir. 2013), the Court declines to indulge Caudill's unbridled speculation either that her counsel's performance was deficient or that she was prejudiced as a result.

During trial, Holden testified that Charles Clark had been present during a conversation in which Caudill asked Holden if she was interested in hurting somebody to make some money. Holden indicated that she wasn't sure if she mentioned Clark's name to Detective Lyons during their interview, but stated that "[Clark] was there, and I'm sure that he'll say he was there." [DVD A-6, February 14, 2000, at 16:20 - 16:22]  However, four years after the trial, Clark signed an affidavit stating that he never heard any such conversation.  He further states that he was available and would have testified at Caudill's trial to this effect.  [TR 572-575]  Caudill contends that her attorney was ineffective because he did not request a short recess from the trial to hire a private investigator to track down Clark so that he could offer this testimony.  [Record No. 1, pp. 98-99]  The Supreme Court of Kentucky rejected this claim, holding that Clark's statement that he did not overhear such a conversation was of little probative value.  Further, counsel could not have been aware of this testimony before trial, and counsel did not make an unreasonable choice in deciding not to halt the trial mid-stream to track down a single impeachment witness. *Caudill II*, at *10.

The Supreme Court of Kentucky did not incorrectly or unreasonably apply federal law in determining that Caudill's counsel was not ineffective regarding Clark's potential trial testimony.

53

It is highly questionable whether the trial court would have granted a stay of the proceedings to locate an impeachment witness on a matter of secondary or tertiary importance. But more fundamentally, Holden testified forcefully that Clark "was there, and I'm sure that he'll say he was there." After Clark gave his statement years after trial in 2004, it was clear that his testimony could have been helpful. But in reviewing counsel's performance, "every effort [must] be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. In 2000, counsel had no basis to believe that Clark would testify differently than Holden described. Further, at that juncture, it was just Holden's uncorroborated word that Caudill had solicited her for the robbery. If counsel had sought and obtained a stay and Clark had corroborated Holden's testimony, the prosecution could have used it to solidify - rather than undermine - Holden's testimony as proof of premeditation. Counsel quite reasonably could have chosen not to take the risk of seeking out, mid-trial, testimony of unknown substance that could harm rather than support his case. *Awkal v. Mitchell*, 613 F.3d 629 ,641 (6th Cir. 2010) (*citing Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008) ("[T]he decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney."); *Samatar v. Clarridge*, 225 F. App'x 366, 372 (6th Cir. 2007).

Holden further told Detective Lyons during their interview that "she believes that [Caudill] solicited [Elizabeth Wollum]" to participate in the robbery [TR 576-578], but Wollum gave a pre-trial statement to Lyons that Caudill had not done so. [TR 579-80] Caudill again contends that her counsel was ineffective because he did not call Wollum to testify. [Record No. 1, p. 99] The Supreme Court of Kentucky denied this claim, noting that Holden did not testify at all during the trial regarding this portion of her statement to Detective Lyons and that her belief that Caudill had solicited Wollum was apparently sincere but mistaken. Thus, cross-examining

her regarding this aspect of her interview would not have materially undermine her credibility. *Caudill II*, at *11. This was not an unreasonable application of *Strickland*. Holden did not testify about Wollum during her direct examination. Therefore, cross-examining her regarding the statement would have introduced new testimony upon this subject matter without materially undermining Holden's credibility. Her counsel's decision to forego extensive cross-examination of Holden in an effort to undermine her testimony that Caudill had solicited her for committing a robbery was not unreasonable, as that approach would avoid repeating at length Holden's testimony in this regard. In addition, Holden's testimony was far from the only evidence in the record supporting premeditation by Caudill. The Supreme Court of Kentucky's determination that Caudill failed to show either deficient performance or a reasonable likelihood of a different outcome as a result was not an incorrect or unreasonable determination of federal law. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003).

## H. Claim 12 – Caudill's Trial Counsel Was Not Ineffective By Failing To Tell The Jury That Goforth Owed Everett Woodward $3,000 For Cocaine And Was Being Evicted From His House, Which Gave Him An Independent Motive To Kill White For Her Money.

Caudill also argues that her attorney was ineffective because he failed to develop evidence at trial that Goforth - apart from his desire to rob White to obtain money to purchase more drugs - had another motive: a debt of $3,000.00 he owed to Everett Woodward, a drug dealer. Caudill states that Goforth was being evicted from his home, thus creating an additional need for funds. Caudill contends these facts gave Goforth an independent reason to rob and kill White that Caudill did not have. And because her trial strategy was to blame Goforth for the murder, she claims that her attorney should have further developed Goforth's motives. [Record No. 1, pp. 90-96]

Caudill's counsel initially indicated during a sidebar that he intended to ask Veronica Jones whether Goforth had told her that he owed money to Woodward to establish that Goforth had a motive to commit the robbery. However, the trial court overruled Goforth's objection to that line of questioning. [DVD A-6, February 14, 2000 at 9:14 - 9:16] Later, counsel indicated that he had decided against questioning Jones about the drug debt, as it would have elicited additional testimony regarding the pair's extensive drug use, which he feared would act to the detriment of his client. [DVD A-6, February 14, 2000 at 9:40] Caudill contends this decision was manifestly unreasonable as extensive testimony regarding their drug use had already been introduced. [Record No. 1, p. 91]

In rejecting this claim, the Supreme Court of Kentucky expressly declined to determine whether counsel's decision to avoid this line of questioning was reasonable because no evidence on this issue had been developed by the circuit court during the RCr 11.42 proceedings. *Caudill II*, at *6. However, the court found that Caudill had failed to demonstrate prejudice from any deficient performance in light of the overwhelming evidence adduced at trial of her guilt. The court concluded that Caudill's story that she was surprised by Goforth's assault on White was implausible because she did not attempt to prevent further attack on White or flee scene once White had been killed. In addition, the pair then robbed the home after the murder and drove White's car to a remote location to dispose of the body. Caudill's supposed fear of Goforth also lacked credibility because she continued to associate with Goforth that night and long after the murder, when she could have driven away in her separate vehicle shortly after the murder. *Id*. Further, significant evidence of Caudill's motive was introduced at trial, and the Supreme Court of Kentucky concluded that evidence of Goforth's own motive was simply insufficient to create

a reasonable likelihood that a jury could conclude that it was Goforth alone who acted to kill White. *Caudill II*, at *7.

As a threshold matter, this Court reiterates its prior conclusion that the Supreme Court of Kentucky applied the proper *Strickland* standard for prejudice. The court did state that prejudice requires "a showing that, but for counsel's unprofessional errors, the outcome of the trial would have been different." *Caudill II*, at *1. This particular articulation of *Strickland*'s prejudice standard appears to require but-for causation, whereas *Strickland* only requires proof of a *reasonable probability* of a different outcome to show prejudice. *Strickland*, 466 U.S. at 694. However, the Kentucky Supreme Court also cited *Brown v. Commonwealth*, 253 S.W.3d 490 (Ky. 2008), which outlines the correct standard. *Id.* at 499 ("[t]he defendant must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different."). In addressing Caudill's first claim under *Strickland*, the Supreme Court of Kentucky also stated the correct standard, that her burden was to "[show] that there is a reasonable probability that testimony from an additional expert would have changed the outcome of the proceeding. " *Caudill II*, at *3. The United States Supreme Court has admonished that, when reviewing state court decisions, "readiness to attribute error is inconsistent with the presumption that state courts know and follow the law" because § 2254(d) requires "state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Accordingly, where the state court plainly expresses a proper understanding of the applicable federal standard, the periodic expression of that standard in "shorthand" does not warrant the conclusion that the state court misapplied federal law. *Cf. Holland v. Jackson*, 542 U.S. 649, 654-55 (2004).

The Supreme Court of Kentucky's discussion of Caudill's ineffective assistance claims establish its awareness of *Strickland*'s clear and long-settled standard for prejudice. *Cf. Jackson v. Bradshaw*, No. 2: 03-983, 2007 WL 2890388, at *11 (S.D. Ohio Sept. 28, 2007). Nonetheless, there are circumstances where federal courts sitting in habeas review have concluded that the state court's articulation of the wrong federal standard in some instances indicates that it failed to properly apply federal law. *Cf. Vasquez v. Bradshaw*, 345 F. App'x 104, 110-12 (6th Cir. 2009). Because another federal court might assess the impact of the language used in the Supreme Court of Kentucky's opinion differently, out of an abundance of caution, the Court will review this claim *de novo*. *Id*. at 112.

But having reviewed the record, the Court concludes that Caudill has failed to demonstrate either deficient performance or resulting prejudice. To demonstrate that her attorney rendered assistance that was constitutionally ineffective, Caudill must show that notwithstanding the strong presumption that her attorney's actions fell within the wide range of reasonably sound trial strategies, her counsel's actions were objectively unreasonable under prevailing professional norms. *Railey v. Webb*, 540 F.3d 393, 415 (6th Cir. 2008). Here, Caudill's attorney initially intended to elicit testimony from Veronica Jones that Goforth owed a drug dealer $2,600.00 to establish an independent motive to rob White, but later chose not to do so to avoid bringing in more evidence of the pair's extensive drug use. [DVD A-6, February 14, 2000 at 9:14, 9:40] Caudill correctly states that there was already considerable evidence regarding their drug use in the record. However, there was also considerable evidence in the record regarding Goforth's motive to rob White. The question then is whether *additional* evidence of both facts would have ultimately been of assistance to Caudill's defense. In short, Caudill's attorney had to decide whether there was a net benefit to bringing in additional

58

evidence regarding Goforth's motive at the expense of introducing additional harmful evidence of drug use. Caudill's counsel answered that question in the negative. While other counsel might have resolved that conundrum differently, this Court cannot conclude that Caudill's attorney's decision was outside the realm of reasonable professional judgment, particularly when affording counsel the strong presumption of competence required by *Strickland*.

Nor has Caudill demonstrated a reasonable probability that the outcome of the trial would have been different had her attorney elicited this testimony. *Hodges v. Colson*, 727 F.3d 517, 528 (6th Cir. 2013). Caudill's version of events was that she had gone to White's home to borrow additional money when Goforth unexpectedly assaulted White and robbed her home. Testimony that Goforth needed money to repay a drug debt would have provided a further motive for him to act in this manner. However, as the Supreme Court of Kentucky noted, there was ample evidence which powerfully undermined the plausibility of Caudill's story. There was no evidence that Caudill had attempted to stop the assault on White or flee the residence once it began.

After the home had been ransacked and robbed, Caudill drove a separate vehicle to a remote location to burn White's body and vehicle. Caudill did not attempt to drive away even when she was utterly free to do so. Caudill also continued to associate with Goforth long after the murder. These are not the actions of a person whose motive was merely to borrow money from White. Instead, they are the actions of a person actively complicit in the murder. In sum, evidence that Goforth had an additional motive to rob or kill White would not have sufficiently undermined evidence of Caudill's own motive to participate in these crimes to create a reasonable possibility that the jury would have concluded that it was Goforth alone who acted to

kill White.  Because Caudill has failed to demonstrate prejudice from her counsel's performance, this claim fails.

> ### I. Claim 14 – Caudill's Counsel Was Not Ineffective Because He Did Not Call Jeffrey Spence To Testify That Goforth Confessed To Him That He Was The One Who Killed White But He Intended To Blame Caudill For The Murder.

Approximately one week before trial, Detective Lyons interviewed Jeffery Spence, an inmate at the Fayette County Detention Center.  Spence had contacted the prosecution, offering to give a statement against Goforth in exchange for his release from jail.  Spence, who was then housed with Goforth, stated that Goforth had told him that "he himself assaulted [White] in an effort to quiet her in a robbery or burglary attempt, [but] did not mean to cause her death.  Goforth was going to place the blame on Caudill for the crime."  However, Lyons indicated that "Spence offered no more specific detail regarding the assault or activity occurring after the assault."  Further, Spence had been charged with assaulting his girlfriend, but he asserted that she had simply fallen from a window, and that she no longer wished to prosecute him for assault.  However, when Detective Lyons interviewed Spence's girlfriend, the girlfriend stated that Spence had in fact assaulted her, fracturing her jaw in the process, and that she had no intention of dropping the charges against him.  [TR 582]  The prosecution chose not to call Spence as a witness, but Detective Lyons's interview notes and report were provided to defense counsel.

Caudill argues that her counsel was ineffective because he did not call Spence as a witness.  Caudill contends that doing so would have put Goforth's confession to the crime before the jury, and would have cast doubt upon the informants who testified that Caudill had confessed.  [Record No. 1, pp. 102-105]  The Supreme Court of Kentucky denied this claim following Caudill's RCr 11.42 proceedings, noting that Spence appeared far more interested in just getting himself out of jail than in altruistically providing helpful testimony.  Likewise, he

had no information about the specifics of the crime which would have buttressed the reliability of his assertions. And Goforth's alleged indication that he had assaulted White but did not intend to kill her was flatly refuted by the forensic evidence adduced at trial. *Caudill II*, at *3.

The Supreme Court of Kentucky reasonably and correctly rejected this singularly dubious claim. Caudill's attorney had no reason to predict what Spence might say if he were called as a witness but had not been released from custody – the deal he actively sought in exchange for his testimony. If Spence testified that Goforth had not made any confession to him, not only would this been unhelpful, it likely would have diminished counsel's credibility with the jury.[8]

Spence might have testified in accord with his statement that Goforth admitted assaulting White. This testimony would likely have been more harmful to Caudill's case than if Spence had disavowed his prior statement entirely. Caudill first contends that Spence's testimony would have put evidence into the record that it was Goforth, rather than Caudill, who robbed and assaulted White. However, as correctly noted by the Supreme Court of Kentucky, Spence's testimony was very unreliable. In a well-publicized case and shortly before trial, Spence actively solicited the prosecution in an effort to obtain his own release in exchange for giving testimony that was utterly devoid of any specific information about the events of that night which might have lent his story some credibility. Spence's statement, therefore, would not have provided any reliable testimony implicating Goforth and thus exonerating Caudill. On that basis alone, her counsel was not unreasonable in choosing not to call him. *Cf. Swanigan v. Rivard*, No. 11-11833, 2012 WL 5379557, at *8-9 (E.D. Mich. Oct. 31, 2012) (concluding that counsel was not

---

[8] Caudill suggests that Spence might have testified "that he made the whole thing up to broker a deal for himself." [Record No. 1, p. 103] Such speculation is patently unreasonable. Spence, still facing criminal charges for assaulting his girlfriend, would not likely have admitted to lying to police when the credibility of his story that she fell out of a window would play a determinative role in his guilt or innocence regarding the assault charge.

ineffective for failing to call witness of questionable credibility); *Smith v. Jago*, 888 F.2d 399, 409 (6th Cir. 1989) (concluding that petitioner failed to show prejudice from counsel's failure to preserve testimony by avowal from witness of doubtful credibility); *see also Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002) (absent record evidence of counsel's reasons for not calling a witness, the court must presume that the decision was based upon trial strategy).

Caudill also contends that Spence's testimony would have cast doubt upon the testimony of Davis and Ellis who testified that Caudill had confessed to the crime. She argues that this would have demonstrated that "different informants told different tales." The flaws in this argument are substantial. The jury was already aware that different witnesses had provided varying accounts of the events. Not only had Caudill's and Goforth's accounts widely diverged, but the testimony of Julia Davis and Cynthia Ellis also varied significantly in their particulars regarding what each alleged that Caudill had told them. It was already plain that Goforth and Caudill intended to point the finger at the other for the robbery and murder of White. Spence's testimony would have only reinforced a fact that was already obvious to the jury.

More importantly, calling Spence could have affirmatively damaged Caudill's case by buttressing both the prosecution and its witnesses. Having heard Spence's testimony that Goforth had confessed that he had assaulted White, Goforth's counsel would have cross-examined him at length about his lack of knowledge of any specific information about the case that would have been known by Goforth but unavailable to the public generally through press coverage. Not only would this have undermined Spence's credibility, it would have either expressly or by implication bolstered the credibility of the prosecution by showing that they would not call just any witness, but only those witnesses they believed to be reliable (in this case, Cynthia Ellis and Julia Davis). Goforth's counsel could also have pointed out that, unlike

Spence, Ellis and Davis provided details in their testimony about facts which would have been known by Caudill but not the public. In sumary, Caudill's attorney quite reasonably could have chosen not to call a witness who would have provided very weak testimony against Goforth at the expense of strengthening the witnesses against his own client. *Cf. Porter v. Berghuis*, No. 04CV71350DT, 2005 WL 2063946, at *11 (E.D. Mich. Aug. 23, 2005) ("Defense counsel's decision not to introduce evidence of the commission of a crime by third parties does not constitute ineffective assistance of counsel, where the evidence does not 'point unerringly' to the guilt of the third party and the innocence of the accused.") (*citing Hoots v. Allsbrook*, 785 F.2d 1214, 1222 (4th Cir. 1986)). Because Caudill has failed to establish either deficient performance or resulting prejudice, this claim fails.

J. **Claim 11 – Caudill's Attorney Was Not Ineffective For Failing To Rebut The Testimony Of The Prosecution's Blood Spatter Expert With Adequate Cross-Examination And Through A Defense Expert.**

During trial, Linda Winkle, a forensic expert employed by the Kentucky State Police, testified that three different kinds of blood stains were found on Caudill's shoes - small impact spatters, contact stains, and smears. Winkle explained that an impact spatter is a small circle of blood, approximately 1-4 mm in diameter, which results when force is applied to a drop of blood, such as when a drop of blood falls the ground or hits another object. [DVD A-6, February 14, 2000, at 14:24:52 - 14:26:30] Regarding impact spatters found on Caudill's shoes, Winkle testified that "the size, shape and distribution of those spatters is consistent with those that would be produced during a beating," and that the smallest of those impact spatters could not have traveled more than three feet. *Id*. at 14:26:45-14:27:30.

During Winkle's cross-examination, Caudill's counsel first asked:

Q:  With regard to the blood stain pattern interpretation of the shoes, you talked about the farthest distance that the small impact spatters could travel, and I believe you indicated up to about three feet or so?

A:  Yes, sir.

Q:  And when you say "consistent with a beating," it could be that the shoes were nearby if somebody else was doing the beating if, you're just saying that the shoes were close by?

A:  They were close by when some force was being applied, yes, sir.

[DVD A-6, February 14, 2000, at 14:37:14-14:37:40]   Winkle also acknowledged on cross-examination that the impact spatters could have been produced in other ways besides a beating, but indicated that merely waving a bloody object would result in "castoff stains" rather than impact spatters.  *Id*. at 14:37:50-14:38:45.

During trial, Caudill testified that she went to White's house on the night of the murder to borrow some money, but that once White opened the door, Goforth unexpectedly ran past her, into the house and down a hallway.  Goforth stated that she was briefly shocked by this action, but when she heard White cry out, she went into the house and walked down the hallway.  When she turned a corner, she saw Goforth standing over White nearby.  At that time, Caudill stated that she never saw Goforth actually strike White, but that there was already blood visible.  Caudill testified that she became hysterical, at which point Goforth slapped her, took her into a bedroom just off the hallway, and tied her hands together.  Caudill later helped Goforth move White's body to the trunk of her car.  [DVD A-7, February 14, 2000, at 15:44-15:47]  On cross-examination, Goforth's counsel asked Caudill, once she had turned the corner to the side hallway and saw Goforth standing over White, whether "by the time you go in, the assault's over with?"  Caudill stated "No, the assault, he had hit her and she was on the ground, I wouldn't say the assault was over with."  Caudill indicated that, after Goforth had placed Caudill in the bedroom

and had tied her hands, there remained a line of sight between her location and where Goforth stood in the hallway over White.  [DVD A-7, February 14, 2000, at 16:18-16:20]

Four years after the trial ended, Douglas Blair, a post-conviction investigator for Caudill, interviewed Winkle.  Some three months after the interview, Blair set forth what he recalled from that conversation in an affidavit signed on January 31, 2005.  [TR 492-493]  Blair stated that Winkle explained, as she had at trial, that the blood spatter on Caudill's shoes was consistent with having come from being near a beating.  Winkle also told him that it was not the result of "satellite spatter" - a term not then defined nor one used by Winkle at trial - and it could not have been Caudill's own blood from a car wreck.

Winkle later brought Edward Taylor into the interview, whom Winkle introduced as a more experienced blood spatter analyst.  When Blair asked him about the blood on Caudill's boots, Taylor concurred with Winkle that they could be impact spatter from having been near a beating.  However, Taylor also told Blair that they could be "satellite spatter," which he described as occurring when falling drops of blood hit either other blood or glance off another object.  As a result, Blair states that Taylor told him that he could not rule out the possibility that the blood spatter occurred either from Caudill assisting carrying White's body to her car shortly after the murder, or from Caudill's own blood dripping from her hands after Goforth flipped the truck they were driving the day after the murder.  *Id.*

Caudill contends that her counsel was ineffective because he did not interview Winkle prior to trial or retain his own expert witness regarding blood spatter analysis.  Caudill speculates that the blood on her shoes could have come from "satellite spatter" as she helped Goforth move White's body to her car, or it could have been her own blood from cuts on her hands following a car accident the next day.  [Record No. 1, pp. 82-90]

The Supreme Court of Kentucky rejected this claim on appeal from the denial of relief in the RCr 11.42 proceedings. The court noted that Winkle conceded during her testimony that, while the blood spatter on Caudill's shoes was "consistent with" her being nearby a beating, there were other ways that blood could spatter or break up, and that Taylor's alleged statements were not directly inconsistent with Winkle's trial testimony. The court also noted that Winkle's testimony did not preclude Caudill from arguing that the blood spatter on her shoes could have occurred either when she helped Goforth move White's body or when she was later involved in the car wreck. The court, therefore, concluded that Caudill's counsel did not perform deficiently by failing to hire its own expert witness to rebut Winkle's testimony. *Caudill II*, at *2-3.

Caudill has failed to demonstrate that the Supreme Court of Kentucky's rejection of this claim was an unreasonable determination of federal law. Caudill first contends that the court was incorrect when it noted that blood on Caudill's shoes was determined to be White's. [Record No. 1, p. 89] Caudill's argument appears to flow from her assertion that the blood on her boots was not DNA tested. [Record No. 1, p. 83] But during trial, Winkle testified that she tested the boots for two enzyme types (PGM and EAP) and that the blood on the boots matched White's blood enzyme types, but did not match Caudill's. [DVD A-6, February 14, 2000, at 14:09-14:11] It was presumably for this reason that Winkle told Blair during their interview that the blood on Caudill's boots was not Caudill's. [TR 492] Further, Blair's affidavit acknowledged that blood on Caudill's shoes "had tested positive for Lonetta White's DNA." *Id*. This is consistent with the testimony of a DNA expert at trial, who indicated that a shoe lace cut from the boots tested positive for both White's and Caudill's blood. [DVD A-5, February 10,

2000, at 16:05-16:06]  Caudill's present assertion that the blood found on her boots "was not ever determined to be Ms. White's blood" is refuted by the record.[9]

The Supreme Court of Kentucky's determination that Caudill's counsel did not perform deficiently was likewise correct.  Winkle's testimony that the blood spatter on Caudill's shoes was "consistent with" a beating did not, from a forensic standpoint, preclude Caudill from arguing that the spatter on her shoes resulted from either White's body being dropped when she and Goforth were moving it or from the subsequent car wreck, particularly in light of Winkle's ready concession that other things could have caused the blood to break up in a similar manner.  Another expert such as Taylor was simply not necessary to argue what Winkle had already conceded: that other things such as "satellite spatter" could account for the blood on Caudill's shoes.[10]  *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 791 (2011) ("In many instances

_____

[9]  At first blush, this fact would seem to undermine Caudill's speculation that the blood spatter on her boots could have been her own from her involvement in the car wreck.  However, on cross-examination Winkle noted that she catalogued 34 different impact spatters, contact stains, and smears on Caudill's boots.  [DVD A-6, February 14, 2000, at 14:37-14:38]  Winkle did not testify or suggest that each and every one of these trace amounts of blood was tested for enzymes or its DNA profile, and such complete (as opposed to sampled) testing would by atypical.  Each of these pieces of blood could therefore have constituted White's blood, Caudill's blood, or both.  Absent a more exhaustive data set and a clear association between each particular blood stain and the source of that blood, Winkle's testimony regarding the blood spatter offered a far less compelling association between Caudill and the beating than Caudill now suggests.  To the extent the prosecution urged otherwise during its closing, an attorney, rather than an expert witness, was all that was required to rebut any argumentative overreaching.  Indeed, Caudill's counsel argued during his closing that based upon Winkle's testimony the blood spatter and smears was consistent with White's body being dropped while Goforth and Caudill moved it to the car, or with Caudill's involvement with the car wreck the following day.  [DVD A-8, February 16, 2000, at 9:58-10:03]

[10]  While an affidavit from Taylor himself regarding his expert opinion regarding the blood spatter would qualify as evidence concerning what an expert witness might have testified to if called, it is highly questionable whether Blair's affidavit containing his recollection of Taylor's statements to him three months before satisfy the requirement that a habeas petition present actual evidence of an expert's testimony required to demonstrate deficient performance.  *Cf.*

cross-examination will be sufficient to expose defects in an expert's presentation."). The Sixth Circuit has admonished that counsel's choices regarding what witnesses to call at trial are "virtually unchallengeable" strategic decisions. *Awkal v. Mitchell*, 613 F.3d 629, 641 (6th Cir. 2010). Where, as here, defense counsel used the prosecution's own witness to establish that the defense's theory of the case was just as plausible, his performance was not deficient. *Cf. Schreibvogel v. Wyoming Dept. of Corrections State Warden*, No. 13-8065, 2013 WL 6487356, at *2 (10th Cir. 2013) (finding no defective performance where defense counsel elicited admission from expert that victim's injuries, while *consistent with* being punched, also could have come from a fall); *Medearis v. United States*, 469 F. Supp. 2d 779, 791 (D.S.D. 2006) (same); *Bower v. Quarterman*, 497 F. 3d 459, 473 (5th Cir. 2007) (holding that defense counsel's decision not to cross-examine state metallurgy expert was not deficient performance where expert's testimony did not undermine defense's time/proximity defense).

### K. Claim 6B – The Prosecutor's Statements Regarding His Experience With Prior Cases Did Not Improperly Refer To Facts Outside The Record.

During closing arguments, the prosecutor stated that "I really can't describe how savage and cruel this crime really was. As many times as I have stood here before jurors in murder cases and I don't have the words." [DVD A-8, February 16, 2000, at 10:57] As she did on direct appeal, Caudill contends that the prosecutor's remarks were intended to tell "the jury that based on his many years' experience it was his opinion this was the worst crime he had seen. This was not only an improper expression of personal opinion, but went outside the record to convey information about other cases and their relative facts." Brief for Appellant, *Caudill v. Commonwealth*, No. 2000-SC-000296, 2001 WL 34546226 (Ky. Mar. 15, 2001), at pp. 23-25;

---

*Long v. Roberts*, 277 F. App'x 801, 803 (10th Cir. 2008); *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) .

[Record No. 1, pp. 53-55]  The Kentucky Supreme Court rejected that claim, holding that the prosecutor's statement "did not tell the jury … that this was the worst crime he had ever seen" but was merely the prosecutor's view of the evidence.  *Caudill I*, at 675.

The Supreme Court of Kentucky correctly and reasonably rejected Caudill's argument as being a clear mischaracterization of the prosecutor's statement.  The prosecutor did not, as Caudill asserts, make any statements to the jury regarding facts that had occurred in other prosecutions, nor did he describe the outcomes in such cases.  Likewise, he did not assert that Caudill's case was the worst crime he had seen.  To the contrary, he stated that the facts of her case were too savage to adequately describe in words.  There was simply no attempt by the prosecutor to bring before the jury facts that were not in evidence.

In addition, the prosecutor's statement - made during his closing argument during the guilt phase - bore only upon the *severity* of the conduct involved, not upon Caudill's guilt or innocence of the offense.  The cases cited by Caudill indicate that prosecutors act improperly when they make statements indicating that, in their opinion, the defendant took certain actions or was guilty of the crimes charged, or that a particular witness was or was not believable.  *Gall v. Parker*, 231 F.3d 265, 312 (6th Cir. 2000) (*citing Caldwell v. Russell*, 181 F.3d 731, 737-38 (6th Cir. 1999) (holding that a prosecutor should not express a personal opinion concerning the defendant's guilt or a witness' credibility) and *United States v. Carroll*, 26 F.3d at 1387-88 (6th Cir. 1994) (holding that a prosecutor should not express "a conviction of personal belief regarding the witness's veracity.")).  Caudill has cited no authority, let alone clearly-established authority from the Supreme Court, indicating that a prosecutor can make no comment whatsoever regarding the severity of the crimes for which the defendant is charged.

Finally, even if the comments had been improper, misconduct does not occur unless they are also flagrant. *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002). Considering the factors set out in *United States v. Carroll*, 26 F.3d 1380, 1387 (6th Cir. 1994), it is plain that the comments in issue in this proceeding were not flagrant. The prosecution made his assertion regarding his inability to describe the severity of the crimes involved in two isolated sentences, and his brief effort to remind the jury that White was beaten to death was unlikely to have misled the jury or prejudiced the accused regarding her guilt or innocence.

**L. Claim 3 – The Jury Instructions Given During the Guilt Phase Of The Trial Did Not Preventing The Jury From Determining Caudill's Culpability During The Penalty Phase.**

Following the close of the evidence during the guilt phase, the trial court advised the jury in Instruction No. 4 that if they were "unable to determine from the evidence whether [Caudill] committed this crime as Principal under Instruction No. 2 or Accomplice under Instruction No. 3, then you will find Virginia Susan Caudill guilty of Murder, Principal or Accomplice, under this Instruction and so state in your verdict." [TR 186] The jury found Caudill guilty of murder under this instruction. [TR 197]

On direct appeal, Caudill noted that the jury instructions provided during the guilt phase did not require the jury to definitively decide at that juncture whether she had "intentionally killed Lonetta White by striking her with a blunt object" under Instruction No. 2 [TR 184], or whether Caudill had merely "acted in complicity" with Goforth when he did so under Instruction No. 3 [TR 185]. Caudill argued that, as a result, when the jury later determined that her sentence should be fixed at death, she was deprived of individualized consideration of sentencing factors in the imposition of the death penalty as required by *Lockett v. Ohio*, 438 U.S. 536 (1978). Brief for Appellant Virginia Caudill, *Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky. 2003), 2001

WL 3456226, at *96-97 (Mar. 15, 2001). Caudill reiterates this claim in her current petition. [Record No. 1, pp. 37-40] Specifically, she argues that "[b]efore a defendant can be sentenced to death ... the state court should at least require that the jury, for purposes of the penalty phase, determine the specific role and level of culpability of the defendant in order to impose the death penalty."[11] [Record No. 1, p. 39]

The Supreme Court of Kentucky rejected this argument, noting that even if the jury concluded that Caudill was only an accomplice to the murder, she remained death-eligible under *Tison v. Arizona*, 481 U.S. 137, 157-58 (1987), and that the instructions given later during the penalty phase expressly instructed the jury that they could consider whether Caudill was merely "an accomplice in the offense committed by another person and her participation in the offense was relatively minor" as a mitigating factor in determining her sentence. *Caudill I*, at 667; [TR 205] That court did not unreasonably apply federal law in reaching this conclusion. In capital cases, "the sentencing process must permit consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Lockett*, 438 U.S. at 601 (*quoting Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)). As a result, "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, *not be precluded* from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id*. at 604 (emphasis added).

---

[11] The Court interprets the wording of Caudill's argument at this point to mean that the jury should have been required to determine her role in the murder during the guilt phase. To the extent her argument could be construed as asserting that the jury should have been required to do so during the penalty phase, she made no such argument to the Kentucky Supreme Court, and that claim would be procedurally defaulted.

Caudill's argument misapprehends these constitutional rules. Caudill contends that the jury's obligation to make an individualized assessment of her culpability during the *sentencing* phase constitutionally requires them to make a specific finding as to her role in the crimes during the *guilt* phase. [Record No. 1, p. 39] But the Supreme Court has repeatedly held that during the guilt phase a jury is only required to determine whether or not the defendant committed the crime charged, not to agree and make specific findings upon each of the predicate facts required to reach that verdict. *Cf. Schad v. United States*, 501 U.S. 624, 631-32 (1991) ("We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone. In these cases, as in litigation generally, different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.") Caudill's approach would run afoul of this well-established rule.[12]

---

[12] The difficulty with Caudill's proposed rule is made more clear by applying it to the facts of her case. Even if the jury had been required to determine Caudill's role in the murder during the guilt phase, other specific facts pertinent to the "individualized sentencing" during the penalty phase would remain unresolved. But Caudill's own analytical approach would find this result unacceptable. For instance, if no "combination" instruction like Instruction No. 4 had been given, the jury would have been required to find her guilty as the principal under Instruction No. 2 or as the accomplice under Instruction No. 3. However, had the jury found her guilty as the principal under Instruction No. 2, it still would not have been required to decide what "blunt object" she used to kill White, or whether the murder occurred during a struggle with White, both factual matters disputed or uncertain at trial. Similarly, if the jury concluded that Caudill was merely an accomplice to Goforth's murder of White under Instruction No. 3, it would not have been required to decide what actions Caudill took "in complicity" with Goforth. These specific facts, as much as the broader label of Caudill as the principal actor or the accomplice to the murder, would be relevant factors to be considered in mitigation during the penalty phase. In short, the rule proposed by Caudill fails because there is no rational basis upon which to limit the specificity or number of the facts it would require the jury to find (unanimously and beyond a reasonable doubt) during the guilt phase simply because they could be among the broad universe of factors which could be relevant in mitigation during the penalty phase.

In addition, *Lockett* requires that a jury be allowed to consider all relevant information, including the defendant's role in the offense, during the sentencing phase of a capital case. Caudill argues that this *permission* during the penalty phase must be, in essence, a *commandment* imposed during the guilt phase, requiring the jury to determine her role in the offense, unanimously and beyond a reasonable doubt, and requiring them to make a specific finding regarding this issue. As a threshold matter, Caudill makes no effort to explain how the fact that the jury was not required to determine her role earlier, during the guilt phase, somehow affirmatively prevented the jurors from considering that role later during the penalty phase. Throughout the trial, Caudill and Goforth sought to cast blame almost entirely upon the other. The fact that jury was not compelled to decide which defendant's version of the events was more credible at the guilt phase did nothing, by itself, to prevent the jurors from considering any relevant evidence bearing upon this question at the penalty phase. Indeed, Caudill requested and received an instruction during the penalty phase advising the jury that it could consider whether she was acting merely as an accomplice and had only a minor role in the murder as a mitigating factor. [TR 205]

Finally, Caudill's argument appears to conflict with the holding in *Mills v. Maryland*, 486 U.S. 367 (1988). A rule which requires a jury to make a unanimous - and presumably binding - determination of her role during the guilt phase would prevent jurors from individually considering evidence on the question during the mitigation phase. *McKoy v. North Carolina*, 494 U.S. 433, 442-43 (1990) ("*Mills* requires that ***each juror*** be permitted to consider and give effect to ... all mitigating evidence in deciding ... whether aggravating circumstances outweigh mitigating circumstances ...") (emphasis added). Here, the trial court properly permitted the

jurors to consider Caudill's contention that she merely played a minor role as an accomplice in the murder carried out by Goforth as mitigation evidence during the penalty phase.

**M. Claim 2A – Imposition Of The Death Penalty Is Not Invalid Because The Trial Court Did Not Give Guilt Phase Jury Instructions for First Degree Manslaughter.**

During the prosecution's case-in-chief, Cynthia Ellis testified that, while incarcerated with Caudill prior to trial, Caudill had told her that after she and White had argued over money, White attempted to make a telephone call and that there was then a struggle between the two. Ellis further testified that Caudill told her that she then pulled something from the wall, perhaps a clock, and struck White once or twice with it, hard enough to knock White off of her feet and to cause her to bleed. [DVD A-6, February 14, 2000, at 11:55-11:57] Ellis later testified on rebuttal that Caudill had also told her that after Goforth had jerked the telephone off the wall, he left the house, returned with a tire iron, and used it to beat White to death. [DVD A-8, February 15, 2000, at 13:11]

Shortly before the close of the evidence, Caudill indicated that would seek jury instructions on first and second degree manslaughter as lesser included offenses to murder, arguing that while she and Goforth intended to rob White, Caudill had no premeditated intent to kill her. However, the trial court stated that, "I can't imagine, and I think the case law supports it, but I can't imagine any theory of the case that would justify anything but intentional murder in light of the number of times this lady was struck. I mean, I don't think there's any other reasonable conclusion the jury could draw." [DVD A-7, February 15, 2000, at 11:19-11:20]

At a hearing following the close of the guilt phase of the case, Caudill reiterated her request for jury instructions on first degree manslaughter. As grounds, Caudill argued that, "in light of events in her life," presumably including the recent suicide of an ex-boyfriend and her

current boyfriend Steve White's expulsion of her from his house, her argument with White at her house was a triggering event which caused her to suffer from "extreme emotional distress" ("EED") at the time of White's murder. [DVD A-8, February 15, 2000, at 13:55-13:56] The trial court overruled the motion for a first degree manslaughter instruction. [DVD A-8, February 15, 2000, at 14:00-14:01]

On direct appeal, Caudill argued that Kentucky law required the trial court to instruct the jury on first degree manslaughter as a lesser-included offense on the two different grounds she asserted at trial. First, she contended that she was under the influence of EED as defined in KRS § 507.020(1)(a) at the time of the murder and, therefore, was entitled to a first degree manslaughter instruction under KRS § 507.030(1)(b). Brief for Appellant Virginia Caudill, *Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky. 2003), 2001 WL 3456226, at *77-81 (Mar. 15, 2001). Second, Caudill contended the evidence would support a conclusion that she intended only to seriously injure White with the object she pulled from the wall, but that she killed White instead and, therefore, she was entitled to a first degree manslaughter instruction under KRS § 507.030(1)(a). *Id*. at *81-82.

The Supreme Court of Kentucky discussed these claims at length but rejected both. Regarding the former, the court concluded that no instruction for first degree manslaughter was warranted because "there was no evidence whatsoever that Caudill was acting under extreme emotional disturbance at the time Lonetta White was killed." *Caudill I*, 120 S.W.3d at 667. The court found that the evidence would not support the conclusion that Caudill entered White's home under the influence of EED, and that White's mere refusal to give Caudill money was not a plausible "triggering event" for EED. *Id*. at 668. On the latter claim, the court found no evidence to support the notion that White's killer did not intend her death, noting that:

The postmortem examination of Mrs. White's body revealed that she suffered at least fifteen blows to the head with a hammerlike object. The blows ranged from those that caused lacerations to those that fractured the skull causing fragments of bone to be driven into the brain. This undisputed evidence precludes any reasonable doubt that whoever attacked Mrs. White intended to kill, as opposed to merely injure, her."

*Caudill I*, 120 S.W.3d at 668.

In her current petition, Caudill reiterates only her second basis for arguing that the jury should have been instructed on first degree manslaughter as a lesser-included offense: that she intended White only serious harm, not death. Caudill contends that the Supreme Court of Kentucky's decision to the contrary is the result of an unreasonable determination of the facts and is contrary to or an unreasonable determination of federal law. [Record No. 1, p. 26-32] Alternatively, Caudill contends that she is entitled to *de novo* review of her legal arguments because the Supreme Court of Kentucky "ruled upon her right to lesser included instructions under state law without any analysis of [her claim] under the Eighth and Fourteenth Amendments" under *Beck v. Alabama*, 447 U.S.625 (1980). *Id*. at 30.

Caudill's argument that she is entitled to *de novo* review of her claim does not require extensive analysis. Caudill's own argument to the Supreme Court of Kentucky that she was entitled to an "intent to injure" first degree manslaughter instruction was itself largely, if not entirely, predicated upon state, as opposed to federal, law. Caudill's argument was based upon two Kentucky cases, *McGinnis v. Commonwealth*, 875 S.W.2d 518, 525 (Ky. 1994), and *Henderson v. Commonwealth*, 507 S.W.2d 454(Ky. App. 1974). Brief for Appellant Virginia Caudill, *Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky. 2003), 2001 WL 3456226, at *81-82 (Mar. 15, 2001). Had Caudill said no more than this, the Respondent would have a compelling argument that Caudill had procedurally defaulted this claim based upon her failure to give the

Supreme Court of Kentucky notice that she claimed a violation of her rights under federal law. *Cf. Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."); *Baldwin v. Reese*, 541 U.S. 27, 33 (2004) (holding that a petitioner's failure to identify a federal claim or to cite case law which might alert the state court to the federal nature of a claim is not fair presentation). It was not until a later "catch-all" section of her brief that Caudill suggested that the failure to instruct the jury on lesser-included offenses might implicate federal rights through her citation to *Keeble v. United States*, 412 U.S. 205 (1973) and *Beck*. 2001 WL 3456226, at *86-87. But even assuming that Caudill's imprecise briefing did not invite the very silence about which she now complains, her argument for *de novo* review is foreclosed by Supreme Court precedent issued after briefing on this matter, specifically *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 784-85 (2011) (holding that *de novo* review is only appropriate if the petitioner affirmatively shows that the state court's decision "did not involve[] a determination of the merits of his claim," such as where the state court denied the claim on procedural grounds).

Regardless, even without affording the Supreme Court of Kentucky the deference to which it is entitled under § 2254(d) and reviewing its decision *de novo*, Caudill's claim is plainly without merit. In *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court held that, at least in capital cases, the constitutional requirement of due process requires that the jury be instructed on lesser included offenses where the evidence warrants the instruction. *Id*. at 635-37. Shortly thereafter, the Supreme Court re-emphasized that "due process requires that a lesser included offense instruction be given *only when the evidence warrants such an instruction*." *Hopper v. Evans*, 456 U.S. 605, 611 (1982) (emphasis added). In making that determination, the Sixth

Circuit has explained that "[a] decision as to whether a *Beck* instruction is required is a fact-specific inquiry in which a court must determine whether there were sufficient facts for a reasonable jury to conclude that such an intent did not exist." *Campbell v. Coyle*, 260 F.3d 531, 545 (6th Cir. 2001).

Here, there was evidence through Ellis's testimony that Caudill only struck White once or twice, but not hard enough to kill her. [DVD A-6, February 14, 2000, 11:55-11:57] Caudill claimed that Goforth then bludgeoned White to death with a tire iron. [DVD A-8, February 15, 2000, at 13:11] Under Kentucky law, a person commits first degree manslaughter when "[w]ith intent to cause serious physical injury to another person, he causes the death of such person or of a third person ..." KRS § 507.030(1)(a). As Caudill explains, "first degree manslaughter ... occurs where a person did not intend to cause the death of another person *but nevertheless caused the death* while intending to cause serious physical injury." [Record No. 1, p. 28 (emphasis added)]

Even under Ellis's version of events - the version of events that Caudill claims supports this instruction - this never occurred. Ellis's testimony that Caudill struck White once or twice with a clock would support the notion that Caudill "intend[ed] to cause serious physical injury" but "did not intend to cause the death of [White]." But it could not support the necessary conclusion that it was *Caudill* who "nevertheless caused the death [of White]": Ellis testified that Caudill told her that it was the actions of *Goforth* - not Caudill - that "caused the death [of White]." The set of circumstances supported by Ellis's testimony plainly does not fit within the meaning of first degree manslaughter under 507.030(1)(a), as a first-degree manslaughter (or "wanton murder") instruction under KRS § 507.030(1)(a) is appropriate where it is the same person who inflicted the blows that were intended only to cause serious injury but which actually

caused the victim's death, not where it is a separate physical violence - committed upon the victim by a different person - that causes the victim's death.

The fundamental flaw in Caudill's argument is that it fails to maintain a clear distinction between the alternative versions of events offered by Caudill and Goforth, which in turn provided the evidentiary foundations for the alternative conclusions presented to the jury for consideration: whether throughout that evening Caudill acted as the principal or the accomplice. If the jury believed some version of Goforth's story, it would, of course, have concluded from the evidence that Caudill herself was the principal, repeatedly striking White in the head, not once or twice with a clock but repeatedly with a "hammerlike" object, causing her death. Such a set of facts would clearly warrant an instruction for intentional murder, and preclude an instruction for first degree manslaughter, as Caudill's intent when striking White would plainly have been to cause her death, not merely to cause serious bodily injury.

Alternatively, the jury could have believed some version of Ellis's testimony, concluding from the evidence that Caudill merely struck White once or twice in the head with the intent to injure but not to kill her. If no further attacks were made upon White, and she had died from these injuries, the manslaughter instruction Caudill requested might have been warranted. But the evidence clearly showed otherwise: the autopsy revealed that White died from multiple blows to the head with an object like a hammer. *Caudill I*, 120 S.W.3d at 668. Under this version of the events, Caudill was merely an accomplice to Goforth, who - after Caudill struggled with White over the phone and either took no action (according to Caudill's testimony) or struck White with a clock (according to Ellis's testimony) - retrieved a hammer or tire iron from his truck, returned to the house, and beat White to death with it. In other words, there was no evidence that White's death was the regrettable and unanticipated consequence of blows

designed merely to harm her, but not to kill her. Instead, White was brutally beaten to death with a hammer or tire iron, regardless of who inflicted the blows. The instructions given were appropriate to the only crime supported by the evidence - that Lonetta White was murdered.

Contrary to Caudill's argument, the Supreme Court of Kentucky did not ignore evidence of either her stated intent in entering the house or the manner in which she attacked White. Evidence of Caudill's alleged intent to only injure White became irrelevant in light of the fact that the autopsy revealed that White was actually killed by "at least fifteen blows to the head with a hammerlike object." Accepting this version of events as true, it plainly would not have been Caudill's few blows, but Goforth's repeated assault with a tire iron or hammer, that was the cause of White's death. The Supreme Court of Kentucky's conclusion that the autopsy results precluded any claim that White's killer (whether Caudill or Goforth) did not intend to kill her was not erroneous, let alone objectively unreasonable. *Campbell*, 260 F.3d at 544-45. In this case as in *Hopper*, the evidence only warranted the conclusion that the victim was intentionally killed, not that the victim's death was an unanticipated consequence of an attack. *Id*. at 612-13. The Supreme Court's admonition in *Hopper* is worthy of repetition:

> It would be an extraordinary perversion of the law to say that intent to kill is not established when a felon, engaged in an armed robbery, admits to shooting his victim in the back in the circumstances shown here. The evidence not only supported the claim that respondent intended to kill the victim, but affirmatively negated any claim that he did not intend to kill the victim. An instruction on the offense of unintentional killing during this robbery was therefore not warranted.

*Hopper*, 456 U.S. at 613.

### N.  Claim 2B – Imposition Of The Death Penalty Is Not Invalid Because The Trial Court Did Not Give A Guilt Phase Jury Instructions For Assault.

During trial, Caudill's counsel did not request a jury instruction for assault as a lesser-included offense to the murder charge. In her brief on direct appeal, Caudill's eleventh

assignment of error questioned numerous aspects of the trial court's guilt phase jury instructions on murder, and challenged its refusal to give instructions for "first degree manslaughter, second degree manslaughter and facilitation." Brief for Appellant Virginia Caudill, *Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky. 2003), 2001 WL 3456226, at *68 (Mar. 15, 2001). Each of these sub-claims was clearly delineated in subsection (A)(1) for the jury instructions on murder, *id*. at *69-77; subsection (A)(2) for the refusal to give a jury instruction for first degree manslaughter, *id*. at *77-82; subsection (A)(3) for the refusal to give a jury instruction for second degree manslaughter, *id*. at *82-83; and subsection (A)(4) for the refusal to give a jury instruction on criminal facilitation, *id*. at *83-85.

In her current petition, Caudill claims that the trial court also erred by failing to give a jury instruction for assault. [Record No. 1, pp. 31-32] Caudill contends that she exhausted this claim by raising it on direct appeal in a single sentence contained within a footnote as part of her argument in support of a first degree manslaughter instruction. The entirety of the footnote reads:

> 6. Cynthia Ellis testified that Virginia Caudill struck Ms. White, but that "the woman was actually murdered by Mr. Goforth." Tape 8; 2/15/00; 13:12:40-54. Under this state of the evidence an assault instruction was also warranted, although defense counsel did not specifically request it. *Id*.; 13:41:14.

*Id*. at 81 n.6. Not surprisingly, the Kentucky Supreme Court did not address this statement, a fact which Caudill now contends entitles her to *de novo* review of the claim. In her petition for rehearing to the Kentucky Supreme Court, Caudill spent half of her petition reiterating her argument that she was entitled to instructions for first and second degree murder, but made no statement suggesting that that court had overlooked or failed to address her argument regarding an instruction for assault. Petition for Rehearing for Appellant Virginia Caudill, *Caudill v.*

*Commonwealth*, 120 S.W.3d 635 (Ky. 2003), at 1-6 (Mar. 15, 2001).  As a result, Caudill's claim is procedurally defaulted because she never exhausted it in the Kentucky courts.  The exhaustion requirement of 28 U.S.C. § 2254(b)(1)(A) is not satisfied unless the federal habeas petitioner "fairly presented" the claim to the state courts for decision.  Fair presentation requires the petitioner to present the state courts with both the legal and the factual bases supporting the claim.  *Hanna v. Ishee*, 694 F.3d 596, 609 (6th Cir. 2012) (*citing Williams v. Taylor*, 529 U.S. 420, 437 (2000)).

Caudill failed to satisfy this requirement in two respects.  First, indulging the questionable assumption that Caudill ever intended to assert this claim before the Supreme Court of Kentucky in the first place, she failed to give that court adequate notice of her intention to do so when she buried it in a single sentence in a footnote on a similar but conceptually distinct claim, and failed to clearly identify it as a separate basis for relief, either in the index at the outset of her brief or in the body of her argument.  *Cf. Chambers v. McCaughtry*, 264 F.3d 732, 739 (7th Cir. 2001) ("In short, the single reference buried in a footnote in an argument on another contention hardly alerted the state judges, as a practical matter, that Mr. Chambers was seeking relief on the ground now argued at length before us.") (*citing  Bocian v. Godinez*, 101 F.3d 465, 469 (7th Cir. 1996)).  Second, Caudill's statement indicated only her belief that state law warranted an instruction for assault, not that trial court's failure to *sua sponte* instruct the jury on that charge violated any of her federal rights.  The requirement of fair presentation requires the petitioner to "make the state court aware that the claims asserted present federal constitutional issues."  *Lucas v. Secretary, Dep't of Corrections*, 682 F.3d 1342, 1352 (11th Cir. 2012).  Caudill plainly failed to so do here.  *Whiting v. Burt*, 395 F.3d 602, 612-13 (6th Cir. 2005).

82

**O. Claim 2C – Imposition Of The Death Penalty Is Not Invalid Because The Trial Court Did Not Give A Guilt Phase Jury Instruction For Second Degree Manslaughter.**

At a hearing following the close of the guilt phase of the case, Caudill requested that the jury be given instructions on second degree manslaughter as a lesser included offense to wanton murder. As grounds for the request, Caudill argued that the evidence would support the conclusion that she and Goforth went to White's house only to get money for drugs, but not to rob White, and that Caudill only struck White with a clock, but that Goforth then struck White repeatedly with a tool from his truck. [DVD A-8, February 15, 2000, at 14:01-14:03] The trial court rejected this request, noting that Caudill could not have "wantonly" hit White with a clock, but must have participating in killing White intentionally. [DVD A-8, February 15, 2000, at 14:04-14:05]

On direct appeal, Caudill argued that she was entitled to jury instructions on second degree manslaughter on two alternative grounds. First, she contended - as she had at trial - that her participation in the robbery amounted to at most "wantonness," a "conscious disregard of a substantial risk that Goforth would kill White during the course of the robbery" under KRS § 507.040(1). The Supreme Court of Kentucky denied that claim concluding that, even if the evidence had warranted an instruction for wanton murder, it would not have done so for the lesser included offense of second degree manslaughter. *Caudill I*, at 668-69.

Caudill does not press that claim again here. She does, however, reiterate her claim - not made to the trial court but argued as grounds for reversal to the Kentucky Supreme Court - that she was so intoxicated that she could have not formed the required intent to convict her of

murder.[13]  Under Kentucky law, voluntary intoxication by the defendant can be a defense to a crime if it would have prevented the defendant from satisfying an element of the offense, such as the intent required to commit murder.  KRS § 501.080(1).  Caudill claimed that the evidence at trial would support the conclusion that she was so intoxicated that she could not have intended to kill White.

During trial, Caudill testified that in the late afternoon on the Saturday of the murder, she and Goforth drove to White's house, where White paid Caudill approximately $20-30 for doing some housecleaning.  Caudill then used the money to purchase crack, which she and Goforth used.  [DVD A-7, February 14, 2000, at 15:40-15:42]  Later the same day, Caudill indicates she observed Goforth unsuccessfully attempting to "shoot up" regular cocaine using a needle, and that she told him that he didn't have to do that because she thought that she could get additional funds from White, which could be used to purchase more crack cocaine.  [DVD A-7, February 14, 2000, at 15:42-15:44]

Caudill testified that she and Goforth then drove to White's house a second time, but this time they parked at a nearby shopping center.  Caudill explained that this was done to make White believe that she had walked from a nearby hotel, so that she could explain to White that she did not have enough money to pay for the hotel.  Further, while Caudill and Goforth both walked to the house, only Caudill approached the door, while Goforth presumably stayed out of sight.  When Caudill knocked at the door, White did not immediately open the door in response to Caudill's knock.  Instead, she asked through the door who was there.  Caudill identified

---

[13]    Ordinarily, an unpreserved error is not reviewed on direct appeal, but Kentucky law specifically excepts capital cases from this rule.  KRS § 532.075(2); *Ordway v. Commonwealth*, 391 S.W.3d 762, 774 (Ky. 2013).

herself to White, but did not indicate that Goforth was present. [DVD A-7, February 14, 2000, at 15:44-15:45]

Caudill testified that White opened the inner door and, after a brief conversation through the storm door, agreed to give Caudill additional money. Caudill then told Goforth that White had agreed to give them money. Caudill testified that Goforth unexpectedly charged through the door and attacked White, at which point she became "hysterical." [DVD A-7, February 14, 2000, at 15:45-15:47] Caudill testified that she only remembered "bits and pieces" after that, but indicated that she had complied with Goforth's request that she take the fur and guns and put them in White's car. She then drove Goforth's truck to a remote location, eventually following Goforth (who was driving White's car) down a small road. Goforth then doused White's car with gasoline and lit the vehicle on fire with White's body inside. [DVD A-7, February 14, 2000, at 15:48-15:51][14]

Goforth also testified during trial. His testimony did not indicate that, before driving to White's house, Caudill was intoxicated or incapable of understanding the events as they transpired. Of particular note was Goforth's general testimony that using crack cocaine did not cause inebriation and that its effects were short term. Specifically, when asked "what kind of high do you get" when an individual uses crack cocaine, Goforth testified that "you get a rush, and feel euphoric for a few minutes, and ... you just, ah, it keeps you up." [DVD A-7, February 15, 2000, at 8:51-8:52] Dr. Peter Schilling testified similarly during the penalty phase of the trial, stating that crack cocaine "has the effect of giving a momentary high that lasts for a few

_____

[14] Caudill testified that Goforth then drove to a series of crack houses in Lexington and they then drove to a house in Nicholasville. At this point during her testimony, Caudill stated that she had also consumed alcohol "this night," but she did not clarify whether she had done so before, or as the context of her testimony equally suggests, after the murder. [DVD A-7, February 14, 2000, at 15:53]

moments, a few minutes, it just brings you up and makes you feel really good." [DVD A-9, September 16, 2000, at 16:52] Goforth's testimony indicated that Caudill's actions did not appear abnormal when they drove to White's house or when they first entered her home. [DVD A-7, February 15, 2000, at 8:54-9:02] Goforth testified that, only once Caudill was in the process of beating White with a hammer did she appear "out of it. I was trying to talk to her and she wasn't coherent..." [DVD A-7, February 15, 2000, at 9:06-9:07] Goforth also testified that Caudill immediately proceeded to search the house for possessions to steal; later prevented him from calling the police; wrapped White's body up and moved the body to her car with his assistance; and drove White's car to a remote location before setting it on fire. [DVD A-7, February 15, 2000, at 9:07-9:20]

On direct appeal, Caudill argued that this evidence was sufficient to warrant an instruction to the jury that they could convict her of second degree manslaughter if they found that she was so intoxicated that she was incapable of intending White's death. Faced with this evidence, the Supreme Court of Kentucky rejected this claim as well, specifically noting that Caudill testified that the pair had parked their truck away from the house and kept Goforth out of view in an effort to hide his presence from White, and there was testimony that Caudill gained entry to the house under false pretenses. In summary, the court concluded that "[t]hese are not the actions of a person who was so intoxicated that she did not know what she was doing." *Caudill I*, at 669-70.

Caudill argues that the Supreme Court of Kentucky's conclusion was an unreasonable determination of the facts because that court did not expressly address other facts she contends indicate that she was extremely intoxicated, and constituted an unreasonable determination of federal law because the evidence of her intoxication was sufficient to warrant the instruction for

second degree manslaughter. [Record No. 1, pp. 34-36] However, the Supreme Court of Kentucky's decision was amply supported by the evidence and was not an unreasonable determination of federal law under *Beck* and its progeny. Under Kentucky law, "[i]ntoxication is a defense to a criminal charge only if such condition ... [n]egatives the existence of an element of the offense...") KRS § 501.080(1); *Fredline v. Commonwealth*, 241 S.W.3d 793, 797 (Ky. 2007). If sufficiently severe, intoxication may permit the jury to reasonably conclude that the defendant was incapable of forming the required intent for a murder charge, and may warrant an instruction for voluntary manslaughter. *Nichols v. Commonwealth*, 142 S.W.3d 683, 689 (Ky. 2004).

But "mere drunkenness will not raise the defense of intoxication." *Jackson v. Commonwealth*, No. 2007-SC-392-MR, 2010 WL 252244, at *11 (Ky. Jan. 21, 2010) (citation omitted). Kentucky law does not permit any degree of intoxication to serve as a defense to intentional murder. Rather, the intoxication must be so extensive and disabling that it wholly prevents the defendant from even forming the intent to commit murder. Thus, before a jury instruction is warranted, "there must be evidence not only that the defendant was drunk, but that [he] was so drunk that [he] did not know what [he] was doing." *Springer v. Commonwealth*, 998 S.W.2d 439, 451-52 (Ky. 1999); *Rogers v. Commonwealth*, 86 S.W.3d 29, 44 (Ky. 2002) ("A voluntary intoxication instruction is justified ... when there is evidence that the defendant was so drunk that he did not know what he was doing, or when the intoxication [negates] the existence of an element of the offense.") (footnotes and internal quotation marks omitted).

The evidence at trial fell far short of that necessary to permit a reasonable jury to conclude that Caudill was so intoxicated that she was rendered incapable of forming intent. While Caudill points to evidence that: (i) she had used crack cocaine that day and was "high" as

a result, and to (ii) she may have consumed some alcohol prior to killing White, there was also considerable evidence that, notwithstanding the effects of those intoxicants that day, Caudill was very much in control of her actions that evening, and acted in a knowledgeable and deliberate fashion. Caudill's own testimony demonstrated her awareness and planning. She and Goforth parked his truck away from the house and devised a story regarding her need for more money. Caudill hid Goforth out of view and did not tell White of Goforth's presence when asked. Further, immediately after the murder, Caudill was both mentally and physically capable of thoroughly looting White's house, taking the stolen items to White's car, and driving to an isolated location. And Caudill was sufficiently cognizant to give fairly detailed testimony regarding the events. Taken as a whole, Goforth's testimony also indicated that, prior to the murder, Caudill's actions were unexceptional to him, and certainly not the product of extreme intoxication. Goforth's characterization of Caudill after the murder was that she was highly focused on robbing the house and destroying evidence, and not that she was incoherent.

The Supreme Court of Kentucky's determination that the evidence could not reasonably support a conclusion that Caudill was so intoxicated that she was incapable of forming intent was not an unreasonable determination of the facts. To the contrary, that court has consistently rejected attempts to obtain a jury instruction on the lesser included offense under similar facts. *See Jackson*, 2010 WL 252244, at *12 ("While Appellant's testimony, in conjunction with Ditto and Scott's, suggested that Appellant was 'high' when the offenses were committed, it does not show that he was so impaired at the time of the altercation and subsequent flight to Rudolph's home that he did not know what he was doing - indeed, at trial, Appellant's defense rested upon his detailed account of what exactly happened.") *Harris v. Commonwealth*, 313 S.W. 3d 40 (Ky. 2010), is particularly instructive. In *Harris*, Supreme Court of Kentucky affirmed the trial

court's denial of a voluntary intoxication instruction. The court noted that witnesses had testified to seeing the defendant (an acknowledged alcoholic) earlier in the day of the murder, walking along railroad tracks "talking to himself, waving his arms, and apparently oblivious to his surroundings." However, there were numerous indications that the defendant was aware of his actions. He had also loaned ten dollars to his son-in-law when asked to do so, and told a woman he encountered after the murder "[s]ee baby, don't tell me I don't care to kill somebody." But it was the defendant's actions shortly before, during, and shortly after the murder that proved most compelling: the defendant had, according to a pre-arranged plan, met with two co-conspirators before the murder armed with a gun; shot the victim in a secluded location; loaded the victim's body into a truck; after the truck was driven to another location, ordered one of the men to set the truck on fire; removed his clothing and threw it into a river; and demanded his agreed-upon payment for the murder. *Id*. at 50-51.

In the present case, while Caudill had cocaine and/or alcohol in her system on the evening in question, the evidence of her conduct before, during, and shortly after the murder indicated that she was not only aware of and in control of her actions, but that she also engaged in conscious and deliberative thought in advance of her actions to achieve her ends. The evidence at trial did not warrant or permit an instruction for second degree manslaughter under Kentucky law, and the Supreme Court of Kentucky's conclusion to this effect was neither contrary to nor an unreasonable determination of federal law. *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) ("A lesser-included offense instruction is therefore not required when the evidence does not support it.") While Caudill focuses upon certain pieces of evidence to the exclusion of others, and asserts a different view of the evidence overall, this is insufficient to warrant habeas relief where the Kentucky Supreme Court's determination of this issue was

89

neither factually nor legally unreasonable. *Id.* at 544 (*citing Williams v. Taylor*, 529 U.S. 362, 411 (2000)).

### P. Claim 17 - Caudill Is Not Entitled To Habeas Relief Based On The Assertion That Her Attorney Did Not Advise Her That She Had The Right To Testify During The Penalty Phase As Well As During The Guilt Phase Of Trial.

In her RCr 11.42 motion, Caudill stated by affidavit that, notwithstanding the fact that she testified during the guilt phase of trial, her counsel "did not discuss … the possibility of testifying at the penalty phase of my trial." Caudill further contends that, '[i]f he had told me that I had the option to do so, I would have." [TR 488] Because Caudill's counsel did not advise her that she could testify, she contended that she did not knowingly, voluntarily, and intelligently waive her right to do so. [TR 478] The trial court rejected Caudill's asserted lack of knowledge as not credible. [TR 782-83]

On appeal, the Supreme Court of Kentucky found it "improbable that Caudill was unaware of her right" to testify because she had testified during the guilt phase of the trial, and when counsel did not call her during the penalty phase, "Caudill expressed no disagreement with this tactical decision and made no indication to the trial court that she wished to testify." *Caudill II*, at *7. In her current petition, Caudill contends in light of her affidavit that the Supreme Court of Kentucky's conclusion that it was unlikely that she had not been advised of her right to testify was an unreasonable determination of the facts under § 2254(d)(2). [Record No. 1, p. 129]

This Court concludes that the Supreme Court of Kentucky's determination that Caudill had not demonstrated that she was unaware of her right to testify during the penalty phase was a reasonable determination of the facts under § 2254(d)(2). Further, even if it were not, Caudill has never articulated a viable legal theory that explains how her asserted lack of knowledge resulted in a violation of her constitutional rights during trial.

90

Federal habeas relief is only available if Caudill demonstrates that the Supreme Court of Kentucky's decision rejecting this claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). This provision embodies a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citations and quotation marks omitted). Because a state court factual findings underpinning its decision are presumed correct, Caudill must meet her burden by presenting clear and convincing evidence undermining the Supreme Court of Kentucky's decision. 28 U.S.C. § 2254(e)(1); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

In support of her claim that she did not know that she had the right to testify during the penalty phase of her trial, Caudill submits her own, one-sentence statement filed in her state post-conviction proceedings that her trial counsel "did not discuss with me the possibility of testifying at the penalty phase of my trial." [TR 488] Caudill apparently did not solicit or present evidence from her trial counsel on this matter. The Supreme Court of Kentucky correctly found that Caudill's own self-serving statement was insufficient to conclude that she was unaware of her right to testify. Notably, Caudill's affidavit does not state that she was *unaware* of her right to testify, only that her counsel did not expressly discuss the matter with her.

The Supreme Court of Kentucky correctly noted that Caudill was likely aware of that right because she had testified on her own behalf during the guilt phase of the trial, a fact clearly undermining her contention that Caudill made no effort to explain or refute. In addition, Caudill did not allege that she had asked her counsel about testifying a second time during the penalty phase, nor did she object when her counsel proceeded through the penalty phase without calling her as a witness. *Caudill II*, at *7. The Supreme Court of Kentucky cited ample facts and

provided good reasons not to take Caudill's self-serving declaration at face value. And Caudill has failed to offer any plausible evidence, let alone clear and convincing evidence, to undermine the presumption of correctness that attaches to that court's finding. Habeas relief, therefore, is inappropriate regarding this claim. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010); *Hodge v. Haeberlin*, 579 F.3d 627, 639-40 (6th Cir. 2009); *Smith v. Perry*, No. 5:11-CV-11145, 2013 WL 173818, at *6 (E.D. Mich. Jan. 16, 2013). But even if Caudill had presented compelling evidence demonstrating that she was unaware that she had the right to testify during the penalty phase, she has not articulated a viable legal claim that her constitutional rights were violated as a result. To be sure, a criminal defendant has a constitutional right to testify on his or her own behalf. *Rock v. Arkansas*, 483 U.S. 44, 49-53 (1987). And a defendant's waiver of that right must be knowing and voluntary. Counsel's role is merely to advise his or her client whether or not to take the stand, but the decision is the defendant's alone. *United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000).

In both her appeal to the Supreme Court of Kentucky and in her petition before this Court, Caudill only argues that her lack of knowledge *would have* prevented her from knowingly, voluntarily, and intelligently waiving that right had she been asked to do so. [Record No. 1, p. 128] But the question of "waiver" is a red herring, as Caudill indicates that she was never asked to nor did she either assert or "waive" her right to testify. Caudill has never offered an explanation of how she can assert a freestanding constitutional claim that her constitutional rights were *violated* predicated solely upon her lack of knowledge. No one told Caudill that she could not testify. Instead, Caudill alleges that she just did not know she had the right to testify during the penalty phase. But lack of knowledge only implicates her constitutional rights if Caudill contends that her attorney rendered ineffective assistance by failing to tell her that she

could testify (a claim she notably does not make), or that the trial court had an affirmative obligation to notify her of this fact, a claim plainly contrary to established law. *Webber*, 208 F.3d at 551 ("[b]arring any statements or actions from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither required to *sua sponte* address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record."); *United States v. Stover*, 474 F.3d 904, 908 (6th Cir. 2007) ("not all fundamental rights must be waived by the defendant after an on-the-record colloquy with the court. The waiver of certain fundamental rights can be presumed from a defendant's conduct alone, absent circumstances giving rise to a contrary inference.")

To conclude that Constitutional rights were violated by her counsel's silence without asserting an ineffective assistance claim, Caudill must necessarily be implying that the Constitution imposes either upon counsel or the court an affirmative obligation to "Mirandize" a criminal defendant regarding the right to testify on one's own behalf, and/or that a waiver of that right be made expressly and on the record. The law is just the opposite, placing the burden of exercising that right squarely upon the criminal defendant. *Goff v. Bagley*, 601 F.3d 445, 471 (6th Cir. 2010) (holding that a defendant must alert the trial court of his or her desire to testify, and that a waiver of that right may be inferred from silence); *United States v. Stark*, 507 F.3d 512, 516-17 (7th Cir. 2007) (collecting cases); *Siciliano v. Dose*, 834 F.2d 29, 30 (1st Cir. 1987) (trial court is not constitutionally required to advise criminal defendant that he has a right to testify and ask him whether he wishes to waive that right); *Palmer v. Hartley*, No. 08-cv-860-PAB, 2010 WL 5476793, at *19 (D. Colo. Dec. 30, 2010).

**Q. Claim 16A – Caudill's Trial Counsel Was Not Ineffective During The Penalty Phase By Failing To Interview Friends, Relatives, High School teachers, And Childhood Neighbors Who Might Have Testified To Caudill's "Positive Character, Difficult Background, And Mental Limitations." Likewise, Counsel Was Not Ineffective By Failing To Offer Evidence Indicating Caudill Was Repeatedly Abused By Boyfriends.**

During the penalty phase of the trial, Caudill's attorney called her mother who testified that while Caudill was growing up, her father drank excessively and was both physically and mentally abusive to her and their children, including Caudill. Caudill's mother further testified that, while Caudill loved her father, she was also terrified of him and would flee the home at times when he came home drunk. Caudill's mother aslo testified that Caudill developed a drug problem in high school, and as an adult would behave in a "spastic" manner when taking crack cocaine. [DVD A-9, February 16, 2000, at 15:11 - 15:23]

Counsel also called Craig Caudill, Virginia's brother, who testified that: (i) Caudill was a kind and loving sister when they were growing up; (ii) his father was a drunk who was abusive to him and Virginia; (iii) he knew she had developed a drug problem in adulthood; but (iv) he had not seen Caudill in over a decade. [DVD A-9, February 16, 2000, at 15:25 - 15:31] Rhonda Whitt, Virginia's sister, testified that: (i) they were scared of their father when he was drunk; (ii) Virginia was slow to learn in high school and was frequently teased because she was overweight; and (iii) Virginia associated with the "wrong crowd" in his school. [DVD A-9, February 16, 2000, at 15:32 - 15:35]

Leslie Redd, Caudill's adult daughter, testified that Caudill was a good mother when she was not using drugs or alcohol, but that her relationship with her mother had been strained in the past because of drug use and the men with whom Caudill associated. [DVD A-9, February 16,

2000, at 15:36 - 15:39]  Caudill also called her cousin, John Moncrief, who testified that Caudill is a good person when she is not intoxicated.  [DVD A-9, February 16, 2000, at 16:36 - 16:38]

Carolyn Whirley, who conducted a non-denominational ministry at the Fayette County Detention Center where Caudill was housed prior to trial, also testified.  Whirley stated that Caudill attended both the group services offered and met with her individually, as well as encouraged other inmates to do so and read related literature to them.  [DVD A-9, February 16, 2000, at 15:40 - 15:44]  Finally, Dr. Peter Schilling, a board licensed and certified psychologist, testified regarding Caudill's abusive father, her difficulties in school, and her repeated relationships, including marriages, to abusive and violent men, including Thomas Garrett. Schilling testified that tests administered to Caudill indicated that she had a very submissive personality.  [DVD A-9, February 16, 2000, at 16:40 - 17:06]

Caudill contends that her attorney was ineffective because he did not present additional mitigation evidence of this type during the penalty phase of the trial.  [Record No. 1, pp. 110-111]  During Caudill's post-conviction review proceedings, she presented affidavits from a parade of individuals, including high school teachers, members of her extended family, and old acquaintances and boyfriends, who could have testified during the penalty phase.  The list of potential witnesses included Henrietta Thomas, a teacher at Caudill's high school; Lovie Brown, a librarian at Caudill's high school; Vina Caudill, Caudill's grandmother; Ruth Brown, a neighbor who lived next door to Caudill's childhood home; Barbara Watson, Caudill's second cousin; Sherry Whetzel, an instructor for the Equine Institute that Caudill had attended; Ray Towery, an old friend; Mike Sipple, an old boyfriend; Ronny Ray Hopkins, an abusive old boyfriend; and Billie Davenport, a legal advocate for the YWCA Spouse Abuse Center in Lexington, Kentucky.  [TR 586-624]

Caudill also argues that her attorney should have introduced medical records from Samaritan Hospital in Lexington from 1995; Massac Memorial Hospital in Metropolis, Illinois from 1997; and Lourdes Hospital in Paducah, Kentucky from 1997, which document physical abuse from her then-boyfriend Thomas Garrett. [TR 625-673] Caudill does not allege that her counsel was actually aware at the time of trial of the identity of these individuals, the substance of their knowledge, or their willingness to testify. However, she suggests that further investigation would have revealed their identities and relevant information.

The Supreme Court of Kentucky rejected this claim, concluding that through the testimony of five family members and one psychologist, Caudill's attorney had adequately "revealed Caudill's abusive childhood, her substance abuse issues, her violent relationships with males, and her cognitive deficiencies. That additional witnesses existed who would have corroborated or expanded upon this testimony does not amount to deficient performance by counsel." *Caudill II*, at *5. Having reviewed the record, the Court concludes that Caudill has failed to demonstrate that the Supreme Court of Kentucky's determination of this issue was either contrary to or an unreasonable application of clearly established federal law.

Caudill's attorney elicited testimony from several family members regarding her troubled childhood, and from a psychologist regarding Caudill's conduct and difficulties as an adult. *Lorraine v. Coyle*, 291 F.3d 416, 427 (6th Cir. 2002) (holding that when considering ineffective assistance claim with respect to presenting mitigating evidence, "it is best to begin with the evidence Petitioner actually presented in mitigation.") While defense counsel must put before the jury enough evidence to establish that there are facts about the defendant's life that are worthy to consider in mitigation, he or she need not continue to add more and more evidence once the point is adequately made. *Ford v. Hall*, 546 F.3d 1326, 1338 (11th Cir. 2008)

("Counsel is not required to call additional witnesses to present redundant or cumulative evidence."); *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005). As the Supreme Court has stated, "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009). Counsel's strategic choice against presenting such evidence does not constitute deficient performance, nor can the habeas petitioner demonstrate prejudice where the testimony is duplicative or cumulative of that already presented. *Cf. Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1409-10 (2011) (holding that no prejudice resulted from not introducing additional evidence of childhood abuse which "largely duplicated the mitigation evidence at trial" and noting that such evidence may cause a jury to conclude that the defendant is "simply beyond rehabilitation."); *Wong v. Belmontes*, 558 U.S. 15, 20-22 (2009) (finding no prejudice in failing to introduce cumulative "humanizing" evidence during the mitigation phase). Caudill's attorney elicited testimony from her mother, brother and sister that amply described the abusive conduct that she faced in her childhood from her father, rendering further testimony on the point cumulative. Dr. Schilling indicated that Caudill had been involved in abusive relationships during her adult life, and Caudill has offered nothing to indicate that she was prejudiced because the jury did not hear more details. *Bobby*, 558 U.S. at 12.

### R. Claim 16B – Caudill's Trial Counsel Was Not Ineffective By Failing To Adequately Direct His Expert Witness For Mitigation, By Failing To Competently Elicit Testimony From An Expert During The Penalty Phase or By Failing To Call A Second Expert To Testify.

In addition to offering the testimony of numerous members of Caudill's family, Caudill's trial attorney also called psychologist Dr. Peter Schilling to testify regarding his evaluation of Caudill. Schilling stated that he had reviewed extensive historical documentation regarding

Caudill and had interviewed her in-person on four occasions prior to trial. Schilling testified regarding Caudill's childhood, her abusive father, and her relationship with Thomas Garrett, who physically abused Caudill on several occasions. He also described Caudill's addiction to crack cocaine and its effect. Schilling indicated that tests of Caudill's intelligence were very unusual, strong in some areas but unexpectedly weak in others, and were perhaps indicative of someone who had suffered brain trauma, such as might be seen in a person who had been repeatedly hit in the head through abuse, or a person with a developmental disability. Additionally, Schilling testified that tests results indicated that Caudill had a very submissive personality. [DVD A-9, February 16, 2000, at 16:40 - 17:06]

Dr. C. Christopher Allen, Ph. D., a licensed clinical psychologist, was retained by counsel to perform a neuropsychological evaluation of Caudill. However, Dr. Allen did not testify at trial. Dr. Allen conducted an interview and evaluation of Caudill at the jail on February 4, 2000. In his report, Dr. Allen indicated that during the interview Caudill told him that "she experienced no significant emotional difficulties" during her early childhood and adolescence but that when she was between ten and fifteen years old her father drank heavily and was abusive to their mother. However, Caudill "denied that her father was in any way abusive to her or her siblings." Allen also gathered information to create a history of Caudill's personal, social, scholastic and employment background. In his report, Allen reviewed Dr. Schilling's MMPI-2 test of Caudill, which he described as permitting the conclusion that Caudill was "an individual who is 'not particularly rule-bound and can put her own needs ahead of other person's feelings and rights.'"

During the interview, Dr. Allen had Caudill take a number of tests. Dr. Allen concluded that Caudill generally tested in the average to slightly below-average range, with a few tests resulting in a "borderline impaired" score. Allen concluded that Caudill's "overall cognitive

skills fall within normal limits," while noting that "her history of polydrug abuse and probable history of traumatic brain injury" suggested possible cerebral dysfunction, and that Caudill's test scores indicated that Caudill might be "particularly vulnerable to influence of other individuals." [TR 683-691] Dr. Allen sent his report to Dr. Schilling and Caudill's counsel, but he was not called to testify during the trial. [TR 680-682] During a conference before the penalty phase, Caudill's counsel indicated that Dr. Allen had prepared a report but that he did not intend to call to him to testify, only that he might have Dr. Schilling explain that Dr. Allen had performed a neuropsychological evaluation of Caudill, and that in Dr. Schilling's opinion, that data indicated that Caudill may have suffered a previous head injury or had a learning disability. [DVD A-9, February 16, 2000, at 2:53-2:55 p.m.][15]

Dr. Andrew Todd Cooley, a board certified psychiatrist, testified on behalf of the prosecution. Dr. Cooley testified that he was provided with significant documentation regarding Caudill prior to meeting with her in person shortly before trial. Cooley testified that, based on his examination of Caudill, there was no indication physically evident or historically related suggestive of neurological or brain damage, including damage resulting from blows to her head. Cooley further testified that the test employed by Dr. Schilling was only capable of suggesting - but not of actually determining - whether Caudill's personality could be considered submissive. [DVD A-9, February 17, 2000, at 9:09-9:23]

---

[15] The record is ambiguous regarding whether Dr. Schilling actually received Dr. Allen's report before trial. Dr. Schilling stated in his affidavit that he did not. [TR 675] However, Dr. Allen stated that he faxed his report to Dr. Schilling and to Caudill's counsel before trial. [TR 681] And while Caudill's counsel said that he would discuss Allen's report through his direct examination of Schilling, he did not. [DVD A-9, February 16, 2000, at 16:40 - 17:06] The record supports the inference that Caudill's counsel intended to elicit the substance of Dr. Allen's report through Dr. Schilling's testimony, but may have been unable to do so because, unbeknownst to him at the time, Dr. Schilling had not received it.

Four years after the trial concluded, Dr. Schilling signed an affidavit stating that he had not received a mitigation report from Susan Snyder, a licensed clinical social worker whom Caudill's counsel had hired as a mitigation specialist, before the trial began. Schilling noted that on December 14, 1999, Snyder had written a letter to Caudill's counsel indicating that John Baldridge, an investigator working for the defense, had been unable to obtain certain historical documents relating to Caudill, such as school and hospital records. In her letter, Snyder stated that she would be visiting Caudill in the jail later that week, and expressed hope that "[p]erhaps [Caudill] will be more motivated to help me in contacting her family, and potential necessary witnesses." [TR 677-679] Schilling stated in 2004 that, had he received these documents, they "would have informed my diagnosis," and that his diagnosis might have changed to "post traumatic stress disorder, unidentified learning disabilities, or battered women syndrome." Schilling also stated that had the report created by Dr. Allen been introduced at trial, which he indicates he did not receive, it would have supported his own testimony. [TR 674-679]

In November 2004, Dr. Allen also executed an affidavit stating that when performing his evaluation of Caudill he did not have "needed medical records" for Caudill. Dr. Allen indicates that he faxed his report to Dr. Schilling, who claims not to have received it, as well as to Caudill's counsel. In contrast to the written report he provided in 2000, in his 2004 affidavit Dr. Allen stated that it was "probable" or "likely" that Caudill had suffered brain damage from her heavy drug use or a blow to the head. [TR 680-682]

In her petition, Caudill argues that her counsel was ineffective in using Drs. Schilling and Allen as expert witnesses because he failed to call Dr. Allen and because he did not call Dr. Schilling to rebut Dr. Cooley's testimony for the prosecution. [Record No. 1, pp. 121-122] The Supreme Court of Kentucky rejected this claim, noting that "[d]efense counsel's investigation

and presentation of mitigation evidence in this case revealed Caudill's abusive childhood, her substance abuse issues, her violent relationships with males, and her cognitive deficiencies", and concluded that Caudill's counsel was not ineffective merely because he failed to present more psychological evidence regarding Caudill. *Caudill II*, at *5.

The Supreme Court of Kentucky correctly and reasonably applied federal law. With respect to counsel's decision not to call Dr. Allen, the Court finds this decision to be well within the broad range of counsel's professional judgment. Caudill contends that Dr. Allen's testimony would have corroborated Dr. Schilling's testimony. As the Supreme Court of Kentucky noted, Dr. Schilling advised the jury that Caudill's father was an abusive and violent alcoholic; that she had a history of relationships with violent and abusive men; that he believed that Caudill may have had a learning disability or had suffered brain trauma as a result of one or more blows to the head; and that she had a submissive personality. Information regarding these topics had therefore already been presented to the jury, and counsel was not ineffective for failing to introduce more. *Clark v. Mitchell*, 425 F.3d 270, 282-83 (6th Cir. 2005).

It is true, as Caudill argues, that introducing Dr. Allen's report through his testimony would have provided additional support for Dr. Schilling's testimony. In his report, Dr. Allen concluded that, in some areas, Caudill tested as "borderline impaired" in her intelligence; however, he also noted that "the patient's overall cognitive skills fall within normal limits." His report further indicated that her history suggested possible cerebral dysfunction, and that her test scores indicated that she might be susceptible to the influence of others. [TR 690-691] However, the limited benefit of that support would have come at considerable cost to the defense, because Dr. Allen's report strongly contradicted numerous elements of Caudill's mitigation case. In his report, Dr. Allen noted that Caudill told him during their interview that

while her father was a drunk and was abusive to her mother, Caudill had "denied that her father was in any way abusive to her or her siblings." This clear and unequivocal statement would have directly contradicted testimony given by Caudill's mother, brother, and sister. Caudill further stated that during her early childhood and adolescence that "she experienced no significant emotional difficulties." [TR 684] It is difficult to imagine testimony more damaging to Caudill's mitigation case than her own statements made to a defense psychologist which suggested that her mother and siblings had either exaggerated or lied about the childhood abuse and its effect upon her, which formed the very basis for her mitigation case.

In his report, Dr. Allen also characterized the results of the MMPI-2 test conducted by Dr. Schilling as "suggest[ing] that Ms. Caudill was feeling significantly depressed, and may have been described as an individual 'not particularly rule-bound and can put her own needs ahead of other person's feelings and rights.'" This statement - that psychological tests performed on Caudill indicated that she did not feel particularly "rule-bound" - could have been used by the prosecution, either on cross-examination of Dr. Allen or through testimony elicited from Dr. Cooper, to suggest that Caudill was a person who did not feel obligated to follow the law, and who felt it was her prerogative to act in her own self-interest even at the expense of others.

This information could have been used by the prosecution - or by Goforth - to indicate that it was Caudill who had robbed and murdered White because she did not feel "rule-bound," or that she was blaming Goforth for the murder because she felt entitled to put her own needs ahead of Goforth's. Of course, Caudill's counsel could have attempted to clarify or explain these statements through further testimony if Dr. Allen meant something other than what the statements suggest when taken at face value. But counsel could reasonably have concluded that the potential harm which could result if the jury did not fully accept those explanations made

introduction of the Dr. Allen's report simply not worth the risk, particularly in light of the limited additional persuasive value it carried. The Supreme Court of Kentucky was correct in determining that Caudill's counsel was not ineffective under *Strickland* for choosing not to present the testimony of Dr. Allen. *Clark*, 425 F. 3d at 284-85; *Webb v. Mitchell*, 586 F.3d 383, 395 (6th Cir. 2009 (holding that counsel may reasonably decide against presenting a retained expert's report and testimony if it contains information potentially damaging to counsel's mitigation theory).

Caudill likewise failed to demonstrate ineffective assistance with respect to the testimony of Dr. Schilling. Caudill appears to argue that her counsel failed to ensure that Schilling received a mitigation report from Ms. Snyder before trial. But neither Dr. Schilling nor Dr. Allen explain what information was missing from this mitigation report, or what documents and records they did not receive. More importantly, neither stated what effect this missing information actually would have had upon their testimony. Without some specific evidence regarding what testimony would have actually been offered had the missing information been provided, there is no basis to conclude that Caudill suffered any prejudice as a result of its absence. *Cf. Hill v. Mitchell*, 400 F.3d 308, 317-319 (6th Cir. 2005).

Snyder's letter suggests that at least some of the difficulty in gathering pertinent information was the consequence not of neglect from counsel, but from a lack of cooperation from Caudill herself. In her December 14, 1999, letter, Snyder expressed her hope that when she visited Caudill later that week, "[p]erhaps [Caudill] will be more motivated to help me in contacting her family, and potential necessary witnesses." This statement indicates that Caudill herself was less than fully cooperative with her own defense team in contacting her family and other witnesses to testify during the mitigation phase. *Strickland v. Washington*, 466 U.S. 668,

691 (1984) ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.")

Finally, while Dr. Schilling complains in his affidavit that he "never received a final report from [Snyder,]" this appears to be because when he asked for the report he "didn't feel it was [his] duty *to drive to Ms. Snyder's to get it*." [TR 675] (emphasis added). This language does not indicate that Snyder did not complete her mitigation report. Instead, it suggests that she did complete it but had not sent it to Dr. Schilling, who "didn't feel it was [his] duty to drive to Ms. Snyder's to get it." Snyder may have failed to send the report to Dr. Schilling because she was working on another capital murder case in Richmond, Kentucky, scheduled for trial the same week as Caudill's trial. [TR 678] Whatever the cause, the record suggests that Snyder may have completed the mitigation report, but that Dr. Schilling did not have it because he refused to drive to her office to obtain it. If, as Dr. Schilling contended in his affidavit, the report was important for him to adequately perform his assessment, one would reasonably assume that he would be willing to drive to Ms. Snyder's office. The fact that he did not suggests it was less critical to his testimony than he later stated. Thus, while Dr. Schilling may not have had all of the records he wished to review in preparation for trial, this appears to have been caused by a variety of factors, most of which were largely outside of counsel's direct control. The facts do not support a conclusion that Caudill's counsel was ineffective or neglectful of his duties.

Caudill also argues in passing that her counsel should have called Dr. Schilling back to the stand to rebut the testimony of the prosecution's expert, Dr. Cooley. But Caudill does not explain how Schilling's testimony would have differed from that given during his direct examination. The Sixth Amendment does not require counsel to call a witness in rebuttal to repeat testimony already heard in furtherance of her case. "[T]o establish prejudice, the new

evidence that a habeas petitioner presents must differ in a substantial way - in strength and subject matter - from the evidence actually presented at sentencing." *Foust v. Hawk*, 655 F. 3d 524, 539 (6th Cir. 2011) (*quoting Hill*, 400 F.3d at 319).

**S. Claim 16C – Caudill's Trial Counsel Was Not Ineffective By Failing To Effectively Use The Testimony of Family Members In Mitigation.**

In 2004, Caudill's mother Mary signed an affidavit stating that she could have testified to more episodes during which her husband abused her and threatened her. The affidavit described specific instances of behavior by her husband, an abusive and sometimes violent alcoholic, of the kind she described in more general terms during her testimony at trial. She also indicates that counsel did not provide her with a list of questions she would be asked, and met with her for fifteen minutes to prepare her for testimony shortly before it was presented. Finally, Mary Caudill indicated that "[t]he jury didn't pay any attention the whole time I was on the stand." [TR 692-696]

Caudill's brother Craig also signed an affidavit in 2004 which described particular instances of abuse, and set forth in more detail the effect that this had upon Caudill in her childhood. Mr. Caudill also indicated that counsel did not ask him all of the questions that he indicated that he would during their preparations, and that "the jury laughed during my testimony." [TR 697-700] In her affidavit, Caudill's sister Rhonda stated that she met briefly with Caudill's attorney before she testified, described her father's abuse and Caudill's submissiveness to it, and indicated that during her testimony she did not have enough time to describe these events. [TR 701-705]

Caudill next contends that her attorney did not adequately prepare her mother, brother, and sister for their testimony, nor did he ask them enough questions when they were one the

witness stand regarding the abuse she and the family suffered as a child. [Record No. 1, pp. 122-127] The Supreme Court of Kentucky rejected this claim, noting that each witness testified and "described the violence and abuse that was an everyday part of Caudill's childhood" as well as "her struggle with substance abuse, and her history of abusive relationships with men." That court found that the Sixth Amendment did not require counsel to elicit further testimony of this type. *Caudill II*, at *5.

The Supreme Court of Kentucky did not unreasonably apply federal law in finding this claim to be without merit. Caudill's counsel elicited testimony from her mother and siblings that during Caudill's childhood her father was an alcoholic who would become violent and abusive when he drank, and that Caudill was afraid of and submissive to her father during these episodes. While Caudill argues that her attorney should have engaged in further questioning to obtain more testimony on this subject, the questions asked were sufficient to bring this information to the attention of the jury for their consideration. Counsel's decision not to engage in further questioning is entitled to the deference afforded professional judgments made by counsel. *Ford v. Hall*, 546 F.3d 1326, 1338 (11th Cir. 2008) ("Counsel is not required to call additional witnesses to present redundant or cumulative evidence."); *Clark v. Mitchell*, 425 F.3d 270, 282-83 (6th Cir. 2005).

Even if another attorney might have chosen to engage in a more searching examination of Caudill's difficult childhood, Caudill cannot demonstrate prejudice flowing from her counsel's contrary decision. "[T]o establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way - in strength and subject matter - from the evidence actually presented at sentencing." *Foust v. Hawk*, 655 F. 3d 524, 539 (6th Cir. 2011) (*quoting Hill*, 400 F.3d at 319). The evidence described in the affidavits provided by Caudill's mother and siblings

is of the same type presented at trial and does not vary meaningfully.  This is particularly so given the acknowledgment by Caudill's mother and brother in their affidavits that the jury seemed wholly uninterested in their testimony.  [TR 695, 698]  Given that fact, it is difficult to conclude that there was any reasonable likelihood that further or more specific testimony regarding Caudill's childhood would have produced a different result.  *Cf. Wong v. Belmontes*, 558 U.S. 15, 20-22 (2009) (finding no prejudice in failing to introduce cumulative "humanizing" evidence during the mitigation phase).

T. **Claim 7 – Caudill Is Not Entitled To Habeas Relief Based On Her Assertion That The Trial Court Refused To Permit Evidence During The Penalty Phase That A Defendant In A Prior Case Involving Multiple Murders Had Been Offered And Accepted A Deal To Plead Guilty To Life Without The Possibility Of Parole.**

Prior to the commencement of the penalty phase, Goforth's counsel advised the trial court that he intended to introduce evidence regarding the sentence received by LaFonda Fay Foster, a defendant in an earlier death penalty case in Kentucky.  In 1987, a jury convicted Foster for her role in the murder of five persons, and a sentence of death was imposed for each of the murders.  On direct appeal, the Kentucky Supreme Court affirmed her convictions but vacated the imposition of the death penalty.  *Foster v. Commonwealth*, 827 S.W.2d 670 (Ky. 1991). Following remand, Foster reached a plea agreement with the prosecution to accept a sentence of life without the possibility of parole.

In Caudill's case, during a conference with the trial court the prosecution made a motion *in limine* to exclude evidence regarding Foster's sentence because it related to a different defendant and, therefore, was not relevant to Goforth's personal characteristics and the circumstances of his crime.  In response, Goforth argued that Foster's life sentence on five murder convictions would be relevant to refute an anticipated prosecution argument that the

death penalty was appropriate in his case for one murder conviction. The trial court excluded evidence regarding Foster's sentence as irrelevant. Following the trial court's ruling, Caudill joined in Goforth's avowal after the fact. [DVD A-9, February 16, 2000, at14:47-14:53] On direct appeal, the Kentucky Supreme Court concluded that the trial court properly excluded the evidence as irrelevant. "[E]vidence of a sentence imposed upon someone else, whether pursuant to plea agreement or jury verdict, is not a factor to be considered by the jury or the sentencing judge in determining the appropriate penalty for this defendant." *Caudill I*, at 672 (*citing Commonwealth v. Bass*, 777 S.W.2d 233, 234 (Ky. 1989); *McClellan v. Commonwealth*, 715 S.W.2d 464, 472 (Ky. 1986)).

In her current petition, Caudill argues without further explication that under *Gardner v. Florida*, 430 U.S. 349 (1977), and *Skipper v. South Carolina*, 476 U.S. 1 (1986), this evidence should have been admitted to rebut the prosecution's statement during closing argument that imposition of the death penalty was warranted. [Record No. 1, pp. 65-66] However, the decision of the Supreme Court of Kentucky was not an unreasonable application of federal law. The Supreme Court has explained that when a jury considers whether the death penalty is an appropriate punishment for the defendant's crime, it should make an *individualized determination* based upon the character and personal history of the defendant and the circumstances under which his or her crime was committed. *Tuilaepa v. California*, 512 U.S. 967, 971-73 (1994); *McCleskey v. Kemp*, 481 U.S. 279 (1987). Because the focus of individualized sentencing is upon the defendant and the offense committed, the exclusion of other evidence as irrelevant is constitutionally permissible. *Lockett v. Ohio*, 438 U.S. 586, 604 n.12 (1978) ("Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances

of his offense."). Because the proffered evidence had no bearing upon the relevant factors, the Supreme Court of Kentucky properly concluded that evidence regarding the penalty received by a different person for a crime committed under different circumstances that was reached by agreement rather than imposed by a jury was simply not relevant to Caudill's case, whether couched as mitigating or rebuttal evidence. *Caudill I*, at 672 (*citing Commonwealth v. Bass*, 777 S.W.2d 233, 234 (Ky. 1989) (holding that sentence received by co-defendant under plea agreement is not "mitigating" evidence under statute "as that evidence relates solely to the defendant on trial.")

### U. Claim 6C – Caudill Is Not Entitled To Habeas Relief Based On The Prosecutor's Arguments Regarding Intoxication As A Defense.

During closing arguments during the penalty phase of the trial, the prosecutor stated:

> Judge Adams has given you additional instructions for this penalty phase. These instructions are to guide you as you determine the punishment that these defendants deserve ... So let's look at those instructions for just a minute if we can. ... On Count One you're also, as a jury, told that you shall consider such mitigating circumstances ... as has been presented to you. *** that at the time of the offense the capacity of either defendant to conform their conduct to the requirements of the law was impaired as a result of intoxication. You listened to the evidence. They knew exactly what they were doing when they were there. Were they under the influence to the extent that they didn't know what they were doing? If you think that's a mitigator, if you think that should lessen their punishment, then that's a decision you have to make.

[DVD A-9, February 17, 2000, at 9:48 - 9:52]

The prosecution was reading from a page containing the instructions that the court had indicated would be given to the jury. Those instructions stated that the jury could consider as a mitigating circumstance evidence that "[a]t the time of the offense, the capacity of the Defendant to appreciate the criminality of her conduct or to conform her conduct to the requirements of law was impaired as a result of intoxication, even though the impairment of the capacity of the

Defendant to appreciate the criminality of her conduct or to conform the conduct to the requirements of law was insufficient to constitute a defense to the crime." [TR 205] The trial court read this and other general instructions to the jury prior to closing arguments. [DVD A-9, February 17, 2000, at 9:25 - 9:29]

On direct appeal, Caudill contended that the prosecutor misled the jury regarding the law because he did not recite the terms of KRS § 532.025(2)(b)(7) verbatim during his closing argument, thus advising the jury that it could consider intoxication as a mitigating circumstance even if it found that the level of her impairment was not sufficient to constitute a defense to murder. Brief for Appellant Virginia Caudill, *Caudill v. Commonwealth*, No. 2000-SC-000296-MR, 2001 WL 34546226 (Ky. Mar. 15, 2001), at pp. 27-29. The Supreme Court of Kentucky rejected this claim. The prosecutor initially stated the law correctly, but his follow-up rhetorical question, "Were they under the influence to the extent that they didn't know what they were doing?", was not the correct standard for the jury to determine the applicability of intoxication as a mitigating factor. Nonetheless, the court concluded that because the misstatement was isolated, and because the jury was apprised of the correct standard in the jury instructions, reversal was not required. *Caudill I*, at pg. 676. Caudill reiterates this claim in her current petition. [Record No. 1, pp. 55-58]

The Supreme Court of Kentucky correctly and reasonably determined that the prosecution's single, isolated misstatement of the law did not amount to misconduct rendering the entire trial fundamentally unfair. While the prosecution's rhetorical question did not encompass the proper standard for the jury to determine whether Caudill's intoxication was sufficient to serve as a factor in mitigation of punishment, that standard was correctly set forth in the jury instructions provided by the trial court, both orally before oral argument and in writing

during deliberations. A court must presume that a jury followed the law as stated in the instructions given by the court. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). That presumption is not lightly overcome by a misstatement made by counsel, particularly where the prosecutor accurately stated the law only moments before. *Cf. United States v. Begay*, 673 F.3d 1038, 1046-47 (9th Cir. 2011). And a jury looks to the court, not counsel, to provide it with clear instruction as to the law to apply. *Boyde v. California*, 494 U.S. 370, 384-85 (1990). Where those instructions are correct and the petitioner offers no concrete facts or circumstances indicating that the jury was confused or mislead as to the law, there is no basis to conclude that the defendant's trial was rendered fundamentally unfair through the misstatement. *United States v. Recendiz*, 557 F.3d 511, 523-24 (7th Cir. 2009); *Lamb v. Oklahoma County Dist. Court*, 229 F. App'x 690, 695-96 (10th Cir. 2007).

### V. Claim 6D – Caudill Is Not Entitled To Habeas Relief Based On The Prosecutor's Argument That Suggested That The Community Desired, And The Jury Therefore Should Impose The Death Penalty.

During closing arguments at the conclusion of the penalty phase, the prosecutor stated:

United States Supreme Court Justice Potter Stewart once wrote ... 'If those who break the law do not receive the punishment that the public believes they deserve therein are sown the seeds of anarchy.' ... The law says that in those aggravated murder cases those worst murder cases the death penalty may be imposed. ... This is an aggravated murder. ... We're here Mr. Malone and me, we're here to tell you that such a brutal heinous murder can not, can not and will not be tolerated in our community ... You know it's been said these days people don't really care what happens unless it happens to them, that they really don't care what happens as long as it doesn't happen to them. Is that the kind of attitude you want in Lexington Kentucky? Is that the kind of community you want Lexington Kentucky to be? I hope not. ... How many times have you watched the news on television or read the news in the newspaper and seen the horrible events that are reported and you said either to yourself or to someone else, they have got to do something about that. What are they going to do? Ladies and gentlemen the "they" they were talking about in this case is you the jury; the "they" is you. You have to decide what will happen when such a cold blooded vicious robbery burglary murder is planned and carried out in our community you must decide

what punishment these convicted murders deserve...  Today you represent Fayette County.

[DVD A-9, February 17, 2000, at 10:05; 10:10-10:13]

Caudill argues that the prosecutor's comments prevented the jury from making its own determination whether the death penalty was appropriate, first when he argued that Caudill was death-eligible if the jury found the existence of an aggravating factor, and second when he implied that "the community wanted them to impose death and that is was the only responsible civic action."  [Record No. 1, pp. 58-64]  On direct appeal, the Supreme Court of Kentucky found this claim to be without merit, holding that the prosecution's remarks did not diminish the jury's sense of responsibility for deciding upon a sentence.  *Caudill I*, at p. 677.

The Supreme Court of Kentucky's rejection of Caudill's argument was not an unreasonable one.  The prosecutor merely explained that under Kentucky law the jury could impose the death penalty if it found the required aggravating circumstance, and argued that imposing the death penalty would protect the community.  Caudill argues that the prosecution's comments violated *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985), where the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  Here, the prosecution did just the opposite, repeatedly stating that it is "you," the jury, not anyone else nor the community at large, that would have to make the decision whether to impose the death penalty:

> How many times have you watched the news on television ... and seen the horrible events that are reported and you said ... "they" have got to do something about that. ...  Ladies and gentlemen the "they" they were talking about in this case is you the jury; the "they" is you.

[DVD A-9, February 17, 2000, at 10:12 a.m.)]  The prosecutor's comments were not improper nor did they attempt to divest the jury of its understanding of the need for an individualized determination of the proper sentence for Caudill.  *See Romano v. Oklahoma*, 512 U.S. 1, 9 (1994) (holding that *Caldwell* is "relevant only to certain types of comment - those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision."   Thus, "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law."") (internal citations omitted).  The prosecution's references to the community did no more than restate the hoary principle that "a jury that must choose between life imprisonment and capital punishment can do little more - and must do nothing less - than express the conscience of the community on the ultimate question of life or death."  *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968).  Thus, similar references to the need to protect the community do not run afoul of *Caldwell*.  *Cf. Bland v. Sirmons*, 459 F.3d 999, 1018-19 (10th Cir. 2006); *accord Hicks v. Collins*, 384 F.3d 204, 219 (6th Cir. 2004) (holding that prosecutor's statement that "the people in the community have the right to expect that you will do your duty" was not improper, but only "proper general references to the societal need to punish guilty people.").  Likewise, the prosecutor's explanation that Caudill became death *eligible* under Kentucky law when certain aggravating circumstances are present certainly did nothing to suggest that the jury was not still responsible for determining whether the imposition of the death penalty is *suitable* in Caudill's case.  *Cf. Nichols v. Bell*, 440 F. Supp. 2d 730, 845 (E.D. Tenn. 2006) ("Nothing in *Caldwell* prohibits the State from telling the jury the law permits the State to ask for the death penalty under certain circumstances.")

Caudill has presented numerous instances of claimed prosecutorial misconduct, each of which the Court has already found to be without merit. Assuming that any of the prosecution's statements could be considered improper, the Court has again reviewed these claims in the aggregate to determine whether the cumulative effect of such statements rendered the entire trial fundamentally unfair. *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005) (*citing Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003). Because the instances of alleged misconduct about which Caudill complains were isolated, and because the jury instructions provided by the trial court were proper, the Court concludes that Caudill has failed to demonstrate any fundamental unfairness in her trial to warrant relief.

## W. Claim 4A – Caudill Is Not Entitled To Habeas Relief Based On The Trial Court's Refusal To Define Extreme Emotional Disturbance In The Jury Instructions.

During the penalty phase, Caudill requested an instruction to the jury that they could consider whether she was under the influence of an "extreme emotional disturbance" ("EED") as a possible mitigating factor even though it was not considered as a defense to the crime itself. The prosecution did not object, but requested that the instructions define what would constitute EED. The trial court disagreed, concluding that the instruction on EED was warranted, but that it could not define that term in the instructions because it was not being offered as a defense to the crime itself but only as a mitigating factor. [DVD A-9, February 16, 2000, at 17:21-17:24]

On direct appeal, Caudill argued that by refusing to instruct the jury on the definition of EED in the penalty phase, the trial court failed to adhere to Kentucky precedent:

> *McClellan v. Commonwealth*, Ky., 715 S.W.2d 464, 468-469 (1986), requires that this term be defined and sets out the appropriate definition. Again, in *Dean v. Commonwealth*, Ky., 777 S.W.2d 900, 909 (1989), this Court made it clear that "[w]hether extreme emotional disturbance is used as an element of the murder, manslaughter, or mitigating circumstance instructions, the jury should be

114

instructed as to its definition." The court's refusal to define this term as requested rendered Virginia Caudill's death sentence constitutionally unreliable.

Brief for Appellant Virginia Caudill, *Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky. 2003), 2001 WL 3456226, at *39 (Mar. 15, 2001). Caudill did not thereafter provide any clearer explanation of the nature of her assertion that her sentence was "constitutionally unreliable," but simply ended at that point. Preceding that discussion of her specific sub-claims for relief, Caudill did state in general terms that:

> [The jury's] sentencing discretion ... [must be] guided and channeled ..." *Proffit v. Florida*, 428 U.S. 242, 258, 96 S. Ct. 2960 (1976). *Gregg v. Georgia*, 428 U.S. 153, 193,96 S. Ct. 2909 (1976) mandates "careful instructions on the law and how to apply it." Caudill's penalty phase instructions (A 30-46) failed to comply with these constitutional imperatives.

*Id*. In Caudill's Reply Brief, she made a one-paragraph argument on the issue which reiterated her primary reliance upon *McClellan* and *Dean*. Caudill's constitutional argument was, in its entirety, that "[t]he failure to define EED in the penalty phase instructions, especially in a case where EED was not instructed upon in the guilt phase, erected an unconstitutional barrier to the jury's ability to consider and give effect to significant mitigation. *See Mills v. Maryland*, 486 U.S. 367, 374 - 375, 108 S. Ct 1860 (1988)." Reply Brief for Appellant Virginia Caudill, *Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky. 2003), 2002 WL 32508222, at *7 (Jan. 15, 2002).

Under KRS § 507.020(1)(a), EED is a defense to a substantive charge of murder, but only if there was "a reasonable explanation or excuse" for the EED. Under KRS § 532.025(2)(b)(2), in a case where the defendant is death-eligible, EED is a mitigating circumstance that may be considered in the selection stage (when it is decided whether the death penalty is appropriate), even if it was not sufficient to qualify as a defense to the substantive murder charge. In

*McClellan*, the Supreme Court of Kentucky noted that § 507.020(1)(a) does not define EED; crafted its own definition for that term; and directed that a trial court must instruct a jury as to that definition. *McClellan*, 715 S.W.2d at 468-69. Three years later in *Dean*, the court held that a trial court must also instruct a jury as to the definition of EED in "mitigating circumstance instructions." *Dean*, 777 S.W.2d at 909.

The Supreme Court of Kentucky rejected Caudill's claim on direct appeal by overruling *Dean*. While *Dean* indicated that the trial court should have given the *McClellan* definition of EED for Caudill's jury as a mitigating circumstance, the court noted that the circumstances warranting an EED instruction as a mitigating circumstance are necessarily broader than those where it is appropriate as a defense to the substantive murder charge. Thus, the definition was inappropriate in the former situation. Concluding that *Dean* was wrongly decided, the court found no error in the trial court's refusal to give the *McClellan* definition of EED to the jury. *Caudill I*, at 673-74.

In her petition, Caudill now argues that the Supreme Court of Kentucky "misse[d] the point of the claim which is that the instruction was so unconstitutionally vague as to inadequately inform or guide the jurors in their sentencing deliberations of EED as a mitigator to a death sentence." Caudill contends that under *Penry v. Lynaugh*, 492 U.S. 302 (1989), "It is not enough simply to allow the defendant to present and/or argue mitigation to the jury." [Record No. 1, p. 42] Having thoroughly reviewed the record, it is plain that Caudill did not present this claim in its current form to the Supreme Court of Kentucky for review. Therefore, it is procedurally defaulted. Even if this were not the case, the claim is substantively without merit.

A federal habeas petitioner must exhaust her remedies in the state courts by fairly presenting a claim through one complete round of the State's appellate review process. 28

U.S.C. § 2254(b)(1)(A). If she does not, and that review process is no longer available, the claim is procedurally defaulted. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). To "fairly present" a claim to the state courts, the petitioner must have presented the state courts with both the legal and the factual bases supporting the claim. *Hanna v. Ishee*, 694 F.3d 596, 609 (6th Cir. 2012) (*citing Williams v. Taylor*, 529 U.S. 420, 437 (2000)). General "notice" of the claim is not enough: "a petitioner must present enough information to allow the state courts to apply controlling legal principles to the facts bearing upon his constitutional claim." *Woods v. Booker*, 450 F. App'x 480, 488 (6th Cir. 2011) (*citing Picard v. Connor*, 404 U.S. 270, 276-77 (1971)). A petitioner who presented the same factual basis for the claim but now asserts different legal grounds for relief has not exhausted the claim to permit federal habeas review. *Rayner v. Mills*, 685 F.3d 631, 643 (6th Cir. 2012).

In her appellate brief to the Supreme Court of Kentucky, it is evident that Caudill was arguing that the trial court had failed to adhere to *Dean* when it refused to define EED for the jury in the penalty phase. Caudill was plainly correct on that point, and particularly given the strength of her argument under *Dean*, if she intended to pursue other grounds for reversal based upon the failure to define EED, it was incumbent upon her to do so clearly and expressly to highlight that claim to the Supreme Court of Kentucky. She did not. Both her subsequent statement in her appellate brief that the failure to follow *Dean* rendered her death sentence "constitutionally unreliable," and her prior insistence upon the need for "guided and channeled" sentencing discretion under *Proffit* appeared to merely refer back to her argument under *Dean* that EED must be defined for the jury. The Supreme Court of Kentucky clearly addressed the one argument Caudill made on direct appeal. If, as she now claims, that court misapprehended the nature or scope of her argument for relief, one would expect that she would have stridently

protested in her petition for rehearing that the court overlooked her constitutional argument. Again, she did not. Petition for Rehearing for Appellant Virginia Caudill, *Caudill v. Commonwealth*, 120 S.W.3d 635, 657 (Ky. 2003), No. 2000-SC-296 (July 21, 2003). The fact that Caudill has changed the nature of her argument is made even more clear when she states that "[d]espite the fact that the statutory definition did not fit the mitigation instructions, the trial court should have crafted an instruction which would have sufficiently guided the jury in its deliberations such that the jury sentencing deliberations would not have arbitrary." [Record No. 1, p. 42] In her appellate brief to the Supreme Court of Kentucky, Caudill clearly argued that the trial court erred by not giving the *McClellan* instruction required by *Dean*, not that the trial court was required, *sua sponte*, to craft a new definition from whole cloth suitable for a mitigation instruction. In essence, Caudill now claims that the trial court was constitutionally required to anticipate the Supreme Court of Kentucky overruling *Dean* and fashioning a remedy before the fact. Caudill plainly made no such argument before the state court. Because Caudill did not argue that the mitigation instructions for EED were "unconstitutionally vague," a phrase found nowhere in her appellate brief regarding this claim, to the Kentucky Supreme Court, this claim is procedurally defaulted. *Rayner*, 685 F.3d at 643.

Even if Caudill's appellate briefing were considered so broadly as to deem her present claim fairly presented to the Supreme Court of Kentucky to permit that court to have decided it, that claim is contrary to established Supreme Court precedent. In her petition, Caudill argues that the Constitution required the trial court to leave the jury's consideration of possible mitigating evidence unconstrained, in order to avoid erecting a "barrier to mitigation," while simultaneously insisting that the trial court must instruct the jury on how to consider that evidence to avoid giving the jury "unlimited discretion" in sentencing. A review of the decisions

118

cited by Caudill in her briefing makes clear that she has uncritically blurred important distinctions between the Supreme Court's rules applicable to the eligibility and the selection phases of capital sentencing.

The Supreme Court explained the fallacy inherent in arguments such as Caudill's in *Buchanan v. Angelone*, 522 U.S. 269 (1998). There, the petitioner stated that the Supreme Court's decisions "indicate that the jury at the selection phase must both have discretion to make an individualized determination and have that discretion limited and channeled" and argued that "the Eighth Amendment therefore requires the court to instruct the jury on its obligation and authority to consider mitigating evidence, and on particular mitigating factors deemed relevant by the State." *Id*. at 275. The Supreme Court flatly rejected that argument.

> No such rule has ever been adopted by this Court. While petitioner appropriately recognizes the distinction between the eligibility and selection phases, he fails to distinguish the differing constitutional treatment we have accorded those two aspects of capital sentencing. It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition. In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination.
> ...
>
> But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And indeed, our decisions suggest that complete jury discretion is constitutionally permissible. *See* [*Tuilaepa v. California*, 512 U.S. 967, 978-79 (1994)] (noting that at the selection phase, the state is not confined to submitting specific propositional questions to the jury and may indeed allow the jury unbridled discretion); [*Zant v. Stephens*, 462 U.S. 862, 875 (1983)] (rejecting the argument that a scheme permitting the jury to exercise "unbridled discretion" in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional, and noting that accepting that argument would require the Court to overrule *Gregg*, *supra*).

*Buchanan*, 522 U.S. at 275-77.  The Supreme Court therefore held that the Eighth Amendment does not require that a jury be instructed as to the concept of mitigating evidence generally or as to the meaning of specific statutory mitigation factors.  *Id*. at 279.  Caudill's claim is therefore substantively without merit.

**X.  Claim 4B – Caudill Is Not Entitled To Habeas Relief Based On Her Argument That The Jury Instructions Incorrectly Suggested To The Jury That It Had To Find EED Mitigator Unanimously.**

During the penalty phase, the trial court provided the jury with written instructions describing certain mitigating and aggravating factors they could consider, as well as various punishments they could impose.  [TR 204-209]  On direct appeal and in her petition, Caudill contended that the trial court's instructions suggested to the jury that they must unanimously agree that a mitigating factor applied before it could be considered, a result contrary to *Mills v. Maryland*, 486 U.S. 367, 384 (1988).  [Record No. 1, pp. 43-44]  *See McKoy v. North Carolina*, 494 U.S. 433, 442-43 (1990) ("*Mills* requires that ***each juror*** be permitted to consider and give effect to ... all mitigating evidence in deciding ... whether aggravating circumstances outweigh mitigating circumstances ...") (emphasis added).  The Kentucky Supreme Court found this claim to be without merit, concluding that a jury does not need to be expressly instructed that its members need not all agree that a mitigating factor applies.  *Caudill I*, at 673-74.

Caudill has formally abandoned this claim, noting in her reply brief that "in *Smith v. Spisak*, [558 U.S. 139, 147-148] 130 S. Ct. 676, 684 (2010), a ruling on similar language in Ohio jury instructions were found not to be contrary to or an unreasonable application of *Mills v. Maryland*.  Petitioner concedes she is unable to establish that the state court's ruling was contrary to or an unreasonable determination of clearly established law.  §2254(d)(1)."  [Record No. 14, p. 11]  In addition to abandonment by Caudill, the Court separately notes that the

instructions in this case permitted the jurors to consider such mitigating factors "as have been presented to you in the evidence and you believe to be true," [TR 205], while requiring the jury to find aggravating factors to be true beyond a reasonable doubt. [TR 208] Further, the verdict form required the foreman's signature only upon the jury's ultimate verdict, and specifically required that an aggravating factor be found beyond a reasonable doubt. No such comparable finding or foreman's signature was required with respect to mitigating factors, undermining any argument that unanimity was required. [TR 210-221] As in *Smith*, in this case "[n]either the instructions nor the forms said anything about how - or even whether - the jury should make individual determinations that each particular mitigating circumstance existed. They focused only on the overall balancing question." *Smith*, 558 U.S. at 148. Because the instructions did not expressly or impliedly indicate to the jury that "they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance[,]" *Mills*, 486 U.S. at 384, no *Mills* violation occurred, and the Kentucky Supreme Court's conclusion to this effect was not contrary to, or an unreasonable application of, clearly established federal law.

**Y. Claim 5 – Caudill Is Not Entitled To Habeas Relief Based On Her Argument That Proportionality Review By The Supreme Court Of Kentucky Was Too Narrow Because It Considered Only Cases In Which The Death Penalty Was Imposed And Not Those Cases In Which The Penalty Was Rejected.**

On direct appeal, the Supreme Court of Kentucky conducted the proportionality analysis required by KRS § 532.075 by comparing Caudill's case to "all cases decided since 1970 in which the death penalty was imposed," with an emphasis on cases involving a murder committed during the course of a robbery. The court found that Caudill's sentence was not the product of any prejudice, and was neither excessive nor disproportionate. *Caudill I*, 120 S.W.3d at 679.

Caudill contends that, because Kentucky voluntarily enacted a statute requiring proportionality review of death sentences imposed in the state, she has a liberty interest under the Due Process Clause in not having the state statute applied arbitrarily. Caudill complains that Kentucky's proportionality statute is vague and lacks clear standards, and contends that the Kentucky Supreme Court's proportionality review was flawed. Caudill argues that KRS § 532.075(3)(c) does not define when other cases should be considered "similar" for purposes of comparison, and does not include a procedure for factual investigation. Caudill further asserts that the locus of cases selected by the Kentucky Supreme Court for comparative analysis in Caudill's review was flawed. [Record No. 1, pp. 45-49]

Kentucky's statute permits the parties to submit briefing on the question whether the imposition of the death penalty is disproportional, after which the Supreme Court must determine:

> (a)     Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and
>
> (b)     Whether the evidence supports the jury's or judge's finding of statutory aggravating circumstances as enumerated in KRS 532.025(2), and
>
> (c)     Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

KRS § 532.075(3). This statute was modeled after Georgia's comparative review statute and used functionally-identical language, *Ice v. Commonwealth*, 667 S.W.2d 671, 679 (1984), which the Supreme Court found to comport with the requirements of the Eighth Amendment in *Gregg v. Georgia*, 428 U.S. 153 (1976). *See also Getsy v. Mitchell*, 495 F.3d 295 (6th Cir. 2007) ("Since proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison; therefore limiting proportionality review to other

cases already decided by the reviewing court in which the death penalty has been imposed falls within this wide latitude.") (internal quotation marks omitted) (*citing Williams v. Bagley*, 380 F.3d 932, 962-63 (6th Cir. 2004)). To the extent Caudill finds fault with Kentucky's proportionality statute as written, that claim fails as a matter of law under well-established precedent. *McQueen v. Scroggy*, 99 F.3d 1302, 1333-34 (6th Cir. 1996).

Caudill's due process claim fares no better. The Constitution itself requires no proportionality review. *Pulley v. Harris*, 465 U.S. 37, 45 (1984). And the Sixth Circuit has indicated that Kentucky's proportionality statute creates no Due Process liberty interest because "[it] only explains what the Kentucky Supreme Court needs to consider - similar cases, the crime, and the defendant - it does not tell that court how to make this decision." *Bowling v. Parker*, 344 F.3d 487, 521-22 (6th Cir. 2003). Just as Caudill does here, Bowling argued that "the Kentucky Supreme Court only compared Bowling's sentence to other crimes where the death penalty was imposed, but should have compared Bowling's sentence to similar crimes where the death penalty was not imposed." *Id*. at 522. The Sixth Circuit concluded that, even assuming the Due Process Clause was implicated, this claim was, in reality, a claim "that Kentucky has an ineffective framework for assessing proportionality rather than a claim that Kentucky misapplied its own framework[,]" and hence was meritless under *Pulley*. Applying *Bowling*, this Court has recently rejected other challenges to the scope of cases considered by the Kentucky Supreme Court when conducting its proportionality analysis. *Bowling v. Parker*, No. 03-28-ART, 2012 WL 2415167, at *9 (E.D. Ky. June 26, 2012) (rejecting challenge to Kentucky Supreme Court's consideration of cases where the death penalty was imposed but not carried out). *See also Thompson v. Parker*, No.5:11-CV-31-R, 2012 WL 6201203, at *34 (W.D. Ky. Dec. 10, 2013). Caudill's claim is without merit and affords no basis for habeas relief.

**Z. Claim 18 – Caudill Is Not Entitled To Habeas Relief Based On Her Argument That Cumulative Errors Occurring During Trial Violated Her Due Process Rights.**

Finally, Caudill contends that even if none of her claims individually amount to a violation of her constitutional rights, the cumulative effect of multiple, non-constitutional errors collectively violated her due process right to a fundamentally fair trial. [Record No. 1, pp. 130-134] While other circuits appear to have concluded that such a habeas claim is cognizable (*see Cargyle v. Mullin*, 317 F.3d 1196, 1220 (10th Cir. 2003)), the Sixth Circuit has reached a contrary result. "Post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." *Hoffner v. Bradshaw*, 622 F. 3d 487, 513 (6th Cir. 2010) (*quoting Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)). Under controlling precedent, Caudill's cumulative error claim fails as a matter of law. Her contention that the Sixth Circuit's conclusion on the matter is error is an argument best directed to the appellate court sitting *en banc*. In addition, similar to the Supreme Court of Kentucky's conclusion, this Court finds that there are no errors to accumulate. Because the Supreme Court of Kentucky's denial of Caudill's cumulative error claim was not an unreasonable application of clearly established federal law, her claim affords no basis for federal habeas relief.

## IV.

In summary, the undersigned concludes that none of the claims presented in Caudill's petition warrants habeas relief. Accordingly, it is hereby

**ORDERED** that Caudill's petition for a writ of habeas corpus [Record No. 1] is **DENIED**.

This 31st day of January, 2014.



Signed By:
*Danny C. Reeves* DCR
**United States District Judge**